Phil Telfeyan*
Natasha Baker*
Equal Justice Under Law
400 7th St. NW, Suite 602
Washington, D.C. 20004
(202) 505-2058
ptelfeyan@equaljusticeunderlaw.org
nbaker@equaljusticeunderlaw.org
* Application for admission *pro hac vice* forthcoming

Constance Van Kley
Rylee Sommers-Flanagan
Upper Seven Law
P.O. Box 31
Helena, MT 59624
(406) 306-0330
constance@uppersevenlaw.com
rylee@uppersevenlaw.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

|  |  |
|---|---|
| TERI LEA EVENSON-CHILDS and DANIEL O'TOOLE, individually and on behalf of all others similarly situated, | Case. No. CV 21-89-M-DLC-KLD |
| Plaintiffs, | FIRST AMENDED CLASS ACTION |
| v. | COMPLAINT |
| RAVALLI COUNTY SHERIFF'S OFFICE; RAVALLI COUNTY JUSTICE COURT; and 21ST JUDICIAL DISTRICT COURT, RAVALLI COUNTY, | AND JURY DEMAND |
| Defendants. |  |

1

**INTRODUCTION**

1.      Defendants operate a wealth-based discrimination scheme, requiring pre-trial arrestees — who have not been found guilty of any crime — to pay exorbitant fees to get out and stay out of jail, without considering ability to pay.

2.      These fees come in the form of pre-trial supervision fees.

3.      Defendants Ravalli County Justice Court and Ravalli County 21st Judicial District Court (collectively referred to as Defendant Courts) routinely impose pre-trial supervision as a condition of pre-trial release for pre-trial arrestees. It is Defendant Courts' policy and practice to impose pre-trial supervision without a risk assessment to determine the necessity of supervision and without an ability to pay determination to ensure that supervision does not discriminate against the indigent. Defendant Courts do not provide any mechanism to challenge the fees that come with supervision.

4.      Once Defendant Courts have assigned a pre-trial arrestee to pre-trial supervision, Defendant Ravalli County Sheriff's Office (hereinafter referred to as Defendant Pre-Trial Supervision) supervises the pre-trial arrestee.

5.      Defendant Pre-Trial Supervision has a policy of refusing to release pre-trial arrestees from jail until pre-trial arrestees pay an arbitrary amount of pre-trial fees — an amount determined by Defendant Pre-Trial Supervision —  even after

pre-trial arrestees have paid their bail amount and/or been ordered by the court to be released.

6.     If pre-trial arrestees are released from jail, Defendant Pre-Trial Supervision threatens to return them to jail if they fall behind on their fee payments.

7.     Defendant Pre-Trial Supervision's threats are not idle; Defendant Courts do consider failure to pay fees when revoking bail and send pre-trial arrestees back to jail for failure to pay fees.

8.     Ravalli County, like many counties throughout the United States, has outsourced onto the backs of its poorest residents its obligation to fund its operations: pre-trial arrestees — who have yet to have their day in court — are saddled with the expenses of pre-trial supervision, on top of having to be supervised and to comply with the onerous and complex rules that come with supervision. Jail time plus ongoing supervision — which can involve embarrassing and invasive GPS ankle monitors, alcohol-monitoring ankle devices, breathalyzers, twice-daily in-person drug tests, drug patches, curfews, and/or house arrest, among other requirements — is apparently not enough for Ravalli County. Pre-trial arrestees must also foot the bill.

9.     Defendants enforce their taxation-by-force system through constant threat of incarceration. Pre-trial arrestees feel compelled to pay pre-trial fees — even

if they cannot afford them — out of fear of being sent back to jail. Their fears are founded, as some judges will revoke for failure to pay pre-trial fees.

10.    When a pre-trial arrestee is sent back to jail, not for a new crime but on a violation of pre-trial supervision conditions — such as failure to pay pre-trial fees — Defendant Courts often impose a new bail amount for the pre-trial arrestee to be released, exacerbating the financial cost to obtaining pre-trial freedom.

11.    Defendant Pre-Trial Supervision also threatens pre-trial arrestees with criminal charges to force compliance. Judges sometimes require pre-trial arrestees to use devices such as GPS ankle monitors or SCRAM breathalyzers. Before being released from pre-trial detention, Defendant Pre-Trial Supervision forces pre-trial arrestees to sign a contract stating that they can be criminally charged with felony theft and criminal mischief if they do not maintain contact with their pre-trial officer or if they damage the devices. These threats are not idle; some prosecutors will move forward with criminal charges. By definition, pre-trial arrestees have not had a trial and thus have yet to be convicted of any crime, but being on pre-trial supervision exposes them to more criminal charges.

12.    Montana law requires the release of all pre-trial arrestees upon reasonable conditions and thus presumes the availability of bail, except in cases that qualify for the death penalty. *See* Mont. Code Ann. § 46-9-106; *see also* Mont. Const. art. II, § 21; *Montana v. Seybert*, 745 P.2d 687, 688 (Mont. 1987) ("The

4

primary purpose of bail in a criminal case is to honor the presumption of innocence and to allow a defendant to prepare his case.").

13.    Ravalli County ignores this presumption in favor of pre-trial release. Court orders refer to pre-trial release as the "Ravalli County Jail Diversion Program," and the division of the Sheriff's Office responsible for pre-trial supervision is known as "Jail Diversion."   By referring to pre-trial release as diversion from jail, Defendants view *jail* as the presumption, and release as the exception.

14.    Given Defendants' policies and practices as to pre-trial supervision, it is not surprising that, rather than ensuring pre-trial arrestees appear for court, pre-trial supervision in Ravalli County functions to push pre-trial arrestees even further into the criminal legal system and entrap them in a cycle of debt-induced poverty. Jail and poverty are the default; liberty and public safety are not.

15.    By having to pay these fees, pre-trial arrestees are deprived of their property without due process. Pre-trial arrestees are punished despite their presumed innocence by having to pay these fees, which apply only at the pre-trial stage and therefore apply only to individuals who have not been convicted of anything.

16.    These fees also act as an extension of pre-trial arrestees' bail amounts, because they must be paid to be released from jail and to remain released from jail. Although money extracted prior to conviction (like bail bonds) must meet at least a

minimal level of due process to be constitutionally sound, pre-trial fees have no such procedural protections.

17.    Defendants impose and charge pre-trial fees arbitrarily and capriciously, without consideration of the appropriateness of the supervision conditions that trigger the fees (such as a GPS ankle monitor or a drug patch) or notice of how much in fees pre-trial arrestees will ultimately be charged.

18.    These fees also amount to violations of due process and equal protection for discriminating on the basis of wealth. Pre-trial arrestees' ability to pay these fees is never assessed. Thus, when indigent pre-trial arrestees fail to pay these fees, they are incarcerated because of their poverty. Such debtors' prisons are unconstitutional.

19.    Defendant Pre-Trial Supervision also falsely imprisons pre-trial arrestees by holding them in jail until they pay whatever amount in pre-trial fees Defendant Pre-Trial Supervision demands.

20.    Defendant Pre-Trial Supervision additionally violates due process by requiring pre-trial arrestees, prior to releasing pre-trial arrestees from jail, to sign unconscionable contracts "agreeing" to further criminal charges if they do not comply with certain conditions.

21.    As a result of these discriminatory policies and practices that amount to constitutional violations, Plaintiffs request declaratory relief and a preliminary

injunction and permanent injunction to enjoin Defendants from charging fees for pre-trial arrestees. Plaintiffs also request damages from Defendant Pre-Trial Supervision for the unconstitutional fees they and the proposed class were and continue to be forced to pay.

## PARTIES

22.     Plaintiff Teri Lea Evenson-Childs is an adult female and is a homeless resident of the state of Montana.

23.     Plaintiff Daniel O'Toole is an adult male and resident of Hamilton, Montana.

24.     Defendant Ravalli County Sheriff's Office is a department of Ravalli County. The Sheriff's Office has a division known as "Jail Diversion," which is its pre-trial supervision office. Defendant Ravalli County Sheriff's Office will be referred to as Defendant Pre-Trial Supervision to reflect the capacity under which Defendant is being sued. Defendant Pre-Trial Supervision has a policy and practice of detaining pre-trial arrestees for non-payment of pre-trial fees, forcing pre-trial arrestees to sign contracts "agreeing" to greater criminal exposure for being on pre-trial supervision, and threatening a return to jail for non-payment of fees.

25.     Defendant Justice Court and Defendant 21st Judicial District Court (collectively referred to as Defendant Courts) are courts in Ravalli County. Their jurisdiction includes criminal matters. Defendant 21st Judicial District Court serves

as a court of review for Defendant Justice Court. Both Defendant Justice Court and Defendant 21st Judicial District Court can impose and amend pre-trial release conditions. Defendant Courts have a policy and practice of requiring pre-trial supervision as a condition of pre-trial release and imposing such supervision without risk or ability to pay assessments. Defendant Courts also have a policy and practice of providing no judicial review of the amount of fees charged for supervision. Defendant Courts also have a policy and practice of re-incarcerating pre-trial arrestees for failure to pay pre-trial fees.

26.    Plaintiffs have been and continue to be harmed by Defendants' unjust and unlawful policies and practices and therefore bring this challenge to end said policies and practices.

## JURISDICTION AND VENUE

27.    The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. §§ 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights. This suit arises under the United States Constitution and 42 U.S.C. § 1983.

28.    The court has personal jurisdiction over Ravalli County because it is a Montana county.

29.     Venue is proper in the Missoula Division of the United States District Court for the District of Montana, pursuant to 28 U.S.C. § 1391(b)(1). Defendants are residents of Montana and of Ravalli County, which falls within the Missoula Division.  D. Mont. L.R. 3.2(b); Mont. Code Ann. § 25-2-126.

## FACTUAL ALLEGATIONS

### A.     Defendants Charge Exorbitant Pre-Trial Fees and Threaten Pre-Trial Arrestees with Jail for Non-Payment

30.     Typically, when someone is arrested in Ravalli County, they are booked at the county jail and only released if they pay bail or if the court releases them on their own recognizance without bail.

31.     Many arrestees cannot afford the full bail amount, so they pay 10–15% of a bail amount to a private bail company to secure their release. This pre-trial payment-for-release is not refundable, regardless of whether the person is later acquitted of all charges.

32.     Even though bail is presumed under Montana law for the vast majority of defendants, Defendant Courts often impose pre-trial supervision as a condition of pre-trial release on top of bail.

33.     When Defendant Courts impose pre-trial supervision, they not only impose supervision and its various terms and conditions (which can include supervision alone or supervision combined with a GPS ankle monitor, twice-daily drug testing, house arrest, etc.), but also the expense of supervision (with pricing set

9

by Defendant Pre-Trial Supervision), though court orders often do not lay out the entire cost a pre-trial arrestee will be forced to pay.

34.    It is Defendant Courts' policy and practice to impose pre-trial supervision without first conducting a risk assessment to determine if supervision (and its attendant costs) is necessary.

35.    It is Defendant Courts' policy and practice to impose pre-trial supervision (and its attendant costs) without an ability to pay analysis to determine if the person can afford the fees.

36.    It is Defendant Court's policy and practice to not offer a mechanism to contest the fees and obtain a waiver or reduction in fees.

37.    Pursuant to Defendant Courts' policies and practices, some court orders require enrollment in pre-trial supervision as a condition of release and some state that certain amounts of pre-trial fees must be paid in advance, without considering whether the pre-trial arrestee can afford them.

38.    For pre-trial arrestees who Defendant Courts have ordered be on pre-trial supervision, Defendant Pre-Trial Supervision demands that those pre-trial arrestees pay pre-trial fees — on top of whatever pre-trial arrestees already paid in bail — and sign contracts about those fees *before* Pre-Trial Supervision will release them from jail. For example, the contract pre-trial arrestees are forced to sign regarding pre-trial supervision states: "If you are incarcerated and still affiliated with

Jail Diversion [Pre-Trial Supervision] services, you could be held responsible for payments due *prior to release until those payments are paid in full*." (emphasis added).

39.    Thus even with a release order from a judge, many pre-trial arrestees remain in jail.

40.    The amount that Defendant Pre-Trial Supervision charges pre-trial arrestees to be released from jail is arbitrary and capricious, based on an individual analysis left entirely to Defendant Pre-Trial Supervision's discretion with no opportunity for judicial review. Defendant Pre-Trial Supervision sometimes require the pre-trial arrestee to pay the equivalent of one month of fees to be released. Sometimes Defendant Pre-Trial Supervision requires the pre-trial arrestee to pay any pre-trial fees owed from a prior matter. Sometimes Defendant Pre-Trial Supervision require a multi-thousand-dollar "deposit" *in cash* on top of the first month of fees for pre-trial arrestees who must wear an alcohol ankle monitor. This demand for money is done extra-judicially and without the pre-trial arrestee's counsel present, based on criteria and an evaluation done entirely by Pre-Trial Supervision.

41.    Unlike bail amounts, which pre-trial arrestees can challenge in the 21st Judicial District Court, the extra-judicial amount of pre-trial fees that Defendant Pre-Trial Supervision imposes on pre-trial arrestees to secure their release cannot be challenged. There is no avenue for judicial review of these amounts.

42.     Thus, some pre-trial arrestees sit in jail longer simply because they cannot afford Defendant Pre-Trial Supervision's demanded fees, even after they have posted bail.

43.     This entire pay-to-get-out-of-jail process is done without considering ability to pay.

44.     Defendant Pre-Trial Supervision thus ties pre-trial arrestees' freedom to payment of their fees, threatening jail for those who are too poor to pay whatever price tag Defendant Pre-Trial Supervision imposes on their freedom.

45.     If a pre-trial arrestee manages to get released from jail, her ongoing pre-trial fees routinely reach several hundred dollars per month. All fees are set by Defendant Pre-Trial Supervision. Pre-trial supervision alone is a $105/month fee — approximately *five times* the cost of supervision for persons on probation because of a felony conviction. Drug patches cost $75 in a one-time administrative fee plus $65 every ten days. Alcohol ankle monitors cost $75 in a one-time administrative fee plus $10 per day. A GPS ankle monitor costs $75 in a one-time administrative fee plus $390 per month. Those in the 24/7 sobriety "program" must pay $4 per day every day for twice-daily drug tests. Many pre-trial arrestees are on multiple conditions simultaneously.

46.     For example, a pre-trial arrestee who is subject to supervision, drug patches, and a GPS ankle monitor is required to pay approximately $690 every

month ($105 + $65 every ten days + $390 every month), plus $150 in administrative fees ($75 for the drug patches and $75 for the GPS ankle monitor).

47.    Pre-trial fees are exorbitant and far outside the financial reach of the indigent pre-trial arrestees who compose the vast majority of those who are brought before Ravalli County courts.

48.    For example, a person working full-time at minimum wage in Montana ($8.75/hour) makes approximately $1,400 pre-tax per month. If the same person were on pre-trial supervision with a GPS ankle monitor (if they can manage to retain full-time work while having to wear a visible ankle monitor), she would likely be forced by Defendant to pay $570 just to get out of jail [the cost of one month of supervision ($105) and GPS ankle monitor fees ($390) plus the one-time administrative fee for a GPS ankle monitor ($75)]. $570 is more than 40% of her pre-tax monthly income and is *on top of* whatever the person had to pay to post bail. Once released from jail, and having paid the one-time administrative fee, that same person would still be charged $495 in ongoing, monthly pre-trial fees ($105 for supervision and $390 for the GPS ankle monitor). $495 is more than 35% of a full-time, minimum-wage earner's pre-tax monthly income.

49.     As another comparison point, the average cost of a one-bedroom apartment in Hamilton, Montana (the largest city in Ravalli County) is $875/month.[1] The example person described above — on supervision and with a GPS ankle monitor —working full-time at minimum wage would not be able to afford even a one-bedroom apartment and pre-trial fees. A person working full-time at minimum wage in Montana earns approximately $1,400 pre-tax. After paying for rent ($875 per month) and pre-trial fees ($495 per month), this person would have $30 left in her pre-tax monthly budget to cover everything else, including food, utilities, medicine, transportation, clothing, etc. for themselves as well as any of their dependents.

50.     Despite the exorbitance of these fees, at no point do Defendants consider pre-trial arrestees' ability to pay before imposing these fees or before threatening jail time for non-payment, effectively criminalizing pre-trial arrestees' poverty.

51.     Defendant Pre-Trial Supervision routinely threatens pre-trial arrestees for falling behind on pre-trial fees, saying that Defendant will issue warrants for their arrest despite Defendant's lack of legal authority to do so. For example, the contract for those in the pre-trial 24/7 sobriety program states: "***You are required to pay in***

---

[1] Zumper, *Hamilton, MT Rent Prices*, https://www.zumper.com/rent-research/hamilton-mt (last visited August 16, 2021).

**_advance_**, or at the time of testing for the [twice daily alcohol breath tests].  Failure to pay may be considered a violation of your bond condition, and you may be arrested." (emphasis in original).

52.     Defendant Pre-Trial Supervision reports lack of payment of pre-trial fees to Defendant Courts and at least one judge will revoke on that basis alone.

53.     Once a pre-trial arrestee is revoked, judges will often impose a new bail amount to release the pre-trial arrestee, compounding the cost of obtaining pre-trial freedom.

54.     Defendant Pre-Trial Supervision will also impose pre-trial conditions such as drug testing without court authorization. If an unauthorized drug test results in a positive test, Defendant will then use that result to obtain a court order requiring a drug patch, which increases the fees the pre-trial arrestee will have to pay.

55.     Defendant Pre-Trial Supervision threatens to bring felony criminal charges against pre-trial arrestees for any damage to ankle monitors or for periods where the pre-trial arrestee is not in touch with Defendant.

56.     Pre-trial fees are thus a ransom imposed on pre-trial arrestees without due process and under threat of incarceration. A pre-trial arrestee's freedom hinges on continuing to pay the Sheriff's Office, which, like a mafioso charging a "protection" fee, threatens harm if pre-trial arrestees do not pay.

57.     Defendants ignore Montana law's presumption of pre-trial release and instead have created an unconstitutional "jail diversion" system. In creating a system that punishes those legally presumed innocent and pushes the costs of that system onto the very people it punishes, Defendants make clear that the purpose of pre-trial supervision is not actually public safety, but rather the creation of a revenue stream.

**B.    Plaintiffs Were Charged Pre-Trial Fees Without Any Finding of Guilt or Ability to Pay Assessment; They Continue to Be Threatened with Further Incarceration If They Do Not Pay**

       **a.     Plaintiff Evenson-Childs**

58.     Plaintiff Evenson-Childs is indigent, has a disability, and has been struggling with homelessness since her criminal case began over a year ago.

59.     She was arrested in February 2020 on domestic violence–related charges, despite being the victim. At her arraignment, the judge set a $30,000 bond and imposed pre-trial supervision and alcohol monitoring as release conditions.

60.     Plaintiff Evenson-Childs hired a private bail bond company to post bail for her and she paid a non-refundable deposit of $3,500 using her tax refund. Without the refund, she would not have had the money to post bail.

61.     Despite Plaintiff Evenson-Childs having posted bail, Defendant Pre-Trial Supervision refused to release her from the jail for days because Defendant had to first locate someone to place a SCRAM alcohol monitoring device on her ankle. Only then did Defendant Pre-Trial Supervision inform Plaintiff Evenson-Childs that

she would have to pay the first month of fees before Defendant would release her. This was the first she learned that she would be charged pre-trial fees. Plaintiff Evenson-Childs was released soon after because her daughter paid her fees.

62.    Shortly after her release, Plaintiff Evenson-Childs was switched to a breathalyzer device that she must blow into *three times per day every day seven days a week*, at 9am, 3pm, and 9pm.

63.    Plaintiff Evenson-Childs is charged $55/month in supervision fees and $270/month in alcohol monitoring fees, totaling $325/month in pre-trial fees.

64.    If she misses a "blow," she must go in person for a urine analysis test, which costs between $35 and $50 for each test.

65.    Plaintiff Evenson-Childs is indigent and thus qualified for a public defender. She cannot afford these fees and yet has been forced to pay them for *over a year* as her case remains in pre-trial status.

66.    Plaintiff Evenson-Childs has a disability, and her only sources of reliable income are disability payments and food stamps. She is sometimes able to secure part-time temp jobs, but the $325/month that she must pay in pre-trial fees is preventing her from securing stable housing. She cannot afford stable housing and without stable housing, she cannot secure stable employment.

67.    Her housing instability and the existence of her case have also made it difficult for her to leave the abusive relationship that triggered her arrest in the first

place. Plaintiff Evenson-Childs' partner threatens to call Defendant Pre-Trial Supervision to report her if she does not do what he says, including staying at his house.

68.    Despite the enormous financial and emotional toll that pre-trial fees impose, Plaintiff Evenson-Childs does her best to pay out of fear of being sent back to jail.

69.    To date, Plaintiff Evenson-Childs has not been convicted of the crime for which she is accused and for which supervision is ordered.

### b.    Plaintiff O'Toole

70.    Plaintiff O'Toole is indigent and has been cycling in and out of jail because of pre-trial supervision for years. He is unable to find and maintain unemployment as a result.

71.    Plaintiff O'Toole has had three recent criminal cases in Ravalli County, with the third one the result of his being on pre-trial supervision in another case.

72.    When he cut off the strap on his alcohol ankle monitor earlier this year, Defendant Pre-Trial Supervision made good on its threat to press criminal charges and Plaintiff O'Toole was charged with felony theft, even though he returned the device at the time of the arrest.

73.    Almost every time he has been jailed on an alleged violation of pre-trial supervision, the court has set a new bail amount for his release. Plaintiff O'Toole

has had to rely on his girlfriend and family members to bail him out, as he cannot maintain steady employment with the constant cycling in and out of jail that has resulted from being on pre-trial supervision.

74.   Every time Plaintiff O'Toole has been jailed on a new case, Defendant Pre-Trial Supervision has demanded he pay pre-trial fees to be released — on top of whatever bail amount was set by the court. In his first case, for example, Defendant charged him $600 to get out of jail, resulting in him spending an additional week in jail while he gathered the money.

75.   In his second case, Plaintiff O'Toole was initially required to be on a SCRAM breathalyzer device, which required him to blow into the machine three times a day every day. The device cost hundreds of dollars, however, and Plaintiff O'Toole did not have the funds for it. Defendant Pre-Trial Supervision then required him to show up *in person twice a day every day seven days a week* to the Sheriff's Office to take a breathalyzer test, at a cost of $4 per day, until he could come up with the money for the SCRAM breathalyzer device.

76.   Once Plaintiff O'Toole was able to come up with the money for the SCRAM breathalyzer device, any time he would miss a "blow," his pre-trial supervision officer would require him, under threat of jail, to report in person that same day and pay for a drug test (at a cost of $35 each).

77.    Plaintiff O'Toole could not comply with Defendant Pre-Trial Supervision's onerous testing requirements and maintain employment.

78.    In each of his cases, Plaintiff O'Toole has been charged hundreds of dollars a month in pre-trial fees, despite his indigence, which has only deepened the longer he is under pre-trial supervision.

79.    Defendant Pre-Trial Supervision has even contributed to increasing the cost of his pre-trial supervision. After Plaintiff O'Toole failed a drug test that Defendant imposed without court authorization, Defendant obtained a court order requiring Plaintiff O'Toole to be on a drug patch, which costs $65 every 10 days.

80.    At no point have Defendants ever inquired into his ability to pay, even though he qualified for a public defender in each of his cases.

81.    Plaintiff O'Toole has paid thousands of dollars in fees to date and yet remains behind.

82.    Despite the enormous financial and emotional toll that pre-trial fees impose, Plaintiff O'Toole does his best to pay out of fear of being sent back to jail.

83.    Defendant Pre-Trial Supervision regularly threatens to send Plaintiff O'Toole back to jail. At an August 2021 check-in with his pre-trial officer, Plaintiff O'Toole was told that if he did not pay $200 in pre-trial fees by his next check-in appointment, he would be sent back to jail.

84.     Plaintiff O'Toole has been jailed for an alleged missed check-in appointment and separately for an alleged positive drug test, the latter of which cost him his job at the time. Plaintiff O'Toole has not been able to obtain and maintain employment because of pre-trial supervision.

85.     By imposing onerous conditions, including exorbitant pre-trial fees, and criminalizing any alleged violation of supervision terms, including non-payment, even before Plaintiff O'Toole had been convicted in any case, Defendants pulled Plaintiff O'Toole further into the criminal system and into poverty.

**C.      Defendants' Wealth-Based Fee Extortion Scheme Violates Due Process and Equal Protection**

86.     Each and every individual required to pay pre-trial fees has only been *accused* of the crime for which supervision has been ordered. These fees apply *only* at the pre-trial stage and therefore apply *only* to individuals who have not been convicted of anything. Pre-trial arrestees are punished despite their presumed innocence by having to pay these fees; they are deprived of their property without due process.

87.     These fees also act as an extension of pre-trial arrestees' bail amounts, because they must be paid to be released from jail and to remain released from jail. Money extracted prior to conviction (like bail bonds) must meet at least a minimal level of due process; Defendants' fees are imposed with no attendant procedural protections.

88.     Pre-trial fees are imposed arbitrarily and capriciously, without a nexus to pre-trial arrestees' flight risk or risk to the community and without any notice of how much in fees pre-trial arrestees will cumulatively face. Pre-trial arrestees must pay fees as long as a case remains in pre-trial status, yet the length of a case is dependent on numerous factors outside of the pre-trial arrestee's control. Cases commonly last several months and sometimes more than a year — as is the case for both Plaintiffs Evenson-Childs and O'Toole — leaving indigent pre-trial arrestees with thousands of dollars of debt.

89.     These fees amount to violations of due process and equal protection for discriminating on the basis of wealth. Pre-trial arrestees' ability to pay these fees is never assessed. Thus, when indigent pre-trial arrestees fail to pay these fees, they are incarcerated because of their poverty. Such debtors' prisons are unconstitutional.

90.     Defendant Pre-Trial Supervision falsely imprisons pre-trial arrestees by holding them in jail until they pay whatever amount in pre-trial fees Defendant demands.

91.     To be released from jail, Defendant Pre-Trial Supervision requires pre-trial arrestees to sign unconscionable contracts "agreeing" to further criminal charges if they do not maintain contact with their pre-trial officer or if they damage their monitoring devices, in violation of due process.

92.    Defendants thus run a pre-trial fee scheme against pre-trial arrestees who have not been convicted of any crime. The scheme not only deprives pre-trial arrestees of their property without due process, but it also is a form of wealth-based discrimination, because fees are assessed to all pre-trial arrestees who are under pre-trial supervision, regardless of their ability to pay. Defendant Pre-Trial Supervision falsely imprisons pre-trial arrestees as a means of extorting fees and continues to use the threat of incarceration to force payment for the duration of the case. Defendant Pre-Trial Supervision subjects pre-trial arrestees to unconscionable contracts in violation of due process by requiring them to preemptively agree to further criminal charges just to be released from jail.

### a.    Defendants Deprive Pre-Trial Arrestees of Their Property Without Due Process

93.    Pre-trial arrestees have a property interest in the dollar amount of pre-trial fees, which routinely amount to hundreds of dollars per month. In the case of Plaintiff Evenson-Childs, that amount was more than three hundred dollars per month. For Plaintiff O'Toole, in his second case (a misdemeanor matter), he was charged more than six hundred dollars per month.

94.    Due process requires that pre-trial arrestees be provided with a meaningful opportunity to challenge any deprivation, by a state actor, of their property. *Mathews v. Eldridge*, 424 U.S. 319 (1976).

95.    In particular, bail payments imposed prior to trial must meet stringent due process requirements. *See United States v. Salerno*, 481 U.S. 739, 751–52 (1987).

96.    Defendants' pre-trial fees, which operate as an extension of bail, carry no procedural protections whatsoever.

97.    First, Defendants only impose these fees on pre-trial arrestees, *i.e.*, individuals who have not been found guilty of anything. In essence, they are assessed a monetary sanction even though they are presumed innocent. As a point of comparison, the cost of supervision for those who have been convicted of a felony and are on probation is approximately \$20/month or *one-fifth* of the cost of supervision for pre-trial arrestees.

98.    Even when a case is discharged, including by dismissal or acquittal, Defendant Pre-Trial Supervision continues to pursue collection of any arrears, including through harassing phone calls.

99.    Second, Defendants provide no ability to contest these fees. There is no opportunity at the time the fees are imposed or afterwards to waive or reduce the fees, unlike bail, which can be challenged in the 21st Judicial District Court.

100.  Defendants do not provide pre-trial arrestees with any meaningful opportunity to challenge this government deprivation of pre-trial arrestees' property.

> **b.      Defendants' Pre-Trial Fees Function as a Form of Arbitrary Bail in Violation of Due Process**

101.   In practice, pre-trial arrestees' bail amount only serves as a down-payment on their pre-trial freedom. Pre-trial supervision fees are an ongoing extension of their bail; to not only get out of jail, but to also remain out of jail, pre-trial arrestees must pay pre-trial fees. Otherwise, Defendant Pre-Trial Supervision refuses to release pre-trial arrestees from jail, even though their release has been granted by the court. Defendant Pre-Trial Supervision also threatens to jail pre-trial arrestees if they fall behind on fees once released.

102.   Therefore, Defendants' pre-trial fees are subject to the same constitutional parameters and protections as bail. *Salerno*, 481 U.S. at 751–52.

103.   Yet these fees are imposed without the parameters and protections required under *Salerno*.

104.   Even though pre-trial freedom is the default under Montana law, Mont. Code Ann. § 46-9-106, Defendant Courts routinely limit that freedom by imposing onerous pre-trial supervision.

105.   It is the policy and practice of Defendant Courts to impose pre-trial supervision (and thus the corresponding fees) without an individualized assessment to determine the necessity of such supervision.

106.   None of the Defendants consider pre-trial arrestees' ability to pay when imposing pre-trial fees.

107.   Defendant Pre-Trial Supervision exacts its additional get-out-of-jail fees without assessing ability to pay, without a hearing, without counsel for pre-trial arrestees present, and without any other due process protection. Indeed, Defendant imposes get-out-of-jail fees under extremely coercive circumstances; unless a pre-trial arrestee signs whatever contract Defendant hands them and pays whatever amount Defendant demands, the pre-trial arrestee remains in jail.

108.   Defendant Pre-Trial Supervision imposes these fees in an arbitrary and discriminatory fashion. Some pre-trial arrestees must pay a multi-thousand-dollar deposit. Some pre-trial arrestees must pay the first month of supervision fees *plus* a multi-thousand-dollar deposit. The decision about who must pay a deposit is based on criteria set forth by Defendant Pre-Trial Supervision without any judicial determination, order, or input. Pre-trial arrestees have no opportunity to challenge the decision. Some pre-trial arrestees, if they have an outstanding balance in pre-trial fees from another matter, must pay that off first. When Plaintiff O'Toole was arrested in his third case, Defendant Pre-Trial Supervision attempted to charge him $1,200 for an alleged outstanding balance for pre-trial fees in his second case, an amount later set aside by plea agreement.

109.   In addition, pre-trial fees are assessed until a case is resolved by conviction, plea, acquittal, dismissal of charges, or lapsing of the statute of limitations. Cases vary greatly in how long they take to resolve; pre-trial arrestees

are thus subject to the whims of the cadence of the criminal legal system —

continuances, the timing of plea offers, etc. — to determine their ultimate exposure

to fees. Pre-trial arrestees have no notice of how much they will ultimately face in

pre-trial fees beyond the set amounts for each month (supervision fees) or each drug

test ($2 per test twice a day every day for the 24/7 monitoring program). Unlike bail,

which is a fixed amount, pre-trial fees are indeterminate because case timelines are

indefinite, further violating due process.

110.   Indeed, the pre-trial arrestee who exercises her constitutional right to

present a defense and have a trial is punished for taking the time necessary to prepare

his defense and have a trial, because each month that passes comes with additional

fees. Plaintiff Evenson-Childs' case has been in pre-trial status for more than a year.

She has been charged nearly $6,000 in pre-trial fees. Every day additional fees

accumulate. Plaintiff Evenson-Childs has continued to assert her right to a trial,

despite feeling the pressure to plea created by the exorbitant and burdensome pre-

trial fees she is charged.

111.   In some cases, the public defender or defense attorney can move to have

certain pre-trial fees removed while a case is still in pre-trial status, but there is no

guarantee of such relief nor is such relief generally comprehensive. A pre-trial

arrestee might be relieved of having to wear a SCRAM bracelet, but she is still

charged the monthly supervision fee. And in any event, the fee is only removed if

the condition is removed; if the condition remains, Defendants do not provide a mechanism to waive or reduce the corresponding fees.

112.   The arbitrariness with which Defendants impose pre-trial fees — under threat of incarceration, divorced from any judicial determination of ability to pay or risk factors, on top of already-paid bail, and indefinite to the point of infringing on other constitutional rights such as the right to trial — violates due process.

> **c.   Defendant Pre-Trial Supervision Unconstitutionally Criminalizes the Status of Being Unhoused, in Violation of the Eighth Amendment's Prohibition on Cruel and Unusual Punishment**

113.   The Eighth Amendment's prohibition on cruel and unusual punishment (incorporated against the states via the due process clause of the Fourteenth Amendment) prohibits punishing someone's status — such as being addicted to alcohol, *see Robinson v. California*, 370 U.S. 660 (1962), or unhoused, *see Martin v. City of Boise*, 920 F.3d 584, 616–17 (9th Cir. 2019) — and punishing involuntary acts associated with that status. *See Powell v. Texas*, 392 U.S. 514, 550 n.2 (1968) (White, J., concurring) (the "proper subject of inquiry is whether volitional acts brought about the 'condition' and whether those acts are sufficiently proximate to the 'condition' for it to be permissible to impose penal sanctions on the 'condition.'"); *see also Blake v. City of Grants Pass*, No. 1:18-CV-01823-CL, 2020 WL 4209227, at *6 (D. Or. July 22, 2020) (appeal to 9th Cir. filed Oct. 8, 2020) (invalidating law banning "camping" within city limits as unconstitutionally

criminalizing involuntary behavior associated with homelessness); *Driver v. Hinnant*, 356 F.2d 761, 765 (4th Cir. 1966) (holding law unconstitutional for criminalizing public intoxication against a "chronic alcoholic" because it "punishe[d] an involuntary symptom of a status").

114.  Defendant Pre-Trial Supervision has a policy of requiring pre-trial arrestees who have no physical address or telephone number — in other words, the unhoused — who are court-ordered to wear an alcohol monitoring device (known as SCRAM/CAM) to pay a deposit in the amount of $2,300 in *cash* before Defendant Pre-Trial Supervision will release them from jail.

115.  This policy expressly punishes class members for being unhoused.

116.  Courts do not require immutable characteristics such as race or age to bring status-based challenges under the Eighth Amendment. Rather, courts focus on chronic conditions that lead to involuntary behavior. *See Robinson*, 370 U.S. at 667 (describing addiction as something that can be acquired "innocently or involuntarily"). Homelessness is a chronic, but not necessarily permanent, status that can be acquired innocently or involuntarily (such as through pandemic-induced job loss), which leads to inevitable consequences: an unhoused person does not have a physical address and may not have a telephone number either.

117.  Many Montanans are unhoused. While ranking 43rd in terms of

population,[2] Montana ranks 17th in terms of the per capita rate of homelessness.[3] The unhoused, including Plaintiff Evenson-Childs, are overrepresented among those targeted by the criminal legal system.

118. Criminalizing homelessness is cruel and unusual punishment in violation of the Constitution. *See Powell*, 392 U.S. at 551 (White, J., concurring) (making connection between homelessness and poverty and concluding that a law criminalizing public drunkenness would be unconstitutional if the law targeted unhoused alcoholics, who cannot avoid public places just as they cannot avoid drinking); *Martin*, 920 F.3d at 617 ("just as the state may not criminalize the state of being 'homeless in public places,' the state may not 'criminalize conduct that is an unavoidable consequence of being homeless — namely sitting, lying, or sleeping on the streets.'"); *Wheeler v. Goodman,* 306 F.Supp.58, 62 (W.D.N.C. 1969) *vacated on other grounds,* 401 U.S. 987, (1971) (striking down vagrancy statute making it a crime to, *inter alia,* be able to work but have no property or "visible and known means" of earning a livelihood because to "make poverty and misfortune criminal is contrary to our fundamental beliefs, and to arrest and prosecute a person under this statute violates the Fourteenth Amendment.").

---

[2] Ellen Kershner, *The 50 US States Ranked By Population*, World Atlas (June 12, 2020), https://www.worldatlas.com/articles/us-states-by-population.html.
[3] *Montana Has 17th Largest Homeless Population in U.S.*, Sidney Herald (Dec. 16, 2020), https://www.sidneyherald.com/news/state/montana-has-17th-largest-homeless-population-in-u-s/article_c212a49a-3b78-11eb-9df1-a3464201ecb6.html.

119.   Not having a physical address or telephone number is shorthand for being homeless.

120.   Defendant Pre-Trial Supervision criminalizes homelessness. Defendant chooses to control, oppress, and extort pre-trial arrestees experiencing homelessness, rather than helping pre-trial arrestees address the underlying conditions that may have contributed to their involvement in the criminal legal system. As a result, Defendant Pre-Trial Supervision not only passes on the opportunity to do work that would enhance public safety, but actively uses pre-trial arrestees experiencing homelessness as a revenue stream.

121.   By requiring unhoused pre-trial arrestees to pay a deposit before granting their freedom — all while they have not been convicted of anything — Defendant Pre-Trial Supervision imposes a status-based punishment in violation of the Eighth Amendment.

> **d.   Defendants' Failure to Consider Ability to Pay in Assessing Pre-Trial Fees Violates Procedural Due Process**

122.   The Fourteenth Amendment's Procedural Due Process Clause prohibits outcomes in the criminal legal system from turning on a person's ability to make a monetary payment. *See Bearden v. Georgia*, 461 U.S. 660, 667 (1983) (defendant cannot have his probation revoked for being too poor to pay restitution); *Tate v. Short*, 401 U.S. 395, 398 (1971) ("[T]he Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term

solely because the defendant is indigent and cannot forthwith pay the fine in full")
(quotations omitted); *Williams v. Illinois*, 399 U.S. 235, 244 (1970) (Equal
Protection Clause of the Fourteenth Amendment "requires that the statutory ceiling
placed on imprisonment for any substantive offense be the same for all defendants
irrespective of their economic status."); *Griffin v. Illinois*, 351 U.S. 12, 19 (1956)
(plurality opinion) (finding state may not condition criminal defendant's right to
appeal on ability to pay for trial transcript because there "can be no equal justice
where the kind of trial a man gets depends on the amount of money he has").

123.   Defendants do not evaluate pre-trial arrestees' ability to pay at any point
prior to or while assessing pre-trial fees.

124.   Both Plaintiffs Evenson-Childs and O'Toole were found indigent by
the court and thus qualified for a public defender. Yet they were not asked about
their ability to pay pre-trial fees before they fees were assessed.

125.   Defendants' failure to assess ability to pay is a violation of due process
and results in indigent defendants being charged pre-trial fees that they cannot afford
— fees that quickly add up to hundreds of dollars *every month*.

> **e.   Defendants' Creation of Debtors' Prisons by Reporting and Imprisoning Pre-Trial Arrestees Who Do Not Pay Their Fees Violates Due Process**

126.   Debtors' prisons are one aspect of the Fourteenth Amendment's due
process prohibition against punishing people for failure to make a monetary

payment. *See Bearden*, 461 U.S. at 667; *Tate*, 401 U.S. at 398; *Williams*, 399 U.S. at 244; *Griffin*, 351 U.S. at 19. The right to freedom from detention is fundamental, and the United States Supreme Court has never wavered from the principle that "[f]reedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 683 (9th Cir. 2001) ("The Supreme Court has recognized that an individual has a liberty interest in being free from incarceration absent a criminal conviction.").

127.   Given this fundamental right to liberty, any attempt to deprive someone of their liberty — including through incarceration for failure to make a monetary payment — is subject to heightened scrutiny. *See Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997) (the due process clause "provides heightened protection against government interference with certain fundamental rights and liberty interests" such as freedom from government detention); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action"); *Salerno*, 481 U.S. at 748 ("compelling" government interests can justify pre-trial detention); *Williams*, 399 U.S. at 241–42 (the "passage of time has

heightened rather than weakened the attempts to mitigate the disparate treatment of indigents in the criminal process").

128.   Ravalli County's debtors' prison does not meet this heightened standard. Liberty cannot hinge on ability to pay, and Defendants' attempts to imprison pre-trial arrestees for failure to pay fees are not narrowly tailored nor serve a compelling government interest. Defendant Pre-Trial Supervision uses threats of jail time to coerce pre-trial arrestees into paying fees. Defendant Pre-Trial Supervision then files revocation reports with Defendant Courts when payments are not made, even if pre-trial arrestees cannot afford the fees. Some judges will then send pre-trial arrestees back to jail based on these reports.

129.   Even if the revocation is based on multiple alleged violations of the terms of pre-trial release, the consideration of failure to pay pre-trial fees is unconstitutional.

130.   Defendants' creation of debtors' prisons violates due process.

### f.   Defendants' Failure to Consider Ability to Pay is Also a Form of Wealth-Based and Status-Based Discrimination that Violates Equal Protection

131.   The Fourteenth Amendment's Equal Protection Clause also prohibits punishing people, including returning them to jail, simply because they are poor. Hinging a person's liberty on her ability to pay is an unconstitutional form of wealth-based discrimination. *See Bearden*, 461 U.S. at 667; *Tate*, 401 U.S. at 398; *Williams*,

399 U.S. at 244; *Griffin*, 351 U.S. at 19; *see also City of Billings v. Layzell*, 789 P.2d 221, 224 (Mont. 1990) (to "incarcerate a defendant solely because of his indigence is a violation of the defendant's right to equal protection").

132.   Article II, § 4 of the Montana Constitution expressly bars discrimination on the basis of one's social condition — i.e., "status of income and standard of living." *McClanathan v. Smith*, 606 P.2d 507, 51 (Mont. 1980).  It is a violation of the Montana Equal Protection clause to punish people by conditioning their freedom on the status of their income.

133.   Pre-trial arrestees are treated differently based on their financial status. A wealthy pre-trial arrestee who is able to afford his pre-trial fees will be released immediately upon posting bond and whatever arbitrary amount Defendant Pre-Trial Supervision imposes. Once released, a wealthy pre-trial arrestee will not be threatened with arrest unless he willingly refuses to pay pre-trial fees. An indigent pre-trial arrestee, on the other hand, will languish in jail even if he has no money to pay pre-trial fees and even after he has paid whatever he does have to post bail. If he does manage to get released, an indigent pre-trial arrestee will be threatened with arrest for not paying pre-trial fees even though his non-payment is not willful.

134.   Because this scheme treats similarly situated people (pre-trial arrestees) differently solely on the basis of their financial status, this scheme is an unlawful

form of wealth-based discrimination in violation of the Equal Protection clauses of the United States and Montana Constitutions.

> **g.      Defendant Pre-Trial Supervision Falsely Imprisons Pre-Trial Arrestees by Unlawfully Detaining Them Until Pre-Trial Fees Are Paid**

135.    Montana law creates a presumption of release in all cases except for those where the death penalty is an available sentence. Mont. Code Ann. § 46-9-106. Defendant ignores this presumption and falsely imprisons pre-trial arrestees as a result.

136.    Even when judges order a pre-trial arrestee's release, Defendant Pre-Trial Supervision continues to hold that person in jail until he has paid whatever amount Defendant Pre-Trial Supervision demands, which sometimes is the equivalent of one month of supervision fees, sometimes is a multi-thousand-dollar cash "deposit" for an alcohol monitor or GPS device, and sometimes is another amount altogether. On one occasion, Plaintiff O'Toole spent an additional week in jail because Defendant Pre-Trial Supervision demanded an additional $600 for his release on top of his court-ordered bail.

137.    Defendant's holding of pre-trial arrestees in jail after their release has been ordered either via posting of bail or release via personal recognizance amounts to false imprisonment.

138.   Federal courts examine false imprisonment claims by applying state law. *See, e.g.*, *Blaxland v. Commonwealth Director of Public Prosecutions*, 323 F.3d 1198, 1204–05 (9th Cir. 2003) (applying California law in analyzing false imprisonment claim); *Mitchell v. First Call Bail*, 412 F.Supp.3d 1208, 1216 (D. Mont. 2019) (applying Montana law in analyzing false imprisonment claim).

139.   False imprisonment under Montana law requires involuntary restraint of a person and restraint that is unlawful. *See In re Roberts Litig*., 97 F. Supp. 3d 1239, 1244 (D. Mont. 2015) (quoting *Kichnet v. Butte-Silver Bow Cty.,* 274 P.3d 740, 745 (Mont. 2012)).

140.   While the "existence of probable cause is a complete defense to claims of false arrest and false imprisonment," *Kichnet,* 274 P.3d at 745, there is no probable cause to detain when a pre-trial arrestee has posted bail and/or been authorized for release on his own recognizance. Further conditioning his release on payment of arbitrary fee amounts is unconstitutional and therefore his continued detention is unlawful.

141.   The fact that Defendant Pre-Trial Supervision coerces pre-trial arrestees to sign contracts with unconscionable terms before Defendant will release them further speaks to the involuntary nature of the restraint and the illegality of that restraint.

h.    **Defendant Pre-Trial Supervision Violates Due Process by Coercing Pre-Trial Arrestees into Signing Unconscionable Contracts "Agreeing" to Further Criminal Charges as a Condition of Release from Jail**

142.   Depending on what kind of conditions a pre-trial arrestee is subject to as part of pre-trial supervision, Defendant Pre-Trial Supervision requires pre-trial arrestees — before Defendant Pre-Trial Supervision will release them from jail — to sign a contract stating that they can be criminally charged with felony theft and criminal mischief if they do not maintain contact with their pre-trial officer or if they damage the devices they are required to use or wear, such as a GPS ankle monitor or an alcohol monitoring ankle device.

143.   What constitutes lack of contact or damage is based on Defendant Pre-Trial Supervision's discretion.

144.   These threats are not idle; some prosecutors will move forward with criminal charges. Indeed, Plaintiff O'Toole was arrested, incarcerated, and charged with felony theft because he cut off the strap on his alcohol ankle monitor, which he was required to wear pre-trial in another matter for which he had yet to be convicted of anything.

145.   These threats are also made under extremely coercive conditions; if pre-trial arrestees do not "agree" to these terms by signing the contract, they will not be released from jail, even if the court has already ordered their release.

146.   These additional criminal charges are only applicable to pre-trial arrestees.

147.   The behavior at issue is not unlawful for the general public to engage in. It is only because pre-trial arrestees are on pre-trial supervision that they are exposed to this additional criminal liability. It is only because Plaintiff O'Toole was on pre-trial supervision in another matter that he was exposed to a felony theft charge related to an alcohol ankle monitor. If he had not been on pre-trial supervision in another matter, this charge could not have been brought against Plaintiff O'Toole.

148.   By definition, pre-trial arrestees have not had a trial and thus have yet to be convicted of any crime, yet being on pre-trial supervision exposes them to more criminal charges.

149.   Defendant's contracts violate due process. Forcing persons who have not been convicted of any crime to expose themselves to more criminal liability as a condition of release is unconscionable and contrary to public policy.

## CLASS ACTION ALLEGATIONS

150.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and all others similarly situated, as representative of the following class:

> All persons who have been or will be: accused of a crime in Ravalli County, Montana, arrested, incarcerated, placed on pre-trial supervision, and charged pre-trial fees without

ever being convicted for the crime for which supervision was ordered.

151.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and all others similarly situated, as representative of the following sub-class:

> All indigent persons who have been or will be: accused of a crime in Ravalli County, Montana, arrested, incarcerated, placed on pre-trial supervision, and charged pre-trial fees without ever being convicted for the crime for which supervision was ordered.

152.   Plaintiffs, and others similarly situated, are victims of Defendants' discriminatory policies and practices resulting in illegal detention and illegal collection of fees and have sustained damages as a direct and proximate cause of these violations.

153.   As described below, this action satisfies the prerequisites of numerosity, commonality, typicality, and adequacy of representation required by Fed. R. Civ. P. 23(a)(1)–(4) to proceed as a class action.

154.   Because of the risk of inconsistent adjudications or prejudice to absent class members, as well as the request for injunctive relief and damages, the proposed class also meets the requirements of Rule 23(b)(1), (2), and (3).

**A.    Numerosity — Fed. R. Civ. P. 23(a)(1)**

155.   The persons in the proposed class are so numerous that joinder of all members is impracticable. Although the exact number of class members is unknown

to Plaintiffs at this time, it is anticipated that the class is composed of hundreds of members. This estimate of the number of potential class members is based upon an average weekly addition of 5–10 people to Defendant Pre-Trial Supervision's docket, or 40–80 people per month.

156.    The sub-class of indigent class members is also sufficiently numerous and largely overlaps with the main class because the majority of those on pre-trial supervision are also represented by public defenders or court-appointed attorneys and thus are indigent.

157.    Ascertainability of the exact number of class and sub-class members is readily achievable through analysis of Defendant Pre-Trial Supervision's records.

**B.      Commonality — Fed. R. Civ. P. 23(a)(2)**

158.    The relief sought is common to all class members: a permanent injunction against the charging of pre-trial fees and reimbursement for sums paid and a permanent injunction against detaining anyone on the basis of not paying pre-trial fees, so as to protect the constitutional rights of class members now and in the future.

159.    There are also issues of law and fact common to the class.

160.    Among the common issues of fact are:

      a.      Do Defendant Courts impose pre-trial supervision without conducting a risk assessment to determine the appropriateness of supervision?

b.   Do Defendants impose pre-trial fees without considering pre-trial arrestees' ability to pay?

c.   Does Defendant Pre-Trial Supervision detain pre-trial arrestees at the county jail beyond their release date because of inability to pay pre-trial fees?

d.   Does Defendant Pre-Trial Supervision threaten class members with jail time to induce payment of fees?

e.   Does Defendant Pre-Trial Supervision report pre-trial arrestees to the court if pre-trial arrestees fall behind on payment of fees, even if non-payment of fees is non-willful?

f.   Do Defendant Courts send pre-trial arrestees back to jail based on non-payment of fees, even if non-payment is non-willful?

g.   Does Defendant Pre-Trial Supervision threaten class members with criminal charges to induce payment of fees?

161.   Common issues of law include:

a.   Does Defendants' charging and collection of pre-trial fees without findings of guilt constitute a deprivation of property in violation of the Fourteenth Amendment's due process guarantees?

b.   Does Defendants' imposition of pre-trial fees as a form of quasi-bail, but without the same protections and parameters, violate due process?

c.   Does Defendant Pre-Trial Supervision's charging of a cash deposit for homeless pre-trial arrestees to be released from jail amount to status-based discrimination in violation of the Eight Amendment?

d.   Does the Due Process clause of the Fourteenth Amendment prohibit the charging of fees without considering ability to pay?

e.   Does the Due Process clause of the Fourteenth Amendment prohibit jailing indigent class members for failure to pay pre-trial fees?

f.   Does the Equal Protection clause of the Fourteenth Amendment prohibit the charging of fees without considering ability to pay?

g.   Does the Equal Protection clause of the Montana Constitution prohibit the charging of fees without considering ability to pay?

h.   Does Defendant Pre-Trial Supervision's detention of class members beyond their release date because of failure to pay pre-trial fees constitute false imprisonment?

      i.    Does the due process clause invalidate contract provisions requiring exposure to additional criminal charges as a condition of release for pre-trial arrestees?

## C.    Typicality — Fed. R. Civ. P. 23(a)(3)

162.   Plaintiffs are members of both the class and the sub-class and have been injured in the same way as the other members of the class and sub-class. Plaintiffs' claims are typical of the proposed class and sub-class members; indeed, they are identical.

163.   Defendants illegally charge and collect fees from all class members. Defendants illegally detain class members because of unpaid fees.

164.   All class members have yet to be convicted of a crime and are charged fees by Defendants while class members' cases remain in pre-trial status.

165.   All class members must continue to pay fees without notice as to how long — and therefore how much — they will have to pay in fees.

166.   All class members are charged fees without assessment of the appropriateness of supervision nor their ability to pay the fees associated with supervision. All sub-class members are deprived of fee waivers and reductions and all are threatened with jail when they non-willfully fall behind on payments because they are indigent.

**D.      Adequacy — Fed. R. Civ. P. 23(a)(4) and 23(g)**

167.   Plaintiffs will fairly and adequately represent the interests of the class. Plaintiffs have no claim antagonistic to those of the Class. In support of this proposition, Plaintiffs would show that:

- Plaintiffs are members of the proposed class and sub-class;
- Plaintiffs are interested in representing the proposed class and sub-class;
- Plaintiffs have no interest adverse to the rest of the class and sub-class; and
- Plaintiffs have suffered the same harm as the proposed class and sub-class.

168.   Class counsel will also fairly and adequately represent the interests of the class. Plaintiffs are represented by attorneys from Equal Justice Under Law and Upper Seven Law. Equal Justice Under Law attorneys have experience in litigating complex civil rights matters in federal court, particularly with regards to wealth-based discrimination. Upper Seven Law attorneys have experience in litigating complex class action matters and have knowledge of federal court processes, particularly in the District of Montana. Class counsel has extensive knowledge of the relevant constitutional and statutory law. Class counsel also have a detailed understanding of state law and county practices as they relate to federal constitutional requirements.

169.   Counsel have devoted significant time and resources to become intimately familiar with how Ravalli County's pre-trial fee scheme works in practice.

Counsel have also developed relationships with some of those victimized by Defendants' practices. The interests of the class members will be fairly and adequately protected by the Plaintiffs and their attorneys.

**E.    Predominance and Risk of Inconsistent Adjudications — Fed. R. Civ. P. 23(b)(1)**

170.   The common questions of fact and legal issues applicable to each individual member of the proposed class are identical. The prosecution of separate suits by individual members of the proposed class would create a risk of inconsistent adjudications of the legal issues and would establish incompatible standards of conduct for any party opposing the class. Common questions of law or fact predominate over any questions affecting only individual class members. Nothing short of a universally-applied remedy to all members of the class would address the allegations set forth in this complaint.

**F.    Injunctive and Declaratory Relief and Damages — Fed. R. Civ. P. 23(b)(2) and (3)**

171.   The class seeks injunctive and declaratory relief under Rule 23(b)(2) to enjoin Defendants from charging fees and detaining class members for failure to pay fees. Such injunctive and declaratory relief is appropriate because Defendants have acted in the same unconstitutional manner with respect to all class members (including subclass members) and an injunction and declaration prohibiting Defendants from charging fees would provide relief to every class (and subclass)

member. While sub-class members have a few additional claims as to why Defendants' fee scheme is unconstitutional as compared to class members, the injunctive and declaratory relief requested would provide relief to everyone, class and sub-class members alike.

172.    The class also seeks damages from Defendant Pre-Trial Supervision for the fees that they have been unconstitutionally charged and for which they have paid. A class action is superior to any other available method for the fair and efficient adjudication of this controversy. All class and subclass members are supervised by Defendant Pre-Trial Supervision and pay fees to Defendant Pre-Trial Supervision. Individual adjudications would be inefficient (not in the least because the likely recovery of any individual class member would be swallowed up by litigation costs) and risk inconsistent rulings, even though every adjudication would turn on the same policies — namely, Defendant's policy of charging fees, detaining class members until they have paid fees, and then threatening to send them back to jail for falling behind on paying fees.

173.    This case is far more manageable as a class action than as individual adjudications because of the common issues of fact and law, which prevail over any minor individual differences among class members. Thus, certification under Rule 23(b)(3) is also appropriate.

## CLAIMS FOR RELIEF

### Count One: Violation of Procedural Due Process Regarding Deprivation of Property Interest in Fee Amount

174.   Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

175.   By charging Plaintiffs for pre-trial fees without any finding of guilt, Defendants deprive Plaintiffs of their property without due process as guaranteed under the Fourteenth Amendment.

### Count Two: Violation of Procedural Due Process for Arbitrary Bail

176.   Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

177.   Pre-trial fees are imposed as quasi-bail, yet without the attendant due process protections. It is the policy and practice of Defendant Courts to impose fees without nexus to risk factors and without any timeline as to how long (and therefore how much) pre-trial arrestees will be subjected to them. Fees are charged as long as the case remains in pre-trial status, yet pre-trial arrestees do not have control over how long a case remains in such status.

### Count Three: Status-Based Discrimination on the Basis of Homelessness

178.   Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

179.   Defendant Pre-Trial Supervision discriminates against homeless pre-trial arrestees on alcohol ankle monitoring by demanding that they pay a multi-thousand dollar cash deposit before being released from jail.

180.   Criminalizing homelessness is cruel and unusual punishment in violation of the Eighth Amendment to the Constitution.

**Count Four: Violation of Procedural Due Process Regarding Ability to Pay**

181.   Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

182.   The Fourteenth Amendment's Procedural Due Process Clause prohibits outcomes in the criminal legal system from hinging on a person's ability to make a monetary payment.

183.   Defendants provide constitutionally deficient due process by assessing pre-trial fees without considering ability to pay.

**Count Five: Violation of Procedural Due Process for Revocation for Non-Payment of Fees**

184.   Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

185.   The Fourteenth Amendment's Procedural Due Process Clause prohibits outcomes in the criminal legal system from hinging on a person's ability to make a monetary payment.

186.   Defendants provide constitutionally deficient due process by allowing the revocation of bail based on failure to pay pre-trial fees without first assessing pre-trial arrestees' ability to pay those fees.

187.   Without considering ability to pay, Defendants effectively criminalize poverty and incarcerate pre-trial arrestees because of their inability to afford pre-trial fees.

188.   These "debtors' prisons" are unconstitutional as a violation of due process.

### Count Six: Violation of Federal Equal Protection for Wealth-Based Discrimination

189.   Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

190.   The Fourteenth Amendment's Equal Protection Clause prohibits outcomes in the criminal legal system from turning on a person's ability to make a monetary payment.

191.   Defendants' pre-trial fee scheme treats similarly-situated individuals — pre-trial arrestees — differently based on whether they are indigent. Indigent pre-trial arrestees risk incarceration simply because they cannot afford pre-trial fees.

192.   This wealth-based discrimination is prohibited by the Equal Protection Clause of the United States Constitution.

### Count Seven: Violation of State Equal Protection for Social Condition Discrimination

193.   Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

194.   Article II, § 4 of the Montana Constitution expressly protects against discrimination on account of social origin or condition.

195.   Defendants' pre-trial fee scheme discriminates against pre-trial arrestees on the basis of social condition, namely, their indigency. Indigent pre-trial arrestees face punishment based solely on their non-willful nonpayment of exorbitant pre-trial fees. Wealthy pre-trial arrestees are similarly situated, but only face punishment if their non-payment of fees is willful, creating a different standard of proof depending on the social condition of the pre-trial arrestee.

196.   This social condition discrimination is prohibited by the Equal Protection Clause of the Montana Constitution.

### Count Eight: False Imprisonment

197.   Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

198.   Defendant Pre-Trial Supervision unlawfully detains pre-trial arrestees beyond their release date by conditioning their release on the unconstitutional payment of whatever arbitrary dollar amount in pre-trial fees that Defendant demands.

199.   Such unlawful and involuntary restraint of pre-trial arrestees amounts to false imprisonment.

## Count Nine: Violation of Due Process via Contracts Increasing Criminal Exposure

200.   Plaintiffs incorporate by reference each and every paragraph herein as if fully restated.

201.   Defendant Pre-Trial Supervision requires certain pre-trial arrestees to sign contracts before being released from jail "agreeing" to further criminal charges if they do not comply with certain pre-trial conditions.

202.   Pre-trial arrestees have not been convicted of any crime yet being on pre-trial supervision exposes them to further criminal liability.

203.   To be free from pre-trial detention, which is the presumption under Montana law, pre-trial arrestees have to agree to expose themselves to even more grounds for their future detention.

204.   The violations of pre-trial conditions that can result in more criminal charges for pre-trial arrestees are not behaviors that are crimes if committed by a member of the general public. They are specific to pre-trial arrestees on pre-trial supervision.

205.   These coercive contracts violate due process.

## REQUEST FOR RELIEF

206.   WHEREFORE, Plaintiffs demand a jury trial and the following relief: Plaintiffs and the classes they represent have suffered the following damages, for which they seek recovery from Defendants:

a.      A declaratory judgment that Defendants' conduct as alleged in the Counts listed above is unlawful;

b.      An order and judgment preliminarily and permanently enjoining Defendants from continuing the above-described unlawful policies and practices;

c.      A judgment ordering Defendants to train all court and Sheriff's Office employees on the above-mentioned preliminary and permanent injunctions;

d.      A judgment compensating Plaintiffs and the Class of similarly-situated individuals for the damages that they suffered as a result of Defendant Pre-Trial Supervision's unconstitutional and unlawful conduct, specifically all pre-trial fees paid to Defendant Pre-Trial Supervision;

e.      An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988;

f.      An order and judgment granting pre- and post-judgment interest;

g.      And any other relief this Court deems just and proper.

Respectfully submitted,

By:  /s/ *Phil Telfeyan*_____
     Phil Telfeyan*
     Natasha Baker*
     Equal Justice Under Law
     400 7th St. NW, Suite 602
     Washington, D.C. 20004
     (202) 505-2058
     ptelfeyan@equaljusticeunderlaw.org
     nbaker@equaljusticeunderlaw.org

     * Application for admission *pro hac
     vice* forthcoming

By:  /s/ *Constance Van Kley*
     Constance Van Kley
     Rylee Sommers-Flanagan
     Upper Seven Law
     P.O. Box 31
     Helena, MT 59624
     (406) 306-0330
     constance@uppersevenlaw.com
     rylee@uppersevenlaw.com

     *Attorneys for Plaintiffs*