IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| TERI LEA EVENSON-CHILDS, DANIEL O'TOOLE, RICHARD CHURCHILL, and KEITH LEONARD, individually, and on behalf of all similarly situated individuals, | CV 21-89-M-DLC-KLD |
| Plaintiffs, | FINDINGS & RECOMMENDATION |
| vs. | |
| RAVALLI COUNTY; STEPHEN HOLTON, in his official capacity as RAVALLI COUNTY SHERIFF; JENNIFER RAY, in her official capacity as RAVALI COUNTY JUSTICE OF THE PEACE; JIM BAILEY, in his official capacity as RAVALLI COUNTY JUSTICE OF THE PEACE; HOWARD RECHT, in his official capacity as DISTRICT JUDGE FOR THE 21st JUDICIAL DISTRICT and JENNIFER LINT; in her official capacity as DISTRICT JUDGE FOR THE 21st JUDICIAL DISTRICT, | |
| Defendants. | |

Plaintiffs Teri Lea Evenson-Childs, Daniel O'Toole, Richard Churchill, and

Keith Leonard bring this putative class action under 42 U.S.C. § 1983, challenging

Defendant Ravalli County's Jail Diversion Program on constitutional and state law

grounds. This matter comes before the Court on the following motions, which have been fully briefed and argued: (1) Plaintiffs' Renewed Motion for a Preliminary Injunction Against Defendants Holton and Ravalli County (Doc. 40); (2) Defendants Ravalli County, Stephen Holton, Jennifer Ray, and Jim Bailey's Rule 12(b)(6) Motion to Dismiss (Doc. 46); (3) Defendant District Court Judges' Motion to Dismiss (Doc. 48); and Plaintiffs' Motion for Class Certification (Doc. 60).

## I.    **<u>Background</u>**[1]

Individuals arrested in Ravalli County, Montana are typically booked at the county jail and may be released by the court upon paying bail or on their own recognizance without bail. (Doc. 34 at ¶ 36). If an arrestee is released subject to conditions of supervision, the court may assign the arrestee to Ravalli County's Jail Diversion Program and specify what program conditions, such as drug testing and electronic monitoring, the arrestee will be subject to while on pretrial release. (Doc. 34 at ¶ 3). An arrestee who is assigned to the Jail Diversion Program must

---

[1] The following facts are taken from the allegations in the Second Amended Class Action Complaint (Doc. 34), which are accepted as true for purposes of the pending motions to dismiss under Federal Rule of Civil Procedure 12(b)(1) and (6). Additional facts that are relevant to Plaintiffs' motion for a preliminary injunction are included in the discussion section below.

pay certain fees associated with the conditions of pretrial supervision, and failure to do so may result in revocation of release. (Doc. 34 at ¶ 2).

The four named Plaintiffs, all of whom are indigent, are current or former participants in the Jail Diversion Program. Evenson-Childs was arrested in February 2020, and her bail was set at $30,000. (Doc. 34 at ¶ 64). The court imposed pretrial supervision and alcohol monitoring as release conditions. (Doc. 34 at ¶ 64). Evenson-Childs posted bail, and as part of the Jail Diversion Program was required to pay supervision and alcohol monitoring fees totaling $325 per month while on pretrial release. (Doc. 34 at ¶¶ 65, 68). As a result of having to pay the Jail Diversion Program fees, Evenson-Childs has not been able to secure stable housing, and without stable housing, she has not been able to obtain stable employment. (Doc. 34 at ¶ 71). O'Toole has had three recent criminal cases in Ravalli County and has been cycling in and out of jail because of the Jail Diversion Program for years. (Doc. 34 at ¶¶ 75, 76). In addition to posting bail as set by the court in each of his criminal cases, O'Toole has paid thousands of dollars in Jail Diversion Program fees while on pretrial release. (Doc. 34 at ¶¶ 79, 83, 86). As a result of his periodic incarcerations while in the Jail Diversion Program, O'Toole has not been able to find and maintain employment. (Doc. 34, at ¶ 75). Churchill was released subject to pretrial supervision and random drug testing in December 2020. (Doc. 34 at ¶¶ 91-92). Churchill was required to pay approximately $335 per

month in supervision and drug testing fees while in the Jail Diversion Program,
and he was jailed twice in 2021 because he could not afford the program's drug
testing fees. (Doc. 34 at ¶¶ 93, 98). Leonard entered the Jail Diversion Program in
January 2021, and has gone into debt as a result of having to pay at least $120
every month for twice-daily alcohol tests. (Doc. 34 at ¶ 101). Leonard claims he
faced new criminal charges resulting from the Jail Diversion Program because he
has twice been charged with criminal contempt for drinking alcohol, which would
not otherwise be considered criminal conduct. (Doc. 34 at ¶ 102).

Plaintiffs commenced this § 1983 action against Ravalli County, the Ravalli
County Sheriff, two Ravalli County district court judges, and two Ravalli County
justice court judges in August 2021, and have amended their complaint twice since
then. Plaintiffs seek to enjoin the operation of the Ravalli County Jail Diversion
Program and their Second Amended Complaint asserts nine claims for relief. (Doc.
34). Count 1 alleges "Violation of Procedural Due Process Regarding Deprivation
of Property Interest in Fee Amount." (Doc. 34 at 54). Plaintiffs claim that
Defendants Ravalli County and Ravalli County Sheriff Stephen Holton deprived
them of their property without due process as guaranteed under the Fourteenth
Amendment to the United States Constitution by charging them for pretrial fees
without any finding of guilt. (Doc. 34 at ¶ 193).

Count 2 alleges "Violation of Procedural Due Process for Arbitrary Bail." (Doc. 34 at 55). Plaintiffs assert Defendant Justice Court Judges Jennifer Ray and Jim Bailey, and Defendant District Court Judges Howard Recht and Jennifer Lint impose pretrial conditions without any nexus to risk factors and without any timeline as to how long pretrial arrestees will be subject to those conditions, and Sheriff Holton charges fees associated with those conditions for however long the case remains in pretrial status. Plaintiffs allege that pretrial fees are thus imposed as quasi-bail, without the attendant due process protections. (Doc 34 at ¶ 195).

Count 3 alleges "Status-Based Discrimination on the Basis of Homelessness." (Doc. 34 at 55). Plaintiffs assert that Sheriff Holton, through the Jail Diversion division of the sheriff's office, discriminates against unhoused arrestees on ankle monitoring by requiring arrestees to pay a multi-thousand dollar cash deposit before being released from jail, thereby criminalizing homelessness in violation of the prohibition against cruel and unusual punishment embodied in the Eighth Amendment to the United States Constitution. (Doc. 34 at ¶¶ 197-98).

Count 4 alleges "Violation of Procedural Due Process Regarding Ability to Pay." (Doc. 34 at 56). Plaintiffs claim that Defendants' practice of assessing pretrial fees without considering ability to pay violates the procedural due process clause of the Fourteenth Amendment to the United States Constitution. (Doc. 34 at ¶¶ 200-201).

5

Count 5 alleges "Violation of Procedural Due Process for Incarceration for Non-Payment of Fees." (Doc. 34 at 56). Plaintiffs assert that by permitting the revocation of bail based on failure to pay pretrial fees without considering ability to pay, Defendants are effectively criminalizing poverty in violation of the Fourteenth Amendment's procedural due process clause. (Doc. 34 at ¶¶ 203-05).

Count 6 alleges "Violation of Federal Equal Protection for Wealth-Based Discrimination." (Doc. 34 at 57).  Because indigent pretrial arrestees may be incarcerated if they cannot afford pretrial fees, Plaintiffs allege that Defendants treat similarly situated pretrial arrestees differently based indigency, and in doing so engage in wealth-based discrimination in violation of the Fourteenth Amendment's equal protection clause. (Doc. 34 at ¶¶ 209-10).

Count 7 asserts "Violation of State Equal Protection for Social Condition Discrimination." (Doc. 34 at 57). Plaintiffs allege that Defendants discriminate against pretrial arrestees on the basis of social condition, specifically indigency, in violation of the equal protection clause of Article II, § 4 of the Montana Constitution because indigent pretrial arrestees face punishment for non-willful failure to pay Jail Diversion Program fees, while similarly situated wealthy pretrial arrestees only face punishment for willful nonpayment. (Doc. 34 at ¶¶ 212-14).

Count 8 alleges "False Imprisonment." (Doc. 34 at 58). Plaintiffs claim that Sheriff Holton, through the Jail Diversion division, unlawfully detains pretrial

arrestees beyond their release date by conditioning release on payment of arbitrary pretrial fees, and that "[s]uch unlawful and involuntary restraint" constitutes false imprisonment. (Doc. 34 at ¶¶ 216-17).

Count 9 alleges "Violation of Due Process via Contract Increasing Criminal Exposure." (Doc. 34 at 58). Plaintiffs allege that Sheriff Holton, through the Jail Diversion division, unlawfully requires pretrial arrestees to sign contracts "agreeing" to further criminal charges if they do not comply with certain pretrial conditions. (Doc. 34 at ¶¶ 219-22).

Plaintiffs request declaratory, injunctive, and monetary relief. First, they seek a declaratory judgment that (1) the Jail Diversion Program, and Ravalli County and Sheriff Holton's conduct in implementing and enforcing the program, is unlawful; and (2) the District and Justice Court Judge Defendants' ongoing practices of ordering participation in the Jail Diversion Program; failing to conduct ability-to-pay and risk assessments; and revoking pretrial arrestees for nonpayment of Jail Diversion Program fees are unlawful. (Doc. 34 at ¶ 224(a)(b)). Second, Plaintiffs request a preliminary and permanent injunction enjoining Ravalli County and Sheriff Holton from continuing the unlawful policies and practices of the Jail Diversion Program.  (Doc. 34 at ¶ 224(c)). Plaintiffs also seek a judgment ordering Sheriff Holton to train all Ravalli County Sheriff's Office employees on the preliminary and permanent injunctions. (Doc. 34 at ¶ 224(d)). Finally, Plaintiffs

request compensatory damages, including specifically all pretrial fees paid to Ravalli County and Sheriff Holton, and an award of reasonable attorney fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988. (Doc. 34 at ¶ 224(e)(f)).

Plaintiffs have moved for a preliminary injunction prohibiting Sheriff Holton and Ravalli County from charging any fees associated with the Jail Diversion Program and from detaining anyone for failure to pay such fees. (Doc. 40). Ravalli County, Sheriff Holton, and the Justice Court Judges (collectively "County Defendants") move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Second Amended Complaint for failure to state a claim for relief. (Doc. 46). The District Court Judges have in turn moved to dismiss for lack of subject matter jurisdiction and failure to state a claim under Rule 12(b)(1) and (6), respectively. (Doc. 48). Plaintiffs have also filed a motion for class certification, asking the Court to certify main damages and injunctive classes, and indigent damages and injunctive subclasses. (Doc. 60). The Court addresses these motions in the order set forth below.

## II.   <u>Motions to Dismiss</u>

### A.   **Legal Standards**

#### 1.   <u>Rule 12(b)(1)</u>

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction over the claims asserted. "Once

challenged, the party asserting subject matter jurisdiction has the burden of proving its existence." *Rattlesnake Coalition v. United States Environmental Protection Agency*, 509 F.3d 1095, 1102 n. 1 (9th Cir. 2007). A defendant may pursue a Rule 12(b)(1) motion to dismiss for lack of jurisdiction either as a facial challenge to the allegations of a pleading, or as a substantive challenge to the facts underlying the allegations. *Savage v. Glendale Union High School, Dist. No. 205, Maricopa County*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). A facial challenge to the jurisdictional allegations is one which contends that the allegations "are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial challenge the court must assume the allegations in the complaint are true and it must "draw all reasonable inferences in [plaintiff's] favor." *Wolfe*, 392 F.3d at 362. "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039. In resolving such a factual attack, the court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Safe Air for Everyone*, 373 F.3d at 1039. A federal court is one of limited jurisdiction; it must dismiss a case upon concluding it lacks jurisdiction. *High Country Resources v. F.E.R.C.*, 255 F.3d 741, 747 (9th Cir. 2001).

      2. <u>Rule 12(b)(6)</u>

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A cause of action may be dismissed under Fed. R. Civ. P. 12(b)(6) either when it asserts a legal theory that is not cognizable as a matter of law, or if it fails to allege sufficient facts to support an otherwise cognizable legal claim. *SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996). When reviewing a Rule 12(b)(6) motion to dismiss, the court is to accept all factual allegations in the complaint as true and construe the pleading in the light most favorable to the nonmoving party. *Hospital Bldg. Co. v. Trustees of the Rex Hospital*, 425 U.S. 738, 740 (1976); *Tanner v. Heise*, 879 F.2d 572, 576 (9th Cir. 1989).

To withstand a motion to dismiss under Rule 12(b)(6), "the plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (2007)). This means that the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). But if the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory," then dismissal under Rule

12(b)(6) is appropriate. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

### B.    District Court Judges

Plaintiffs bring official capacity claims for declaratory relief against District Court Judges Howard Recht and Jennifer Lint.[2] (Doc. 34, at ¶ 31). Plaintiffs allege that the District Court Judges violated their constitutional rights to due process and equal protection under the Fourteenth Amendment by (1) assigning them to the Jail Diversion Program without a risk assessment to determine the necessity of pretrial conditions and without an ability-to-pay determination, and (2) revoking bail for nonpayment of pretrial fees and assigning new bail after revocation. (Doc. 34, at ¶¶ 3, 31). Plaintiffs request a declaratory judgment that the District Court Judges' ongoing practices of ordering participation in the Jail Diversion Program; failing to conduct ability-to-pay and risk assessments; and revoking pretrial arrestees for nonpayment of program fees are unlawful. (Doc. 34, at ¶ 224(b)).

The District Court Judges move to dismiss Plaintiffs' claims for lack of subject matter jurisdiction under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6). (Doc. 48). They argue Plaintiffs' claims should be dismissed for

---

[2] Plaintiffs acknowledge that they may not seek injunctive relief against the District Court Judges under § 1983 (Doc. 41, at 8 n.1) and, as evidenced by their request for relief, agree that monetary damages are not recoverable from the District Court Judges under § 1983 and the Eleventh Amendment (Doc. 34, at 60-61). See *Aholelei v. Department of Public Safety,* 488 F.3d 1144, 1146 (9th Cir. 2007).

lack of subject matter jurisdiction because they do not present an actual case or controversy as required for Plaintiffs to have standing under Article III of the United States Constitution. They further argue Plaintiffs' claims are subject to dismissal based on Eleventh Amendment immunity, the *Rooker-Feldman* doctrine, and *Younger* abstention.

Under Article III, § 2 of the Constitution, the subject matter jurisdiction of the federal courts is limited to "actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). Article III's case or controversy requirement applies to actions for declaratory relief. See *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126-27 (2007) (citing *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240 (1937)).

"The 'case or controversy' requirement demands first that the issues are justiciable," meaning that "they must 'present a real and substantial controversy which unequivocally calls for the adjudication of … rights.'" *Western Mining Council v. Watt*, 643 F.2d 618, 623 (9th Cir. 1981) (quoting *Poe v. Ullman*, 367 U.S. 497, 509 (1961) (Brennan, J. concurring)). An action for declaratory relief "presents a justiciable case or controversy" if "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Shell Gulf of Mexico, Inc. v. Center for Biological*

*Diversity, Inc.*, 771 F.3d 632, 635 (9th Cir. 2014) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). Additionally, where declaratory relief is requested, the "controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury." *Ward v. City of Barstow*, 2015 WL 4497950, at *6 (C.D. Cal. July 22, 2015) (citing City *of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

"A second case or controversy requirement is that the plaintiffs have standing to assert their claims." *Western Mining Council*, 643 F.2d at 623. See *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) (recognizing that standing is "an essential and unchanging part of the case-or-controversy requirement of Article III"). To establish standing, a plaintiff must demonstrate "(1) an injury in fact, (2) a sufficient causal connection between the injury complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Munns v. Kerry*, 782 F.3d 402, 409 (9th Cir. 2015). See also *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016); *Lujan*, 504 U.S. at 560-61.

Because "a plaintiff must demonstrate standing separately for each form of relief sought," a "plaintiff who has standing to seek damages for past injury, or injunctive relief for an ongoing injury, does not necessarily have standing to seek prospective relief such as a declaratory judgment." *Mayfield v. U.S.*, 599 F.3d 964,

969 (9th Cir. 2010) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Serv. Inc.*, 528 U.S. 167, 185-86 (2000)).

The District Court Judges contend that Plaintiffs' claims for declaratory relief do not present an Article III case or controversy because Plaintiffs have not alleged facts demonstrating that the interests of the District Court Judges are legally adverse to those of Plaintiffs. The District Court Judges further argue that Plaintiffs have not satisfied the causation and redressability elements of Article III standing.  As explained below, the Court finds the District Court Judges' first argument dispositive and, therefore, does not address causation and redressability.

"Article III of Constitution affords federal courts the power to resolve only 'actual controversies arising between adverse litigants.'" *Whole Women's Health v. Jackson*, 142 S.Ct. 522, 532 (2021) (quoting *Muskrat v. United States*, 219 U.S. 346, 361 (1911)). The District Court Judges maintain that this case or controversy standard is not satisfied here because Plaintiffs have not established the requisite adversity of interest.

The District Court Judges begin with the premise that under federal law, including the Ninth Circuit's decision in *Grant v. Johnson*, 15 F.3d 146, 148 (9th Cir. 1994), a judge acting in an adjudicatory capacity is not adverse to a plaintiff challenging the constitutionality of a statute, and thus is not a proper party under § 1983. In *Grant,* a state court judge granted a petition to appoint a temporary

guardian for the plaintiff without notice or a hearing, as permitted by a state statute in effect at the time, and the guardian then placed the plaintiff in a psychiatric ward where she was involuntarily held for approximately two weeks. *Grant*, 15 F.3d at 147. The plaintiff brought a § 1983 action against the judge, asking the court to declare the statute "unconstitutional and to enjoin its future use against her." *Grant*, 15 F.3d at 147. The judge argued he was not the proper party for the plaintiff "to sue in order to test the constitutionality of a state statute that he merely applied in a neutral fashion," and the Ninth Circuit agreed. *Grant*, 15 F.3d at 147. The Ninth Circuit noted that "[s]uits against state judges who are adjudicating cases pursuant to state law raise serious questions about the existence of a justiciable controversy between the parties," and looked to the First Circuit's leading decision in *In re Justices of Supreme Court of Puerto Rico,* 695 F.2d 17 (1st Cir. 1982) for guidance. *Grant*, 15 F.3d at 147-48.

The *In re Justices* plaintiffs brought suit against justices of the Puerto Rico Supreme Court, challenging the constitutionality of Puerto Rico statutes requiring attorneys to belong to the Puerto Rico bar association and pay bar association membership dues. *In re Justices*, 695 F.2d at 18-19. The justices argued that because they had acted "as neutral adjudicators rather than as administrators, enforcers, or advocates" with respect to the statutes, their interests were not legally adverse to those of the plaintiffs as required to give rise to an Article III case or

controversy. *In re Justices*, 695 F.2d at 21. The First Circuit agreed that "ordinarily, no 'case or controversy' exists between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of a statute" because "[j]udges sit as arbiters without a personal or institutional stake on either side of the constitutional controversy" and "[a]lmost invariably…have played no role in the statute's enactment" or initiating its enforcement. *In re Justices*, 695 F.2d at 21. The First Circuit did not base its holding on Article III, however, concluding instead that the plaintiffs failed to state a claim under Rule 12(b)(6) because § 1983 does not provide a cause of action against "judges acting purely in their adjudicative capacity." *In re Justices*, 695 F.2d at 22.

The Ninth Circuit followed this reasoning in *Grant*, holding that "judges adjudicating cases pursuant to state statutes may not be sued under § 1983 in a suit challenging the state law." *Grant*, 15 F.3d at 148. Because there was no doubt the defendant judge had acted in an adjudicative capacity by appointing a guardian for the plaintiff under the applicable state statute, the Ninth Circuit held the judge was not a proper defendant under § 1983. *Grant*, 15 F.3d at 148.

Other federal courts have followed suit, and "in doing so, have used language with broader constitutional implications." *Lindke v. Tomlinson*, 31 F.4th 487, 492 (6th Cir. 2022). In *Lindke*, the plaintiff brought a § 1983 action against a county sheriff and state court judge, seeking to enjoin enforcement of Michigan's

domestic personal protection order statute and requesting declaratory relief against
the judge. *Lindke*, 31 F.3d at 489, 490. The judge had previously granted a third-
party application for a personal protection order against the plaintiff pursuant to the
Michigan statute, and later found plaintiff in violation of that order. *Lindke*, 31
F.3d at 489. Citing *In re Justices* as the seminal case and acknowledging the Ninth
Circuit's decision in *Grant*, the Sixth Circuit held "that no case or controversy
exists between a state-court judge who has acted in an adjudicatory capacity under
a state statute and a litigant who is attacking the constitutionality of that statute."
*Lindke*, 31 F.4th at 492-93.

      Again citing *In re Justices*, the Sixth Circuit found that "the threshold
consideration is whether the judge is acting, under the statute at issue, in an
adjudicatory capacity or as an enforcer or administrator." *Lindke*, 31 F.4th at 491.
If a judge has "acted as enforcer or administrator of the statute," the judge "may be
a proper defendant" under § 1983. *Lindke*, 31 F.4th at 493. The Sixth Circuit
concluded the defendant judge's role under the statute was purely adjudicative,
noting that the judge had not initiated the underlying action and was simply
responsible for evaluating the third-party petitioner's request for a personal
protection order as directed by the statute. *Lindke*, 31 F.4th at 493. Because the
judge had "merely acted in an adjudicatory capacity to construe and apply the
statute," the Sixth Circuit concluded the parties were "not adverse to one another,

so there [was] no case or controversy" as required for the court to have subject matter jurisdiction over the plaintiff's claims. *Lindke* 31 F.4th at 495.  See also *Lindke v. Lane,* 523 F.Supp.3d 940, 942 (E.D. Mich. 2021) (finding in a case involving the same plaintiff that a different state court judge's role under Michigan's non-domestic personal protective order statute was to act in an adjudicatory capacity, and dismissing for lack of subject matter jurisdiction because the judge's interests were not adverse to the plaintiff's and there was no Article III case or controversy); *Wolfe v. Strankman*, 392 F.3d 358, 365 (9th Cir. 2004) (stating that "[u]nder *In re Justices*, whether judges are proper defendants in a § 1983 action depends on whether they are acting as adjudicators or as 'administrators, enforcers, or advocates'") (quoting *In re Justices*, 695 F.2d at 21); *Evans v. City of Ann Arbor*,  2022 WL 586753, at *15 (E.D. Mich. Feb. 25, 2022) (recognizing that "a judge may be a proper defendant in a suit for declaratory relief where he enforces or administers a statute, such as where he has the authority to initiate proceedings, has been delegated administrative functions, or in some way possesses adverse interests to the litigant").

Applying these standards here, the District Court Judges argue Plaintiffs have not alleged facts establishing the adversity of interest necessary to create an Article III case or controversy. Taking the facts asserted in the Second Amended Complaint as true, the District Court Judges maintain it is clear they were acting in

an adjudicatory capacity under Montana's bail statutes, rather than as an enforcer or administrator of the challenged Jail Diversion Program. The Court agrees.

Montana's bail statutes establish a presumption of release for pretrial arrestees, except in cases that qualify for the death penalty. Mont. Code Ann. § 46-9-106. The statutes provide that "[b]efore a verdict has been rendered, the court shall … authorize the release of the defendant upon reasonable conditions that ensure the appearance of the defendant and protect the safety of the community or of any person." Mont. Code Ann. § 46-9-106. Courts are authorized to "impose any condition that will reasonably ensure the appearance of the defendant as required or that will ensure the safety of any person or the community" and provide a non-exhaustive list of conditions that may be imposed. Mont. Code Ann. § 46-9-108(1).

In determining whether a defendant should be released or detained prior to trial, courts are statutorily required to consider a variety of factors regarding risk and ability to pay. Mont. Code Ann. § 46-9-109. "[A]t any time" after the initial imposition of conditions, "the court may, upon reasonable basis, amend the order to impose additional or different conditions of release upon its own motion or upon the motion of either party." Mont. Code Ann. § 46-9-108(3). When a defendant is released on conditions pending trial, pretrial services including supervision, monitoring for compliance, and testing, are typically performed by a "pretrial

services agency," which is defined as "a government agency or private entity under contract with a local government...that is designated by the district court, justice's court, municipal court, or city court to provide services pending trial." Mont. Code Ann. § 46-9-505(5).

If a defendant violates a condition of release, "the prosecutor may make a written motion to the court for revocation" and the court may revoke the order of release. Mont. Code. Ann. § 46-9-503(1). The bail statutes further provide that "[u]pon failure to comply with any condition of a bail or recognizance," the court may issue an arrest warrant and "[u]pon the arrest, the defendant must be brought before the court without unnecessary delay and the court shall conduct a hearing and determine bail..." Mont. Code. Ann. § 46-9-505(1), (4).

The Second Amended Complaint and Plaintiffs' response brief make clear that Plaintiffs are not challenging the constitutionality of Montana's bail statutes or the District Court Judges' authority to impose bail conditions under Montana law, but rather Jail Diversion Program, including particularly the program fees. (Doc. 34; Doc. 57, at 12). Plaintiffs do not directly address the line of authority outlined above, and make no attempt to distinguish any of the cases cited by the District Court Judges. (Doc. 57, at 12-13). Instead, Plaintiffs argue in broad strokes that the District Court Judges have acquiesced to, adopted, and implemented the Jail Diversion Program. (Doc. 57, at 12-13).

But the allegations in the Second Amended Complaint do not support this assertion. To begin with, Plaintiffs expressly allege that Ravalli County and Sheriff Holton are responsible for the "creation, implementation, and enforcement" of the Jail Diversion Program, and further assert that Sheriff Holton sets the program fees to which Plaintiffs object. (Doc. 34 at ¶¶ 6, 24-25). Plaintiffs do not allege facts demonstrating that the District Court Judges have promulgated the Jail Diversion Program, or are responsible for its enforcement. Nor do Plaintiffs allege any facts demonstrating that the District Court Judges have been delegated, either by statute or the Jail Diversion Program itself, any administrative functions relating to implementation of the program. The District Court Judges did not initiate the underlying criminal proceedings against Plaintiffs, and their allegedly improper actions were performed while discharging their duties under Montana's bail statutes and adjudicating issues in the underlying criminal proceedings. See *Lindke*, 31 F.4th at 493 (recognizing that a judge may be adverse to a plaintiff challenging the constitutionality of a statute or practice if the judge promulgated, implemented, or adopted the statute or practice, or was responsible for its enforcement); *Allen v. DeBello*, 861 F.3d 433, 442 (3rd Cir. 2017) (concluding that state court judges were not proper parties under § 1983 in a case challenging the constitutionality of state law governing child custody proceedings, because the presiding judges were acting in an adjudicatory capacity in that they had no right to

21

initiate custody proceedings, were not given any administrative function, and did not promulgate the statutes or judicial standards to which the plaintiffs objected).

Plaintiffs do claim that the District Court Judges assign pretrial arrestees to the Jail Diversion Program without making the statutorily required risk or ability to pay assessments, and have created forms they use to make those assignments. (Doc. 34 ¶ 31). But even taking these allegations as true, the District Court Judges would have been acting in their adjudicatory capacity under Montana's bail statutes in doing so. To the extent Plaintiffs also claim that the District Court Judges wrongfully impose a new bail amount after a revocation (Doc. 34 at ¶ 10), they are statutorily required to redetermine bail, and in doing so are performing a judicial function. See Mont. Code. Ann § 46-9-505.

Likewise, to the extent Plaintiffs assert that the District Court Judges "revoke bail for non-payment of fees, consistent with the policies of the Jail Diversion Program," this allegation does not demonstrate that the judges were acting as enforcers or administrators of the program. (Doc. 34). The District Court Judges submitted affidavits in support of their motion to dismiss stating that "[a]lthough the failure to pay fees may be included in a revocation order, including a requirement to reimburse the providing agency for monitoring as provided [by statute], a revocation is always based on another violation of pretrial conditions,

such as failure to appear, alcohol/drug use, or other criminal act." (Doc. 49-1 at ¶ 11; Doc. 49-2 at ¶ 11).

To the extent these affidavits raise a factual challenge to jurisdiction, they are properly considered by the Court. The affidavits directly contradict Plaintiffs' allegation that the District Court Judges revoke bail for nonpayment of program fees, and Plaintiffs have not submitted any evidence to the contrary. But even taking the Plaintiffs' allegations as true, the District Court Judges would have been acting in an adjudicatory capacity when revoking bail in the underlying criminal proceedings.

For the first time at oral argument, Plaintiffs cited *Georgevich v. Strauss*, 772 F.2d 1078 (3d. Cir 1985) to support their argument that the District Court Judges are adverse because they administer and enforce the Jail Diversion Program.  In *Georgevich*, a class of prisoners brought a § 1983 action challenging Pennsylvania's statutory parole procedures, and named several state court judges responsible for making parole determinations as defendants. *Georgevich*, 772 F.2d at 1082. Importantly, Pennyslvania law "divided[d] the authority to make parole decisions between the sentencing judges and the [Parole] Board," thereby making them both "administrators of the parole power." *Georgevich*, 772 F.2d at 1087. Consequently, the Third Circuit Court of Appeals saw "no basis for distinguishing the role of sentencing judges from that of the Board," and held the prisoners could

proceed against the judges because "[t]his is not a case in which judges are sued in their judicial capacity as neutral adjudicators of disputes." *Georgevich*, 772 F.2d at 1087.

Here, unlike *Georgevich*, Montana's bail statutes do not make the District Court Judges administrators of the Jail Diversion Program. As noted above, Plaintiffs do not claim that District Court Judges have been delegated, either by statute or the Jail Diversion Program itself, any administrative functions relating to implementation of the program. The facts and the law in this case are thus materially distinguishable from *Georgevich.*

Unlike *Georgevich*, the facts as alleged by Plaintiffs demonstrate that the District Court Judges were at all times performing "quintesenntially judicial functions" under Montana's bail statutes when setting bail, establishing conditions of pretrial release, and making revocation decisions in Plaintiffs' criminal proceedings. See *Silver v. Court of Common Pleas of Allegheny County*, 2018 WL 6523890, at *14 (W.D. Pa. Dec. 12, 2018) (dismissal of state judge defendant required where the judge "engaged in quintessential judicial functions" and thus was not adverse to the plaintiff).

Taking the facts alleged in the Second Amended Complaint as true, the District Court Judges were at all times acting in an adjudicatory capacity under Montana's bail statutes. Because the District Court Judges were performing

quintessentially judicial functions in the underlying criminal cases, Plaintiffs have not established the adversity of interest necessary to create an Article III case or controversy. Consequently, Plaintiffs' claims for declaratory relief against the District Court Judges are subject to dismissal for lack of subject matter jurisdiction.

Having so concluded, the Court does not reach the District Court Judges' alternative arguments that Plaintiffs' claims are barred by Eleventh Amendment immunity, *Younger* abstention, and the *Rooker-Feldman* doctrine.

## C.   County Defendants

Ravalli County, Sheriff Holton, and the two Justice of the Peace Defendants, Jennifer Ray and Jim Bailey (collectively "County Defendants") move to dismiss Plaintiffs' claims for failure to state a claim under Rule 12(b)(6). (Doc. 46). They argue that: (1) the Court should abstain from exercising jurisdiction under the *Younger* and *Pullman* abstention doctrines; (2) Sheriff Holton and the Justices of the Peace are not proper parties; and (3) Plaintiffs fail to state a claim for municipal liability against the County under § 1983.

### 1.   *Younger* Abstention

In *Younger v. Harris*, 401 U.S. 37 (1971), the Supreme Court "established a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *King v. County of Los Angeles*, 885 F.3d 548, 559 (9th Cir. 2018) (quoting *Middlesex Cty. Ethics Comm. v.*

*Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982)). The *Younger* doctrine
"generally directs federal courts to abstain from granting injunctive or declaratory
relief that would interfere with pending state judicial proceedings." *Martinez v.
Newport Beach City*, 125 F.3d 777, 781 (9th Cir. 1997) (citing *Younger*, 401 U.S. at
40-41).

   The *Younger* doctrine "remains an extraordinary and narrow exception to the
general rule" that a "federal court's obligation to hear and decide a case is virtually
unflagging." *Arevalo v. Hennessy*, 882 F.3d 763, 765 (9th Cir. 2018) (internal
quotation marks omitted). "A federal court may abstain under *Younger* in three
categories of cases: '(1) parallel, pending state criminal proceedings, (2) state civil
proceedings that are akin to criminal prosecutions, and (3) state civil proceedings
that implicate a State's interest in enforcing the orders and judgments of its
courts.'" *Herrera v. City of Palmdale*, 918 F.3d 1037, 1043-44 (9th Cir. 2019)
(quoting *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759
(9th Cir. 2014)). In addition, for *Younger* abstention to apply "the state proceeding
must be (1) 'ongoing,' (2) implicate important state interests,' and (3) provide 'an
adequate opportunity … to raise constitutional challenges.'" *Herrera*, 918 F.3d  at
1044 (quoting *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S.
423, 432 (1982)). The Ninth Circuit also requires that "[t]he requested relief must

seek to enjoin  -- or have the practical effect of enjoining -- ongoing state proceedings." *ReadyLink Healthcare*, 754 F.3d at 758.

The County argues all of the *Younger* requirements are satisfied because: it appears based on the allegations in the Second Amended Complaint that there are ongoing state criminal proceedings; Montana has an important interests in ensuring that criminal defendants appear for their court proceedings and comply with the conditions of bail, and in protecting persons from bodily injury; Plaintiffs are not barred from litigating federal constitutional issues in their state criminal proceedings and are in fact entitled to a hearing on their bail conditions at any time; and granting the relief sought in this action would interfere with the underlying criminal proceedings. (Doc. 47 at 15).

Plaintiffs concede that there are ongoing pending state criminal proceedings, but argue no other *Younger* requirements are satisfied. Plaintiffs agree that the County has an important interest prosecuting violations of state law and ensuring that defendants comply with conditions of bail, but maintain those interests are not implicated here. Plaintiffs cite *Arevalo v. Hennessy*, in which the Ninth Circuit held that *Younger* abstention did not apply to a pretrial detainee's claim that he had been detained for several months without a constitutionally adequate bail hearing. 882 F.3d at 766-67. The Ninth Circuit found that *Younger* abstention was not appropriate "because the issues raised in the bail appeal [were] distinct from the

underlying criminal prosecution," which would "move forward unimpeded."
*Arevalo*, 882 F.3d at 766. The same is true here. Regardless of how Plaintiffs'
claims challenging the imposition of pretrial fees are resolved, the state criminal
proceedings will move forward unimpeded. While Plaintiffs seek to enjoin the
County from implementing the Jail Diversion Program to the extent pretrial fees
are allegedly imposed without considering an arrestee's ability to pay and pretrial
release is allegedly revoked for nonpayment, such relief would not interfere with
the state's interest in prosecuting violations of state law and requiring defendants
to comply with conditions of release that are constitutionally imposed.

In addition, as Plaintiffs further contend, the underlying criminal
proceedings do not provide an adequate opportunity to raise the federal
constitutional challenges asserted here. In *Gerstein v. Pugh*, pretrial detainees
sought injunctive relief requiring the state of Florida to make prompt probable
cause determinations. 420 U.S. 103, 107-08 (1975). The United States Supreme
Court held that *Younger* abstention did not apply because "[t]he injunction was not
directed at the state prosecutions, as such, but only at the legality of pretrial
detention without a judicial hearing, an issue that could not be raised in defense of
the criminal prosecutions. The order to hold preliminary hearings could not
prejudice the conduct of the trial on the merits." *Gerstein*, 420 U.S. at 107 n.9.
Here, as in *Gerstein,* the constitutional claims alleged present federal questions

regarding the imposition of pretrial fees by the County that could not be raised in defense of the state criminal prosecutions.

Finally, Plaintiffs argue *Younger* is inapplicable because they are not seeking to enjoin the underlying criminal proceedings, and the relief they seek would not have the practical effect of doing so. The Court agrees. As in *Arevalo* and *Gerstein*, the pretrial fee practices and procedures challenged by Plaintiffs are separate from any underlying criminal prosecution, and resolution of Plaintiffs' claims would not enjoin or otherwise impede the criminal proceedings against them. See also *Walker v. City of Calhoun GA*, 901 F.3d 1245, 1254 (11th Cir. 2018) (holding that *Younger* did not apply because the plaintiff was "not asking to enjoin any prosecution" and was "merely seek[ing] prompt bail determinations for himself and his fellow class members").

The County nevertheless argues that *Younger* abstention is warranted under *O'Shea v. Littleton*, 414 U.S. 488 (1974). In *O'Shea*, the plaintiffs brought a § 1983 class action against a county magistrate and state circuit judge for engaging in a continuing pattern and practice of allegedly unconstitutional practices in setting bonds, imposing discriminatory sentences, and setting jury fees in criminal cases. *O'Shea*, 414 U.S. at 492. "As the Supreme Court characterized it, the plaintiffs sought 'an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials,'

which amounted to 'an ongoing federal audit of state criminal proceedings.'"

*Walker*, 901 F.3d at 1254 (quoting *O'Shea*, 414 U.S. at 500). The Supreme Court

concluded that the requested injunction amounted to "nothing less than an ongoing

federal audit of state criminal proceeding which would indirectly accomplish the

kind of interference that *Younger* … sought to prevent," and made clear that a

"federal court should not intervene to establish the basis for future intervention that

would be so intrusive and unworkable." *O'Shea*, 414 U.S. at 500.

Here, unlike *O'Shea*, Plaintiffs are not asking for an injunction that would

interfere with state criminal prosecutions. Instead, as in *Walker*, Plaintiffs are

requesting relief related to the County's pretrial procedures and policies, which

would not require "the sort of pervasive federal court supervision of State criminal

proceedings that was at issue in *O'Shea*." *Walker*, 901 F.3d at 1255. See also

*Arevalo*, 882 F.3d at 766 n. 2 (finding that *O'Shea* was easily distinguishable from

the plaintiff's claim that he had been detained without a constitutionally adequate

bail hearing because *O'Shea* "involved an injunction against state criminal

prosecutions, a decision that squarely impacted criminal prosecution," whereas the

relief requested in *Arevalo* could "be achieved without an ongoing intrusion into

the state's administration of justice").

For these reasons, the Court finds that abstention under *Younger* is not warranted.[3]

2.    <u>*Pullman* Abstention</u>

The County next argues the Court should abstain from exercising jurisdiction under the *Pullman* doctrine. Under *Pullman*, "federal courts should abstain from decision when difficult or unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 236 (1984). For *Pullman* to apply, three requirements must be met: "(1) [t]he complaint touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open; (2) [s]uch constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy; [and] (3) [t]he possibly determinative issue of state law is doubtful." *Smelt v. County of* Orange, 447 F.3d 673, 679 (9th Cir. 2006).

The County argues the Court should abstain under *Pullman* because a ruling on Plaintiffs' state law claims for false imprisonment and social condition discrimination in violation of Article II, § 4 of the Montana Constitution would render their federal constitutional claims "mooted or substantially narrowed."

---

[3] Because the requirements for *Younger* abstention are not satisfied, the Court need not address Plaintiffs' argument that the irreparable harm exception to *Younger* abstention applies.

(Doc. 47 at 17). But as Plaintiffs argue in response, their federal and state claims are entirely independent of each other. Plaintiffs' state law claims are not intertwined with the constitutional issues raised in their federal claims, and state court interpretation of Montana's constitutional provision on social status discrimination or false imprisonment statute would not affect the analysis of Plaintiffs' federal equal protection and due process claims, much less render those claims mooted or substantially narrowed. See *San Remo Hotel v. City and County of San Francisco*, 145 F.3d 1095, 1101 (9th Cir. 1998) (recognizing that "[i]f the constitutional questions before us might be mooted or substantially narrowed by decision of the state law claims intertwined with the constitutional issues in this case, then our precedents require abstention in order to avoid an unnecessary conflict between state law and the federal Constitution").

Because there is no indication that a "definitive ruling" on Plaintiffs' state law claims "would terminate the controversy" or eliminate the need for "constitutional adjudication" of Plaintiffs' federal claims, *Pullman* does not apply. See *R.R. Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 498 (1941).

### 3.   Sheriff Holton

Sheriff Holton, who is sued only in his official capacity, argues Plaintiffs' claims should be dismissed because they are duplicative of those asserted against Ravalli County. It is well settled that "[a]n official-capacity suit is, in all respects

other than name, to be treated as a suit against the entity," and may be dismissed by the court as duplicative. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Melendres v. Arpaio*, 784 F.3d 1254, 1260 (9th Cir. 2015). Given that Ravalli County agrees it is liable for any alleged wrongdoing by Sheriff Holton, Plaintiffs agree that their official capacity claims against Sheriff Holton are duplicative and should be dismissed. (Doc. 51 at 6-7). The County Defendants' motion to dismiss Plaintiffs' claims against Sheriff Holton should be granted accordingly.

4.   Justices of the Peace

Justices of the Peace Jennifer Lint and Ray Bailey argue they are entitled to Eleventh Amendment immunity, and also join in the District Court Judges' motion to dismiss. (Doc. 47 at 4-5; Doc.58 at 3). Like the District Court Judges, the Justices of the Peace are sued only in their official capacities and only for declaratory relief. (Doc. 34 at 7, 53, 60).

The Ravalli County Justice Court "is one of the several 'courts of justice of this state,' and is thus an 'arm of the state' for purposes of the Eleventh Amendment." *Hubbard v. Sheffield*, 2012 WL 2969434, at *4 (D. Mont. July 20, 2012) (quoting Mont. Code Ann. § 3-101(5)). See also *Eggar v. City of Livingston*, 40 F.3d 312, 315 (9th Cir. 1994) ("[A] municipal judge acting in his or her judicial capacity to enforce state law does not act a municipal official or lawmaker for purposes of § 1983 liability.") (internal quotations omitted).

Consistent with *Hubbard* and *Eggar*, the Court finds the Justices of the Peace are state actors. As such, the Justices of the Peace are on equal footing with the District Court Judges, who are also state actors for purposes of § 1983 liability. The Justices of the Peace have joined in the motion to dismiss filed by the District Court Judges, and Plaintiffs' claims for declaratory relief are subject to dismissal for lack of subject matter jurisdiction for all of the same reasons.

Taking the facts alleged in the Second Amended Complaint as true, the Justices of the Peace were at all times acting in an adjudicatory capacity under Montana's bail statutes. Because the Justices of the Peace were performing quintessentially judicial functions in the underlying criminal cases, Plaintiffs have not established the adversity of interest necessary to create an Article III case or controversy. Consequently, and for the reasons discussed in more detail above in relation to the District Court Judges' motion to dismiss, Plaintiffs' claims for declaratory relief against the Justices of the Peace should be dismissed for lack of subject matter jurisdiction.

## 5. Ravalli County

Ravalli County argues Plaintiffs have not pled sufficient facts to state a claim for municipal liability under § 1983. Section 1983 provides a cause of action for the violation of federal constitutional rights by persons acting under color of

state law.[4] 42 U.S.C. § 1983. A municipality like Ravalli County is considered a "person" under § 1983 and may be sued for causing a constitutional deprivation. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978)). "A municipality cannot, however, 'be held liable under § 1983 a respondeat superior theory.'" *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002) (quoting *Monell*, 436 U.S. at 691). Rather, liability attaches "only where the municipality itself causes the constitutional violation through 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Ulrich*, 308 F.3d at 984 (quoting *Monell*, 436 U.S. at 694).

To state a claim against Ravalli County under § 1983, Plaintiffs must allege that: (1) they were deprived of a constitutional right; (2) Ravalli County had a policy, custom, or practice; (3) the policy, custom or practice amounted to deliberate indifference to Plaintiffs' constitutional rights; and (4) the policy, custom or practice was the moving force behind the constitutional violation. See

---

[4] The County's motion does not specifically address Count 3 of the Second Amended Complaint, which is titled "Status-Based Discrimination on the Basis of Homelessness" and alleges the County has criminalized homelessness in violation of the Eighth Amendment to the United States Constitution. Because the County does not specifically address this claim or the underlying theory of liability, it has not demonstrated that Count 3 fails to allege a viable Eighth Amendment violation.

*Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011); O*viatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992).

Ravalli County maintains that Plaintiffs fail to state a claim for municipal liability based on Fourteenth Amendment equal protection and due process violations. Ravalli County's primary argument relates to the first requirement for municipal liability, in particular, that Plaintiffs have not alleged a viable underlying constitutional claim. Plaintiffs counter that they have sufficiently pled claims for wealth-based discrimination in violation of their constitutional right to equal protection, and for procedural due process violations.

a.   *Equal Protection*

The Equal Protection Clause of the Fourteenth Amendment prohibits the government from denying individuals equal protection of the laws, "which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Plaintiffs' federal equal protection claim is set forth in Count 6 of the Second Amended Complaint, which alleges wealth-based discrimination in violation of the Fourteenth Amendment. (Doc. 34 at 57 ¶¶ 207-10). Specifically, Plaintiffs assert that the County treats similarly situated pretrial arrestees "differently based on whether they are indigent" and "[i]ndigent pre-trial arrestees risk incarceration simply because they cannot afford pre-trial fees." (Doc. 34 at ¶ 209).

As an initial matter, the Court notes that the parties use different use

different legal frameworks to analyze whether Plaintiffs have stated a viable equal

protection claim. Ravalli County relies on the traditional equal protection

framework (Doc. 47 at 7-11), while Plaintiffs rely on the hybrid framework for

wealth-based discrimination claims used by the United States Supreme Court in

*Bearden v. Georgia*, 461 U.S. 660 (1983). (Doc. 51 at 22-25). *Bearden* held that a

state cannot revoke an indigent defendant's probation for failure to pay a fine

without first inquiring into the reasons for the failure to pay and considering

alternate forms of punishment, because "[s]uch a deprivation would be contrary to

the fundamental fairness required by the Fourteenth Amendment." *Bearden*, 461

U.S. at 662, 672-73.

In reaching its holding, the Supreme Court recognized that "[d]ue process

and equal protection principles converge" when considering cases involving "the

treatment of indigents in our criminal justice system." *Bearden*, 461 U.S. at 664,

665. "Whether analyzed in terms of equal protection or due process," the Court

cautioned, "the issue cannot be resolved by resort to easy slogans or pigeonhole

analysis[.]" *Bearden*, 461 U.S. at 666. Plaintiffs argue *Bearden* provides the

appropriate framework for considering whether they have stated an equal

protection claim against the County.[5] Even if the traditional equal protection framework applies, Plaintiffs argue, they have still sufficiently pled an equal protection claim. For reasons outlined below, the Court agrees that Plaintiffs have stated a claim for relief under either approach.

Under the traditional equal protection framework, "[e]qual protection claims can be divided into three general categories: (1) claims that a statute, regulation, or official policy discriminates on its face; (2) claims that the application of a facially neutral statue, regulation, or official policy intentionally has a disparate impact on a particular class; and (3) claims that a facially neutral statute, regulation, or official policy is being unequally administered." *Waln v. Dysart School District*, 522 F.Supp.3d 560, 607 (D. Ariz. March 1, 2021), rev'd on other grounds, 54 F.4d 1152 (9th Cir. 2022) (citing *Hunter v. Underwood*, 471 U.S. 222, 223 (1985)).

The County argues, and Plaintiffs do not disagree, that Plaintiffs are not claiming the Jail Diversion Program is being unequally administered. Instead, as the County sees it, Plaintiffs are asserting a disparate impact equal protection claim. "The first step in equal protection analysis is to identify the [state's] classification of groups." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005). Plaintiffs have identified two similarly situated groups: arrestees who

---

[5] Under the *Bearden* framework, it is appropriate to analyze the due process claim in Count 5 and the equal protection claim in Count 6 together because they both allege that fundamental liberty interests are at stake.

have been placed on the Jail Diversion Program and charged pretrial fees without

having been convicted of a crime, and indigent arrestees in the same situation. (See

Doc. 34, at 47; Doc. 51, at 25). As the County notes, Plaintiffs do not allege that it

charges different amounts for Jail Diversion Program services based on wealth, or

that it treats the failure to comply with conditions of the program any differently

based on wealth. (Doc. 58, at 5-6). According to the County, the challenged policy

is thus neutral on its face because it applies equally to all criminal defendants who

are placed on the Jail Diversion Program. In other words, as the County frames it,

"Plaintiffs' complaint is not that they are treated differently than non-indigent

defendants, but that the requirements for obtaining pretrial services impact them

differently," thus putting their equal protection claim "squarely in the realm of a

disparate impact case." (Doc. 58, at 6).

Citing the well-settled principle that a disparate impact equal protection

claim requires proof of discriminatory intent, the County argues Plaintiffs fail to

state a claim for relief because they have not alleged facts permitting an inference

of discriminatory intent. See *McLean v. Crabtree*, 173 F.3d 1776, 1185 (9th Cir.

1999) ("Proof of discriminatory intent is required to show that state action having a

disparate impact violates the Equal Protection Clause.").

The Court finds Plaintiffs have alleged facts from which a reasonable

inference of discriminatory intent can be made. Plaintiffs claim the County has

created, implemented, and enforced a policy requiring pretrial detainees to pay Jail

Diversion Program fees without considering their ability to pay, and incarcerating

indigent arrestees for nonpayment. Some of Plaintiffs' more specific allegations

include that the County (1) "refuses to release pre-trial arrestees from jail until pre-

trial arrestees pay an arbitrary amount of pre-trial fees … even after pre-trial

arrestees have paid their bail amount and/or been ordered by the court to be

released" (Doc. 34 at ¶ 6); (2) "threatens to return [pre-trial arrestees] to jail if they

fall behind on their fee payments" (Doc. 34 at ¶ 7); (3) "threatens pre-trial arrestees

with criminal charges to force compliance with the program" (Doc. 34 at ¶ 11); and

"falsely imprisons pre-trial arrestees by holding them in jail until they pay

whatever amount in pretrial fees [the County] demands" (Doc. 34 at ¶ 18). Taking

these and all other factual allegations in the Second Amended Complaint as true,

Plaintiffs have adequately alleged discriminatory intent as required to state a

disparate impact equal protection claim.

Even assuming Plaintiffs have sufficiently alleged discriminatory intent, the

County further argues they have not stated a disparate impact equal protection

claim under rational basis review. At the motion to dismiss stage, a plaintiff

asserting a constitutional claim subject to rational basis review must plausibly

allege facts demonstrating that no reasonably conceivable set of facts could

provide a rational basis for the challenged policy. *Sanchez v. Office of State*

*Superintendent of Education*, 45 F.4th 388, 396 (D.C. Cir. 2022). See also

*Oklevueha Native American Church of Hawaii, Inc.v. Holder*, 2012 WL 6738532,

at *7 (D. Haw. Dec. 31, 2012). The County cites *Ortwein v. Schwab*, 410 U.S. 656,

660 (1973) for the principle that recouping costs associated with the provision of

government service is a rational basis for imposing fees. According to the County,

it has rational basis for imposing Jail Diversion Program fees because the fees "are

clearly intended to recoup the cost of providing" pretrial services to criminal

defendants who participate in the program. (Doc. 47, at 10).

    This argument fails, however, because, as Plaintiffs argue in opposition to

the County's motion, their equal protection claim is subject to a heightened strict

scrutiny standard of review. Strict scrutiny under the equal protection clause

applies if (1) the classification impinges on a fundamental right, or (2) the

classification itself is suspect. See *San Antonio Indep. School District v. Rodriguez*,

411 U.S. 1, 17 (1973). As a general rule, wealth is not a suspect classification for

equal protection purposes. See e.g. *Harris v. McRae*, 448 U.S. 297, 323 (1980)

("[T]his Court has held repeatedly that poverty, standing alone, is not a suspect

classification."); *Ortwein v. Schwab*, 410 U.S. 656, 660-61 (1973) (concluding that

an appellate court filing fee in a civil action did not violate equal protection

because wealth is not a suspect class and the fee was rationally related to the state's

interest in offsetting court operating costs). Because wealth is not a suspect

classification, the County argues, Plaintiffs' equal protection claims are subject to rational basis review. (Doc. 47, at 10).

While wealth alone is not a suspect classification, a heightened standard of strict scrutiny review may apply where fundamental liberty interests are also at stake. *Buffin v. California*, 2018 WL 424362, at *7-10 (N.D. Cal. Jan. 16, 2018). In *Buffin,* the court applied a strict scrutiny standard of review to claims by a class of pretrial detainees that use of a countywide bail schedule violated the plaintiffs' rights to equal protection and due process because it failed to take into account their ability to pay the preset mandatory bail amounts. *Buffin*, 2018 WL 424362, at *7-10. To the extent the defendant argued the plaintiffs were asserting an equal protection claim based purely on a wealth-based classification, the court agreed "as a matter of legal theory, that wealth-based challenges generally do not warrant strict scrutiny." *Buffin,* 2018 WL 424362, at *8. But because the plaintiffs' equal protection and due process claims also alleged "the deprivation of the fundamental right to personal liberty," the court concluded the claims were subject to strict scrutiny review based on *Bearden* and its predecessors, *Tate v. Short*, 401 U.S. 395 (1971) and *Williams v. Illinois*, 399 U.S. 235 (1970). *Buffin*, 2018 WL 424362, at *8-10.

In *Williams*, the Supreme Court held that a facially neutral statutory scheme pursuant to which the state could extend a convicted defendant's term of

imprisonment beyond the statutory maximum based solely the defendant's inability to pay a fine "work[ed] an invidious discrimination" in violation of the Equal Protection Clause. *Williams*, 399 U.S. U.S. at 242-43. Although *Williams* "did not explicitly call for heightened scrutiny, it used a functionally similar analysis, finding the government's 'substantial and legitimate' interest in collecting revenues from fines did not justify 'invidious discrimination' against those financially unable to pay the fines." *Buffin*, 2018 WL 424362, at *8 (citing *Williams*, 399 U.S. at 238, 242). In *Tate*, the Supreme Court extended the rule in *Williams* and held that equal protection principles prohibit "the [s]tate from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent cannot forthwith pay the fine in full." *Tate*, 401 U.S. at 398.

The *Buffin* court interpreted the *Bearden-Tate-Williams* line of cases as requiring it to apply a heightened strict scrutiny standard of review to the plaintiffs' claims challenging the constitutionality of a countywide bail schedule that failed to take into account their ability to pay the preset mandatory bail amounts. *Buffin*, 2018 WL 424362, at *9. In doing so, the court rejected the defendant's argument that *Bearden*, *Tate*, and *Williams* are limited to post-conviction constitutional challenges and do not apply in the pretrial context. *Buffin*, 2018 WL 424362, at *9. To the contrary, the court found "the Supreme Court's holdings and analyses apply

with special force in the bail context, where fundamental deprivations are at issue and arrestees are presumed innocent. Indeed, arrestees who have not been found guilty have an especially 'strong interest in liberty'." *Buffin*, 2018 WL 424362, at *9 (quoting *United States v. Salerno*, 481 U.S. 739, 750 (1987) (holding that pretrial detention must serve a compelling governmental interest). The *Buffin* court was thus satisfied that strict scrutiny applied to the plaintiffs equal protection and due process claims. *Buffin*, 2018 WL 424362, at *10.

Here, as in *Buffin*, Plaintiffs' equal protection claim also alleges the deprivation of fundamental liberty interests, and is therefore subject to a heightened strict scrutiny standard of review. In particular, Plaintiffs claim the County has an unconstitutional policy of requiring pretrial arrestees to pay Jail Diversion Program fees without considering their ability to pay, and incarcerating or threatening to incarcerate them for nonpayment. Because Plaintiffs allege a wealth-based liberty deprivation, a heightened strict scrutiny standard of review applies. *Buffin*, 2018 424362, at *10. The County's motion to dismiss Plaintiffs' equal protection is premised on application of rational basis review. Because the County does not argue that Plaintiffs fail to state a claim under heightened scrutiny review, Plaintiffs' equal protection claim survives dismissal to the extent it is based on a disparate impact theory of liability.

44

Notably, however, Plaintiffs disagree with the County's characterization of their claim as one based on disparate impact, and take the position that their equal protection challenge is a facial one. (Doc. 51 at 24). To succeed on a facial challenge, Plaintiffs must show "that no set of circumstances exists under which" the County's policy "would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiffs reiterated their position at oral argument, explaining that their argument is not that the facially neutral program fees themselves are discriminatory, but that the County's policy of requiring payment of program fees without assessing ability to pay, and incarcerating or threatening to incarcerate indigent arrestees for nonpayment, is facially discriminatory in violation of the Equal Protection Clause. Characterized as such, Plaintiffs argue, the County policy as implemented through the Jail Diversion Program is discriminatory on its face and under no set of circumstances could be considered constitutional.

Plaintiffs analogize to *Griffin v. Illinois*, 351 U.S. 12, 18 (1956), in which the Supreme Court held that a state law requiring every criminal defendant to pay a fee for a trial transcript as a prerequisite to filing an appeal violated the equal protection and due process rights of indigent criminal defendants who were unable to pay the fee. Relying on equal protection and due process concepts, the Court found the law constituted "invidious discrimination" in violation of the Fourteenth Amendment because there was "no meaningful distinction between a rule which

would deny the poor the right to defend themselves in a trial court and one which effectively denies the poor an adequate appellate review accorded to all who have money enough to pay the costs in advance." *Griffin,* 351 U.S. at 18.

*Griffin* provided the legal and analytical foundation for the *Bearden-Tate-Williams* line of cases that followed. See *Bearden*, 461 U.S. at 663-666 (summarizing the "equal justice" principle established in *Griffin* and further developed by *Williams* and *Tate*). As explained above, *Bearden* identified four factors for courts to use when evaluating claims of unconstitutional wealth-based discrimination: (1) "the nature of the individual interest affected"; (2) the extent to which that interest is affected; (3) "the rationality of the connection between legislative means and purpose," and (4) whether "alternative means for effectuating the purpose" exist. *Bearden*, 461 U.S. at 666-67.

Taking the factual assertions in the Second Amended Complaint as true, Plaintiffs have adequately alleged a wealth-based equal protection claim under the *Bearden* factors. First, Plaintiffs allege that fundamental liberty interests and significant financial interests are at stake. Second, Plaintiffs assert these interests are significantly affected because the County requires pretrial arrestees to pay "exorbitant fees" without considering ability to pay, thereby infringing on their property interests and livelihoods, and incarcerates indigent pretrial arrestees for non-willful failure to pay those fees. Third, Plaintiffs assert facts upon which it

could be determined that the County's alleged policy of charging Jail Diversion

Program fees without considering ability to pay, and incarcerating indigent pretrial

arrestees for non-willful failure to pay those fees, bears no rational connection to

the County's purpose of promoting public safety and ensuring that arrestees appear

for court. Finally, Plaintiffs allege facts upon which it could be determined that the

County failed to consider any alternative means for effectuating these purposes.

Because Plaintiffs have alleged facts that would, if later proven true, satisfy the

*Bearden* factors, they have adequately pled an equal protection claim for wealth-

based discrimination.

　　　In sum, Plaintiffs' equal protection claim is adequately pled whether it is

properly categorized as a disparate impact claim, as the County maintains, or as a

facial challenge, as Plaintiffs maintain, and whether it is analyzed under the

traditional equal protection framework or the hybrid framework followed in

*Bearden.* Count 6 is thus sufficient to survive dismissal.[6]

　　　　　b.　　*Due Process*

---

[6] In Count 7 of the Second Amended Complaint, Plaintiffs also assert a state equal
protection claim for social condition discrimination under the equal protection
clause of Article II, § 4 of the Montana Constitution. (Doc. 34 at ¶¶ 212-14).
Because the County does not specifically address Count 7 in its motion to dismiss,
it has not demonstrated that Plaintiffs fail to allege a viable constitutional violation.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty or property, without due process of law," and provides a basis for both substantive and procedural due process claims. U.S. Const. Amend. XIV, § 1.

Plaintiffs' due process claims are set forth in Counts 1, 2, 4, 5, and 9 of the Second Amended Complaint. Counts 1, 2, 4 and 5 are expressly identified as procedural due process claims. Count 1 alleges the County deprived Plaintiffs of their property without due process by charging them pretrial fees without any finding of guilt. (Doc. 34 at ¶ 193). Count 2 alleges the pretrial fees charged by the County are imposed as "quasi-bail without the attendant due process protections." (Doc. 34 at ¶ 195). Count 4 alleges "Defendants," presumably including the County, provide constitutionally deficient due process by assessing pretrial fees without considering ability to pay. (Doc. 34 at ¶ 201). Count 5 builds on the assertions in Count 4 and alleges the County provides constitutionally deficient due process by assessing pretrial fees without considering ability to pay and, in doing so, effectively criminalizes poverty and incarcerates pretrial arrestees because of their inability to afford pretrial fees. (Doc. 34 at ¶¶ 204-05). Count 9 alleges the County requires pretrial arrestees to sign "coercive contracts" agreeing to further criminal charges if they do not comply with certain pretrial conditions in violation of due process. (Doc. 34 at ¶¶ 219-23).

To state a procedural due process claim, Plaintiffs must allege facts showing: "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Kildare v. Saenz*, 325 F.3d 1078, 1085 (9th Cir. 2003). Due process is a "flexible" concept, and "calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (citing *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972)). Fundamentally, procedural due process requires "some kind of notice" and "some kind of hearing" before the state can deprive a person of life, liberty, or property. *Zinermon v. Burch*, 494 U.S. 113, 127-28 (1990) (citations omitted).

The County does not dispute that Plaintiffs have alleged deprivations of constitutionally protected property and liberty interests, but argues they fail to state for relief because the alleged deprivations are not the direct result of the County's policy and, even if they were, constitutionally adequate procedural protections exist. These arguments, which are presented in general terms and do not address Plaintiffs' due process claims individually, are unpersuasive.

First, the County argues that the District Court Judges and Justices of the Peace are responsible for the deprivations alleged by Plaintiffs. As the County describes it, "the judges impose the requirement to obtain pretrial services, including the requirement of payment for those services," and "[i]f a criminal defendant fails to pay for the required services, it is the judge who revokes bail."

(Doc. 47, at 12). According to the County, it "merely sets fees for each service and collects those fees from the criminal defendant" and "has no mechanism for extracting money from those do not pay other than referring them back to the judge who imposed the bail condition of pretrial services." (Doc. 47, at 12). The County submits that "the court has complete discretion to ignore such referrals, amend bond conditions, revoke release on bail, or impose any other bail condition it deems appropriate." (Doc. 47, at 12). Thus, the County contends, "it is the authority of the court acting pursuant to Montana law" that is the moving force behind the alleged deprivations," not "the County's policy of setting and collecting fees for pretrial services." (Doc. 47, at 12).

But as Plaintiffs argue in response, the County's factual assertion that it has no mechanism for extracting money from pretrial arrestees who do not pay the Jail Diversion Program fees is contradicted by the allegations in the Second Amended Complaint, which must be taken as true at this stage in the litigation. For example, Plaintiffs allege that the County holds pretrial arrestees in jail until they pay whatever arbitrary amount of money the County requires, even if they have already paid their bail and been ordered released by the court.  (Doc. 34 at ¶¶ 6, 18, 42-48, 153, 158). Plaintiffs also claim that the County: threatens pretrial arrestees with jail to compel payment (Doc. 34 at ¶¶ 7, 25, 48, 54-55, 88); refuses to allow pretrial arrestees to take drug and alcohol tests if they cannot pay for them, thereby forcing

pretrial arrestees to violate their conditions and setting them up for revocation (Doc. 34 at ¶ 56); and imposes Jail Diversion Program conditions that are not ordered by the court, such requiring use of a drug patch, thereby increasing the amount of fees a pretrial arrestee must pay (Doc. 34 at ¶¶ 59, 84). Plaintiffs have thus alleged facts which, if true, demonstrate that the County has several mechanisms for extracting payment from pretrial arrestees without any involvement from the District Court Judges and Justices of the Peace, such that the County could plausibly be the moving force behind the constitutional violations alleged.

Second, the County maintains that the procedural safeguards in Montana's bail statutes, particularly bond hearings, provide adequate due process protection. This is so, the County contends, because bond hearings provide pretrial arrestees the opportunity "to challenge the amount, duration, and conditions of bail." (Doc. 47 at 13). The County further argues that additional procedural safeguards are provided in the Montana bail statutes that allow a pretrial arrestee to move for modification of the conditions of release at any time, or to alter the conditions of bail. See Mont. Code Ann. § 46-9-108(2); § 46-9-311.

Plaintiffs counter that the procedures provided for in the bail statutes cited by the County are constitutionally deficient for two primary reasons. To begin with, Plaintiffs argue no notice is provided before Jail Diversion Program fees are

imposed. Plaintiffs claim that pretrial arrestees are not typically advised of the fees during their bond hearing, and instead learn they will be charged pretrial fees only after having been ordered released by the court and after having posted bail. (Doc. 34 at ¶¶ 66, 79, 92). Plaintiffs further allege that even after pretrial arrestees have been ordered released and have posted bail, the County will not release them from jail unless they sign contracts agreeing to pay the fees they have just learned about and, in some cases, unless they also pay whatever arbitrary amount in fees the County demands. (Doc. 34 at ¶¶ 42-44, 124-25, 153).

Even if the County did provide adequate notice of the Jail Diversion Program fees, Plaintiffs argue the statutory bail procedures outlined above do not provide pretrial detainees with an adequate opportunity to be heard regarding the imposition and amount of the fees. Plaintiffs allege that unlike bail amounts, the "Jail Diversion Program fees imposed on pretrial arrestees to secure their release cannot be challenged" and "[t]here is no avenue for judicial review of these assessments." (Doc. 34 at ¶ 45).

Contrary to the County's argument that there are procedures in place pursuant to which pretrial arrestees can contest the imposition and amount of Jail Diversion Program fees at the bond hearing or in a subsequent motion, Plaintiffs specifically allege that the County does "not offer a mechanism to contest Jail Diversion fees or to obtain a waiver or reduction in fees." (Doc. 34 at ¶ 41).

Whether pretrial arrestees can, as the County seemingly suggests, request a waiver or reduction in Jail Diversion Program fees during the bond hearing, or by moving to modify the conditions of their release or to alter the conditions of bail, is not clear. Even considering the bail statutes, taking the allegations in the Second Amended Complaint as true for present purposes, Plaintiffs have adequately pled procedural due process violations based on the County's alleged failure to provide adequate notice of the Jail Diversion Program fees and a reasonable opportunity to opportunity to contest those fees.

As pointed out above, Plaintiffs' due process claims are set forth in Counts 1, 2, 4, 5, and 9 of the Second Amended Complaint. Count 1 alleges the County imposes pretrial fees without a finding of guilt, and Count 2 alleges the County imposes those pretrial fees as long as the case remains in pretrial status. (Doc. 34 at ¶¶ 193, 195). On their face, Counts 1 and 2 are not wealth based and say nothing about the County's alleged failure to consider ability to pay. Rather, as explained by Plaintiffs in their preliminary injunction motion, Counts 1 and 2 advance the theory that the County's practice of charging Jail Diversion Program fees "exacts punishment without guilt in violation of due process." (Doc. 41 at 23).

Other than to argue that the bail statutes provide adequate due process, the County does not address the viability of this underlying theory in its motion to dismiss, arguing instead that Counts 1 and 2 fail to state a claim because there are

sufficient procedural protections in place to satisfy due process. As discussed above, however, Plaintiffs have alleged facts which, if true, show that the bail statutes do not guarantee that arrestees are given notice and an opportunity to be heard as to the imposition of pretrial fees. The Court therefore concludes that Counts 1 and 2 should survive the County's motion to dismiss, but in reaching this conclusion the Court does not address the legal viability of Plaintiffs' apparent theory that the mere imposition of pretrial fees is, in and of itself, unconstitutional.

Count 4, which alleges the County "provide[s] constitutionally deficient due process by assessing pre-trial fees without considering ability to pay" states a claim for relief for the reasons discussed above. (Doc. 34 at ¶ 201). Count 5 expands on Count 4 and alleges the County provides constitutionally deficient due process by assessing pretrial fees without considering ability to pay and, in doing so, effectively criminalizes poverty and incarcerates pretrial arrestees because of their inability to afford pretrial fees. Count 5 also states a claim for relief for the reasons explained above. (Doc. 34 at ¶¶ 204-05).

Plaintiffs' last due process claim is Count 9, which is titled "Violation of Due Process via Contracts Increasing Criminal Exposure." (Doc. 34 at 58). Count 9 alleges the County requires pretrial arrestees to sign "coercive contracts" agreeing to further criminal charges if they do not comply with certain pretrial conditions in violation of due process. (Doc. 34 at ¶¶ 219-23). The Ninth Circuit's

decision in *Edwards v. Leaders in Community Alternatives, Inc.* casts doubt on the

viability of Plaintiffs' theory that statements in the contracts upon which this claim

is based are unconscionable or constitute a threat of incarceration. 850 Fed. Appx.

503, (2021) (finding that statements about the potential consequences of failing to

pay supervision fees were not wrongful and were within legal bounds). Other than

to argue that Montana's bail statutes provide adequate due process, the County's

motion to dismiss does not specifically address Count 9 or its theory of liability.

But again, whether the bail statutes the County relies on do in fact provide

sufficient procedural protections is not clear. Accordingly, the County has not

demonstrated that Count 9 fails to state a claim for relief.

> d.   *Monell Factors*

Finally, circling back to the municipal liability factors under *Monell*, the

Court concludes that, taking the allegations in the Second Amended Complaint as

true and drawing all reasonable inferences in their favor, Plaintiffs have stated a

claim for relief against the County under ¶ 1983. As the discussion above reflects,

Plaintiffs have alleged: (1) viable underlying constitutional claims for equal

protection and due process violations under the Fourteenth Amendment; (2) that

the County has policy of requiring pretrial arrestees to pay Jail Diversion Program

fees without considering their ability to pay and incarcerating arrestees for

nonpayment; (3) that the County's policy reflects a deliberate indifference to the

constitutional rights of pretrial arrestees, and; (4) that the County's policy was the moving force behind the alleged constitutional violations.

In sum, and for the reasons outlined above, the County's Rule 12(b)(6) motion to dismiss the claims asserted against it in the Second Amended Complaint should be denied. Having determined that Plaintiffs' claims survive dismissal for failure to state a claim for relief, the Court turns next to Plaintiffs' motion for a preliminary injunction.

### III.   Motion for a Preliminary Injunction

Plaintiffs move for a preliminary injunction prohibiting the County from charging any fees associated with the Jail Diversion Program, and from detaining anyone for failing to pay Jail Diversion Program fees. (Doc. 40). The County argues the motion should be denied because: (1) Plaintiffs lack standing to seek the injunctive relief requested; (2) the injunctive relief requested is not available as to the County; (3) *Younger* abstention applies; and (4) Plaintiffs have not demonstrated that the factors necessary to obtain a preliminary injunction are satisfied. (Doc. 50). The Court agrees that Plaintiffs have not met their burden of establishing the elements necessary to obtain preliminary injunctive relief against the County.

### A.   Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a plaintiff must establish four elements: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of an injunction, (3) that the balance of equities tips in the plaintiff's favor, and (4) that the injunction is in the public interest. *Winter*, 555 U.S. at 20. While the likelihood of success on the merits is the most important factor, *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 846, 856 (9th Cir. 2017), a plaintiff "must satisfy all four *Winter* prongs in order to secure an injunction." *Cottonwood Envtl. Law Center v. U.S. Sheep Experiment Station*, 2019 WL 3290994 at *1 (D. Mont. July 22, 2019) (citing *Alliance of the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). The party seeking the injunction bears the burden of proving these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009).

"The basic function of a preliminary injunction is to preserve the *status quo* pending a determination the action on the merits." *Chalk v. U.S. District Court Cent. Dist. of California*, 840 F.2d 701, 704 (9th Cir. 1988). The status quo is "the last, uncontested status which preceded the pending controversy." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quoting *Regents of the Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 514 (9th Cir. 1984)). Here, however, Plaintiffs are requesting a preliminary injunction

that would alter the status quo by prohibiting the County from continuing its

uncontested practice of charging fees associated with the Jail Diversion Program.

Preliminary injunctive relief that "goes well beyond simply maintaining the status

quo … is particularly disfavored, and should not be issued unless the facts and law

clearly favor the moving party." *Anderson v. United States*, 612 F.2d 1112, 1114

(9th Cir. 1979) (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)).

Such relief will not be granted "unless extreme or very serious damage will result"

and will not issue "in doubtful cases[.]" *Anderson*, 612 F.2d at 1115 (quoting

*Clune v. Publishers' Ass'n of N.Y.C.*, 214 F. Supp. 520, 531 (S.D.N.Y. 1963),

*aff'd,* 314 F.3d 343 (2d Cir. 1963); see also *Marlyn Nutraceuticals,* 571 F.3d at

878-79 ("[A] mandatory injunction orders a responsible party to take action" and

"is particularly disfavored.") (citation and quotation marks omitted).

### B.    Additional Facts

Plaintiffs, all of whom claim indigency, have submitted several declarations

and a handful of Jail Diversion Program documents and contracts in support of

their preliminary injunction motion. (Docs. 41-1 through 41-25). Plaintiff Teri Lea

Evenson-Childs states in her declaration that she was arrested in March 2020, spent

a week in jail after posting bond because pretrial services had to locate someone to

put an alcohol monitoring device on her ankle, and "was required to pay the first

month of fees" before she was released. (Doc. 41-2 at ¶¶ 2, 5). Evenson-Childs

explains that she is required to pay $325 per month in pretrial supervision and alcohol monitoring fees, claims her attorney has unsuccessfully attempted to get those fees reduced, and says she was told that if she misses one of her three daily breathalyzer blows, she "would go back to jail." (Doc. 41-2 at ¶¶ 8, 9, 12). Evenson-Childs represents that she has not been able to find stable housing as a result of the pretrial fees she is required to pay. (Doc. 41-2 at ¶¶ 15-26).

Plaintiff Daniel O'Toole states that in October 2018 he spent a week in jail after posting bond before he managed to gather the $600 in pretrial fees the County required him to pay before releasing him. (Doc. 41-4 at ¶¶ 3, 6). O'Toole states that he was charged several hundred dollars per month in pretrial supervision and drug patch fees while that case was pending, and in subsequent criminal cases without anyone ever asking him if he could afford to pay the fees. (Doc. 41-4 at ¶¶ 7-24, 29). O'Toole claims he has "gone back to jail many times because of pretrial supervision" in his criminal cases, and says that his pretrial officer regularly threatens to send him back to jail. (Doc. 41-4 at ¶¶ 25, 28). O'Toole claims it has been difficult for him to maintain employment because he is "on pretrial supervision and cycling in and out of jail as a result." (Doc. 41-4 at ¶ 31).

Plaintiff Richard Churchill submits that he has been jailed twice for failing to pay pretrial fees that he could not afford, and on one occasion the County required to him to pay $110 in overdue fees before releasing him, notwithstanding

the fact that he had already posted bail. (Doc. 41-5 at ¶¶ 18-20).  Churchill states that he has been charged more than $300 a month in pretrial fees, was never asked if he could afford the fees, and was no longer able to afford living on his own as a result. (Doc. 41-5 at ¶ 12-16).

Plaintiff Keith Leonard entered the Jail Diversion Program in January 2021, and states that he has gone into debt in order to pay his pretrial supervision and alcohol monitoring fees. (Doc. 41-6 at ¶¶ 2, 3, 16). Leonard describes paying his fees "under threat of being sent back to jail," says he was never asked if he could afford to pay the fees, and claims being on pretrial supervision has taken a financial and emotional toll on his life. (Doc. 41-6 at ¶¶ 13, 21, 22).

Plaintiffs have also submitted declarations from several putative class members who also claim indigency and describe similar experiences while in the Jail Diversion Program. (Docs.  41-7 through 41-18, 41-20). Plaintiffs argue that, read collectively, these declarations illustrate the harm caused by the County's Jail Diversion Program, and substantiate their claims that the County imposes pretrial fees without regard to indigency and uses incarceration to force compliance. (Doc. 41 at 10).

The County, in opposition, has provided an affidavit from Sheriff Holton, who explains that he sets the fees for each service provided as part of the Jail Diversion Program "based on the cost of equipment and personnel required to

provide those services." (Doc. 50-1 at ¶ 4). Sheriff Holton states that he sets the fees "as low as possible to cover the cost of providing services," and if a criminal defendant "fails to pay for those services, that failure is documented for the Ravalli County Attorney's Office." (Doc. 50-1 at ¶¶ 4, 7). According to Sheriff Holton, it is the county attorney who decides whether to seek an arrest warrant, and "[t]he Ravalli County Sheriff's Office does not arrest individuals for failure to pay for pretrial services unless a warrant has been issued by the court commanding that arrest." (Doc. 50-1 at ¶ 7). Sheriff Holton submits that if the County is "prohibited from collecting fees for pretrial services the Ravalli County Sheriff's Office would quit providing those services and would refer criminal defendants to private service providers." (Doc. 50-1 at ¶ 8).

The County has also submitted affidavits from Justices of the Peace Jennifer Ray and Jim Bailey, and Ravalli County Probation and Pretrial Services Officer Shane Fisher.[7] (Docs. 69-1 through 69-3). Ray explains that she "regularly preside[s] over hearings held, in part, for the purpose of setting conditions for the release of pretrial detainees from the Ravalli County Detention Center" and that "[b]ail and pretrial monitoring services are among the issues discussed and decided

---

[7] The County filed these declarations as exhibits to its response to Plaintiffs' motion for class certification. Although the County did not also file the declarations as exhibits to its response to Plaintiffs' preliminary injunction motion, the declarations are part of the record in this case and are properly considered by the Court.

at these hearings as an alternative to incarceration, and/or reduced bail." (Doc. 69-1 at ¶ 2). When Ray is advised of a detainee's "potential inability to afford pretrial services," she "will consider lowering a detainee's bond if doing so will facilitate payment for the monitoring" deemed necessary. (Doc. 69-1 at ¶ 8). Ray further explains:

> If a pretrial detainee advises the court that he or she is unable to afford pretrial monitoring, in whole or in part, I consider that factor at the time of the hearing. I make clear to detainees that they should notify the Court if they have difficulty meeting the conditions of release rather than violating the conditions. The Court regularly works with individuals on pretrial monitoring, as it does with people paying fines or restitution, who have difficulty making payments by adjusting payments during times of financial hardship.

(Doc. 69-1 at ¶ 9).

If the Court orders a detainee to obtain pretrial services, the detainee "meets with a probation officer to discuss available services and sign a contract for those services." (Doc. 69-1 at ¶ 4). Ray notes that "[t]he circumstances under which an offender is placed on monitoring and the cost and type of monitoring are unique to each case," and it is her "understanding that probation officers attempt to accommodate individuals to the best of their ability within the requirements of the Court's order." (Doc. 69-1 at ¶ 6). Ray states that she does "not revoke an individual's bond solely on the basis of his or her failure to pay for pretrial monitoring or for being late with a payment," and only orders bond revocation "when the detainee violates at least one other condition of release." (Doc. 69-1 at ¶

10). Ray also indicates that she does not recall any of the pretrial detainees who have submitted declarations in support of the Plaintiffs' motion ever raising "the issue of financial hardship with regard to payment for pretrial monitoring at the time of the initial hearing or at any time thereafter," and had they done so, Ray "would have explored with them possible solutions to the problem." (Doc. 69-1 at ¶ 11).

Bailey's affidavit corroborates many of Ray's statements, including for example, that pretrial monitoring services are among the issues discussed and decided at bail hearings, and he does not recall ever revoking an individual's bond based solely on failure to pay for pretrial monitoring or being late with a payment. (Doc. 69-2 at ¶¶ 2, 8, 10). Bailey also represents that "[t]he Court regularly works with individuals on pretrial monitoring, as it does with people paying fines or restitution, who have difficulty making payments by adjusting payments during times of financial hardship." (Doc. 69-2 at ¶ 9).

Fisher's duties as a Misdemeanor Probation and Pretrial Services Officer include supervising and monitoring individuals for compliance with court-ordered conditions of pretrial release. (Doc. 69-3 at ¶ 3). Fisher explains that when she first meets with an individual who has been ordered to obtain pretrial services, they discuss the cost and other requirements of drug and alcohol testing, and unless the court orders otherwise, she ordinarily defers to the individual as to the type of

testing that best suits the individual's financial situation. (Doc. 69-3 at ¶ 5). Fisher

further states that "[i]f an individual does not submit to testing because they claim

to be unable to pay, the supervising officer advises them that it will be considered a

'failure to provide' and will be reported as such to the Ravalli County Attorney and

the Court." (Doc. 69-3 at ¶ 7). Fisher represents that pretrial services officers "do

not threaten to arrest, and we do not arrest people who fail to submit to a drug test

because they claim to be unable to pay for the test," and "only arrest individuals

pursuant to arrest warrants or other court orders." (Doc. 69-3 at ¶ 7).

### C.    Likelihood of Success on the Merits

Although Plaintiffs' equal protection and due process claims are sufficient to

survive dismissal for failure to state a claim for relief, Plaintiffs must do more than

merely state a claim for relief to demonstrate that that they are likely to succeed on

the merits. See e.g. *Gonzalez v. Ahern*, 2021 WL 2321839, at *1 (N.D. Cal. June 7,

2021) (noting that whether plaintiffs have shown a likelihood of success on a claim

at the preliminary injunction stage is different from the analysis on a Rule 12(b)(6)

motion to dismiss "wherein the Court must accept all the factual allegations pled in

the complaint as true"); *Washington v. United States Dept. of Homeland Security*,

598 F.Supp.3d 1051, 1066 (E.D. Wash. Sept. 14, 2020) (recognizing that the

preliminary injunction standard is more demanding that the lower *Iqbal/Twombly*

threshold of plausibility under Rule 12(b)(6)).

Plaintiffs argue they have shown they are likely to succeed on the merits of Counts 1, 2, and 4 through 7 of the Second Amended Complaint. Plaintiffs maintain that the County's "pretrial fee scheme" unconstitutionally deprives pretrial arrestees of their property and freedom because it: (1) exacts punishment without guilt in violation of due process (Counts 1 and 2) and; (2) criminalizes poverty in violation of due process (Counts 4 and 5) and equal protection (Counts 6 and 7). (Doc. 41 at 23).

Beginning with Counts 1 and 2, Plaintiffs argue the County's pretrial fee scheme fails under the three-part balancing test established in *Mathews v. Eldridge*, 424 U.S. 319 (1976). "Under the *Mathews* balancing test, a court evaluates (A) the private interest affected; (B) the risk of erroneous deprivation of that interest through the procedures used; and (C) the governmental interest at stake." *Nelson v. Colorado*, 137 S. Ct. 1249, 1255 (2017). As to the first and third factors, Plaintiffs contend they have an obvious property interest in the money they are required to pay in pretrial fees, and assert the County has no legitimate interest in collecting pretrial fees. (Doc. 41 at 24-25). As to the second factor, Plaintiffs maintain that the County does not provide any procedure by which Jail Diversion Program fees can be challenged, such that "[p]re-trial arrestees lack any meaningful opportunity to challenge this government deprivation of their property." (Doc. 41 at 26).

The County counters by pointing again to the procedures set forth in Montana's bail statutes, which it contends provide pretrial arrestees with a sufficient opportunity to be heard regarding the imposition and amount of pretrial fees. As it does in support of its motion to dismiss, the County maintains that pretrial arrestees in the Jail Diversion Program are free to request a reduction in fees during the initial bond hearing, or by later moving to modify the conditions of their release or to alter the conditions of bail. In fact, Ray states in her declaration that pretrial arrestees are told they should notify the court if they have difficulty complying with the conditions of release, and the court "regularly works with individual on pretrial monitoring… who have difficulty making payments by adjusting payments during times of financial hardship." (Doc. 69-1 at ¶ 9). By way of example, Ray states that Evenson-Childs was a defendant in her court but never asked for her pretrial fees to be reduced, and never advised the court that the fees created a financial hardship. (Doc. 69-1 at ¶ 15).

Again, whether pretrial arrestees can request a waiver or reduction in Jail Diversion Program fees by moving under Montana's bail statutes to modify the conditions of their release or to alter the conditions of bail is not entirely clear. Nor is it clear whether such procedures would be constitutionally adequate. In addition, as to the third *Mathews* factor, the Plaintiffs' assertion that the County has no legitimate interest in collecting pretrial fees is questionable. See e.g. *Ortwein*, 410

U.S. at 660 (recouping costs associated with the provision of government service is rational basis for imposing fees). At this preliminary stage, the Court finds Plaintiffs have not shown that the "facts and law clearly favor" their position, as required to demonstrate a likelihood of success on the procedural due process claims in Counts 1 and 2. *Anderson*, 612 F.2d at 1114.

Plaintiffs also have not provided sufficient evidence to demonstrate that they are likely to success on their equal protection claims and their two remaining procedural due process claims. Plaintiffs address Counts 4 through 7 together, and argue the County's failure to consider ability to pay violates due process and equal protection because it criminalizes poverty. (Doc. 41 at 25-29). Plaintiffs analyze these equal protection and due process claims under the *Bearden* framework, and take the position that because the County "impose[s] fees and incarceration for non-payment of fees without an indigence exception, [the County's] fee scheme is unconstitutional." (Doc. 41 at 26). As discussed at length above, the Court agrees that Plaintiffs have stated a claim for relief under *Bearden*, which recognizes that "[d]ue process and equal protection principles converge in the Court's analysis" of cases involving "the treatment of indigents in our criminal justice system." *Bearden*, 461 U.S. at 664-65. Plaintiffs have not, however, met their higher burden of showing that the facts and the facts and law clearly favor their position that the

67

County incarcerates or threatens to incarcerate pretrial arrestees for failure to pay Jail Diversion Program fees.

A core component of the equal protection and due process claims alleged in Counts 4 through 7 is Plaintiffs' allegation that the County incarcerates or threatens to incarcerate pretrial arrestees for failure to pay Jail Diversion Program fees. In their supporting declarations, some Plaintiffs and putative class members describe being incarcerated because of pretrial supervision and failing to pay pretrial fees. (See e.g. Doc. 41-4 at ¶ 25; Doc. 41-5 at ¶¶ 18-20; Doc. 41-9 at ¶ 15). Other describe being threatened with incarceration for failure to pay pretrial fees. (See e.g. Doc. 41-4 at ¶ 28; Doc. 41-6 at ¶¶ 21, 22; Doc. 41-8 at ¶13). The County has submitted contrary evidence, including Ray's declaration stating that she does "not revoke an individual's bond solely on the basis of his or her failure to pay for pretrial monitoring or for being late with a payment," and only orders bond revocation "when the detainee violates at least one other condition of release." (Doc. 69-1 at ¶ 10). Fisher, in turn, states that pretrial services officers "do not threaten to arrest, and …do not arrest people who fail to submit to a drug test because they claim to be unable to pay for the test," and "only arrest individuals pursuant to arrest warrants or other court orders." (Doc. 69-3 at ¶ 7). Given such apparently contradictory evidence, Plaintiffs have failed at this preliminary stage to demonstrate that the facts and law are clearly in their favor.

In sum, the Court finds based on the evidence of record that Plaintiffs have not shown the "facts and law clearly favor" them on their equal protection and due process claims, as required to obtain a preliminary injunction that alters the status quo. *Anderson*, 612 F.2d 1144.

## D. Irreparable Injury

Plaintiffs also have not carried their burden of showing that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

Plaintiffs assert that without injunctive relief, putative class members will continue to be charged pretrial fees they cannot afford, possibly resulting in the loss of employment and housing, and will "remain under threat of detention and be detained for no reason other than their poverty." (Doc. 41 at 29). To the extent Plaintiffs argue the pretrial fees they have been and will continue to be charged constitute irreparable injury, such financial harm is not considered irreparable injury for purposes of obtaining a preliminary injunction. See e.g. *People of California v. Tahoe Regional Planning Agency*, 766 F.2d 1316, 1319 (9th Cir. 1985) ("Mere financial injury will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation."). To the extent Plaintiffs assert they have been irreparably injured as a result of losing housing or employment, there is not sufficient evidence in the record at this preliminary stage to demonstrate that such alleged harm is likely to result from the imposition of

pretrial fees.  In addition, the Court notes that Plaintiffs are not seeking damages for such alleged losses.

While "[d]eprivation of physical liberty by detention constitutes irreparable harm," *Arevalo*, 882 F.3d at 767, Plaintiffs have not demonstrated that it is likely they or putative class members will be incarcerated as a result of failing to pay pretrial fees they cannot afford. As discussed above, the County has presented evidence that counters the declarations submitted by Plaintiffs asserting they have been incarcerated for failing to pay Jail Diversion Program fees. Montana courts are authorized to increase, revoke, or alter conditions of bail, and failure to comply with release conditions is a ground for revocation of release. See Mont. Code Ann. § 46-9-311; § 46-9-503. Plaintiffs have not demonstrated that it is likely they or other putative class members will be unlawfully incarcerated for failing to pay pretrial fees.

Accordingly, the Court concludes Plaintiffs have not met their burden of showing that "extreme or very serious damage will result" in the absence of a preliminary injunction that will alter the status quo. *Anderson*, 612 F.2d at 1115.

## E.    Balance of Equities and Public Interest

When the government opposes the issuance of a preliminary injunction, as the County does here, the final two factors – the balance of the equities and the public interest merge. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th

Cir. 2021). The court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

To be sure, Plaintiffs have an interest in not being incarcerated solely for non-willful failure to pay pretrial fees they cannot afford. The County, in turn, has an interest in supervising individuals on pretrial release to ensure that they appear at  future court proceeding, and to ensure the safety of the community.  An injunction prohibiting the County from charging any fees associated with the Jail Diversion Program would impose significant and immediate financial and logistical burdens on the County. Particularly in light of Plaintiffs' failure to show that the facts and law are clearly in their favor, or that they are likely to suffer irreparable harm without an injunction, this factor tips in favor of the County.

Based on the record before it, the Court finds extraordinary relief is not warranted at this point. Plaintiffs have not their burden of persuasion and have not demonstrated that the facts and the law are clearly in their favor, that they are likely to suffer irreparable harm if an injunction is not entered, that the balance of equities tips in their favor or that an injunction is in the public interest. For these reasons, Plaintiffs' motion for a preliminary injunction should be denied.

## IV.   <u>Motion for Class Certification</u>

### A.   **Legal Standard**

Class certification is governed by Federal Rule of Civil Procedure 23. A plaintiff seeking class certification must first satisfy the four requirements of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011).  A plaintiff must also satisfy one of the three subsections of Rule 23(b), which requires a showing that: (1) prosecuting separate actions would create a risk of prejudice; (2) declaratory or injunctive relief is appropriate as to the class; or (3) common questions of law or fact predominate over individual issues and a class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(1)-(3); *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542 (9th Cir. 2013).

Rule 23 "does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350. A plaintiff must "affirmatively demonstrate" that the rule's requirements are met. *Dukes*, 564 U.S. at 350. Therefore, a court cannot accept the allegations in the pleadings as true; a plaintiff must prove that Rule 23's requirements are "in fact" satisfied. *Dukes*, 564 U.S. at 350; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (finding the district court applied "impermissible legal criteria" by accepting the allegations in the complaint as true, rather than "resolving the critical factual disputes" overlapping with the Rule 23(a) requirements). A court cannot find the factors of Rule 23 to be satisfied without "significant proof[.]" *Ellis*, 657 F.3d at 983.

### B.    Proposed Classes

Plaintiffs propose two main classes and two subclasses. Rule 23(c)(5) provides that "a class may be divided into subclasses that are each treated as a class under the rule." "This means that each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action." *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981).

Plaintiffs propose a main damages class consisting of "[a]ll persons (within the statute of limitations) who are or have been: accused of a crime in Ravalli County, Montana, arrested, incarcerated, placed on the Jail Diversion Program, and charged pretrial fees without having been convicted for the crime for which the Jail Diversion Program was ordered." (Doc. 61 at 14).  Plaintiffs propose a damages subclass that is limited to "indigent persons," but is otherwise identical to the proposed main damages class. (Doc. 61 at 14). The main damages class seeks damages under Counts 1, 2, 5, and 8 of the Second Amended Complaint, while the indigent damages subclass seeks damages under Counts 4, 6, and 7. (Doc. 61 at 16).

Plaintiffs propose a main injunctive class consisting of "[a]ll persons who are or will be: accused of a crime in Ravalli County, Montana, arrested, incarcerated, placed on the Jail Diversion Program, and charged pretrial fees without having been convicted for the crime for which the Jail Diversion Program

was ordered." (Doc. 61 at 14-15). Plaintiffs propose an injunctive subclass that is limited to "indigent persons," but is otherwise identical to the propose main injunctive class. (Doc. 61 at 15). The main injunctive class seeks injunctive and declaratory relief under Counts 1, 2, 5, 8, and 9 of the Second Amended Complaint, while the indigent injunctive subclass seeks injunctive and declaratory relief under Counts 3, 4, 6, and 7. (Doc. 61 at 16).

Before considering whether the requirements of Rule 23 are met, the Court addresses what it sees as a number of threshold issues. Although both main classes seek relief under Counts 5 and 8, the Court finds those claims cannot reasonably be read to encompass nonindigent plaintiffs. Count 5 alleges the County "provide[s] constitutionally deficient due process by allowing the revocation of bail based on failure to pay pre-trial fees without first assessing pre-trial arrestees' ability to pay those fees," and that in doing so, the County "effectively criminalizes poverty and incarcerate[s] pre-trial arrestees because of their inability to afford pre-trial fees." (Doc. 34 at ¶¶ 204-05). As pled, Count 5 is expressly asserted on behalf of indigent arrestees. Count 8 alleges the County "unlawfully detains pre-trial arrestees beyond their release date by conditioning their release on the unconstitutional payment of whatever arbitrary dollar amount in pre-trial fees that [the County] demands," on the theory that doing so constitutes false imprisonment of pretrial arrestees who are unable to afford to pay those fees. Count 8 cannot reasonably be read as alleging

false imprisonment on behalf of nonindigent arrestees who have the means to secure their release by paying pretrial fees. The Court therefore finds that Plaintiffs' main injunctive and damages classes cannot seek relief under Count 5 or 8 of the Second Amended Complaint.

Both proposed main classes also seek relief under Counts 1 and 2, and the main injunctive class also seeks relief under Count 9. Unlike Counts 3 through 8, which are asserted exclusively on behalf of indigent plaintiffs, Counts 1, 2, and 9 are not based on indigency and can arguably be read as encompassing nonindigent plaintiffs. While Counts 1, 2, and 9 are ostensibly asserted on behalf of indigent and nonindigent pretrial arrestees alike, the facts and legal theories pled in the body of the Second Amended Complaint do not support the assertion of claims on behalf of nonindigent class members. The named Plaintiffs are all indigent, and the Second Amended Complaint is replete with allegations that the County's pretrial fee policy is unlawful because it does not consider the ability of indigent arrestees to pay those fees, and incarcerates or threatens to incarcerate those who do not pay. As summarized in the opening sentence of the Second Amended Complaint, the core theory of Plaintiffs' case is that "Ravalli County operates a wealth-based discrimination scheme, requiring pre-trial arrestees – who have not been found guilty of any crime – to pay exorbitant fees to get out and stay of jail, without considering ability to pay." (Doc. 34 at ¶ 1). While Plaintiffs include seven

paragraphs in support of Counts 1 and 2 alleging generally that the County deprives pretrial arrestees of their property by requiring payment of pretrial fees, there are no allegations relating specifically to nonindigent arrestees. (Doc. 34 at ¶¶ 110-117). Reading the Second Amended Complaint as a whole, the Court finds Plaintiffs have not pled facts to support any legal claims on behalf of nonindigent arrestees, or to support the inclusion of nonindigent arrestees in their proposed main classes as to Counts 1, 2, and 9.

Even if they had, the Court finds that Plaintiffs' motion for class certification is premature as to Counts 1, 2, and 9. While Rule 23(c)(1)(A) provides that class certification should be addressed "at an early practicable time," the Court retains discretion as to the timing of the class certification decision. See *Wright v. Schock*, 742 F.2d 541, 543 (9th Cir. 1984) ("The key word of section (c)(1) in its final form is 'practicable,' a term that deliberately avoids a mechanical approach and calls upon judges 'to weigh the particular circumstances of particular cases and decide concretely what will work."). "[I]n some cases, it may be appropriate in the interest of judicial economy to resolve a motion for summary judgment or motion to dismiss prior to ruling on class certification." *Wade v. Kirkland*, 118 F.3d 667, 670 (9th Cir. 1997) (citing *Wright*, 742 F.2d at 545-46)). As explained above, while the Court has determined that Counts 1, 2, and 9 should survive dismissal for failure to state a claim, whether they will survive summary judgment is uncertain. Under the

circumstances, and in the interest of judicial economy, the Court finds that whether class certification is appropriate as to Counts 1, 2, and 9 is more practicably resolved at the summary judgment stage. To the extent Plaintiffs also seek to certify the indigent damages and injunctive subclasses as to Counts 1, 2, and 9, the same reasoning applies and their motion for class certification should be denied as premature.

In sum, Plaintiffs' motion to certify both proposed main classes should be denied, and their motion to certify the indigent subclasses should be denied as to Counts 1, 2, and 9. This leaves Plaintiffs with their motion seeking certification of their indigent injunctive subclass as to Counts 3 through 8, and their indigent damages subclass as to Counts 4 through 8. Plaintiffs argue these proposed classes satisfy the threshold requirements of Rule 23(a), and seek certification of the injunctive classes under Rule 23(b)(2) and damages classes under Rule 23(b)(3).

### C.    Rule 23(a)

#### 1.    Numerosity

To establish numerosity, Plaintiffs must show that the proposed class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). An exact number of members is not required to adequately plead numerosity; a reasonable estimate is sufficient. *Burton v. Mountain West Farm Bureau Mut. Ins. Co.*, 214 F.R.D. 598, 608 (D. Mont. 2003) (citing *Robidoux v. Celani*, 987 F.2d

931, 935 (2d. Cir. 1993). Courts generally find Rule 23(a)'s numerosity requirement is satisfied when a class contains at least 40 members. *Rannis v. Recchia*, 380 Fed. Appx. 646, 651 (9ᵗʰ Cir. 2010) (citing *EEOC v. Kovacevich "5" Farms,* 2007 WL 1174444, at *21 (E.D. Cal. Apr. 19, 2007)).

a.    *Damages Subclass*

Plaintiffs estimate that their indigent damages subclass consists of hundreds of individuals. This proposed subclass includes all indigent individuals who are or have been charged Jail Diversion Program fees within the statute of limitations period. Based on Jail Diversion Program enrollment records and emails provided by the County, Plaintiffs estimate that more than 800 hundred individuals have been placed on the Jail Diversion Program and required to pay fees during this period. (Doc. 61-26). Based on 35 declarations from individuals charged Jail Diversion Program fees, Plaintiffs estimate that this group of 800 individuals has an indigency rate of approximately 83 percent. (See Doc. 61-30). Plaintiffs thus estimates that the indigent damages subclass consists of hundreds of individuals.

In response, the County essentially reiterates its arguments that the due process and false imprisonment claims for which the indigent damages subclass seeks to recover do not state a claim for relief. The County also challenges whether the declarations provided by Plaintiffs are sufficient to demonstrate that 83 percent of the 800 Jail Diversion Program are indigent. (Doc. 69 at 10-12).

Courts often rely on good faith estimates for the purposes of determining numerosity at the class certification stage. *P.P. v. Compton Unified School* District, 2015 WL 5752770, at *8 (C.D. Cal. Sept. 29, 2015). The Court finds that the supporting declarations provided by Plaintiffs are sufficient to demonstrate numerosity. As to the County's merits based arguments, the Court has determined for the reasons stated above that Plaintiffs' due process and false imprisonment claims survive dismissal for failure to state a claim. Whether those claims, including the legal theories upon which some of those claims are based, are sufficient to survive summary judgment remains to be seen. But for present purposes, Plaintiffs have presented sufficient evidence to satisfy the numerosity requirement as to the proposed damages subclass.

      b.   *Injunctive Subclass*

Plaintiffs' proposed injunctive subclass includes all individuals who are or will be charged Jail Diversion Program fees. Based on information provided in an email provided by the Ravalli County Sheriff's Office, Plaintiffs estimate that at any given time roughly 200 to 300 individuals pay Jail Diversion Program fees (Doc. 61-31), and submit that absent a change in the County's policy, hundreds more individuals will be placed on the Jail Diversion Program and charged pretrial fees. (Doc. 61 at 19-20). Citing the estimated indigency rate of 83 percent, Plaintiffs contend the indigent subclass meets is sufficiently numerous. As with the

damages subclass, the Court finds that Plaintiffs have provided sufficient evidence

showing that the indigent injunctive subclass satisfies the numerosity requirement.

   2. <u>Commonality</u>

  To establish commonality, Plaintiffs must show that "there are questions of

law or facts common to the class." Fed. R. Civ. P. 23(a)(2). Commonality is met

through the existence of the "same injury" resulting in a "common contention" that

is "capable of classwide resolution … in one stroke." *Dukes*, 564 U.S. at 350.

"What matters to class certification … is not the raising of common 'questions' –

even in droves – but rather the capacity of a classwide proceeding to generate

common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at

350.

  Plaintiffs have identified questions of fact and law that are common to each

of their proposed subclasses. With respect to the claims advanced by both indigent

subclasses, whether the County charges Jail Diversion Program fees without

considering ability to pay is a factual question that applies to all class members,

and whether failure to consider an arrestee's ability pay pretrial fees violates equal

protection and due process present a common legal question. Additionally, whether

Jail Diversion Program officers threaten supervisees with incarceration to induce

payment of fees as a matter of policy is a common question of fact, and whether

doing so violates equal protection and due process is a common question of law for purposes of the claims advanced by the indigent subclasses.

These common questions are central to Plaintiffs' various claims and can be answered on a class wide basis. The Court finds the commonality requirement is satisfied.

### 3.   Typicality

To establish typicality, Plaintiffs must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is present "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Armstrong,* 275 F.3d at 868 (citation omitted). "[R]epresentative claims are typical if they are reasonably co-extensive with those of the absent class members; they need not be substantially identical." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014). The typicality and commonality requirements "tend to merge" because both seek to determine "whether the named plaintiff's claim and the class claims are so interrelated that interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 349 n. 5.

Here, the named Plaintiffs' claims are typical of the class claims. For example, because the named Plaintiffs allege that the County did not assess their

ability to pay pretrial fees, threatened them with incarceration, and conditioned release on payment of pretrial fees, they share claims with the unnamed members of the indigent damages and injunctive subclasses under Counts 3 through 8. Accordingly, and for the same reasons the commonality requirement is met, Plaintiffs' claims are sufficiently typical of the class claims.

    4. <u>Adequacy</u>

   Finally, to establish adequacy, Plaintiffs must show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry presents two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Chief Goes Out v. Missoula County*, 2013 WL 139938, at * 6-7 (D. Mont. Jan. 10, 2013) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

   The County argues that the named Plaintiffs, all of whom are indigent, have not shown they will adequately represent the interests of the nonindigent members of the main classes. Because the Court has determined that Plaintiffs have not pled claims for relief on behalf of nonindigent class members and their motion to certify should be denied as to both main classes, the County's argument on this point is effectively moot. The County does not challenge the adequacy Plaintiffs'

representation on any other basis. Because the interests of the named Plaintiffs are aligned with the unnamed members of the proposed subclasses classes and there is no basis to conclude that counsel will not prosecute the action vigorously on behalf of those classes, the Court finds the adequacy requirement is satisfied.

### D.    Rule 23(b)

#### 1.    Rule 23(b)(2)

Plaintiffs seek certification of their indigent injunctive subclass under Rule 23(b)(2). Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies when a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 338. Class certification is not appropriate under Rule 23(b)(2), however, "when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360. "The fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010), abrogation on other grounds recognized by *Rodriguez Diaz v. Garland*, 53

F.4th 1189 (9th Cir. 2022). See also *Parsons v Ryan*, 754 F.3d 657, 688 (9th Cir. 2014).

Here, Plaintiffs seek a declaratory judgment that the Jail Diversion Program's pretrial fee collection policy is unlawful, and injunctive relief enjoining the County from continuing its implementation. (Doc. 34 at ¶ 224(a),(c)). As proposed, this declaratory and injunctive relief would apply to all members of the indigent injunctive class, and would not require any individualized determinations. Therefore, certification of Plaintiffs' proposed main injunctive class and indigent injunctive subclass is appropriate under Rule 23(b)(2).

Relying on *Dukes*, the County argues Rule 23(b)(2) certification is improper because the rule "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." (Doc. 69 at 20, quoting *Dukes*, 564 U.S. at 360-61). But because Plaintiffs' injunctive classes do not seek an award of damages, and instead request only prospective injunctive relief, *"Dukes'* admonition that 'individualized monetary claims belong in Rule 23(b)(3)" is inapplicable." *Byorth v. USAA Casualty Ins. Co.*, 333 F.R.D. 519, 534 (D. Mont. 2019) (distinguishing *Dukes* and finding Rule 23(b)(2) certification appropriate where the plaintiffs separately sought to certify a Rule 23(b)(3) damages class and did not seek a damages award in connection with their claim for injunctive and declaratory relief). See also *West v. California Servs. Bureau, Inc.*,

323 F.R.D. 295, 307 (N.D. Cal. 2017) ("District courts may certify both a 23(b)(2) class for the portion of the case concerning injunctive and declaratory relief and a 23(b)(3) class for the portion of the case requesting monetary damages."); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 987 (9th Cir. 2011).

### 2.   Rule 23(b)(3)

Plaintiffs seek certification of their indigent damages subclass under Rule 23(b)(3), which requires the Court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The Court must also determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### a.   *Predominance*

The predominance inquiry is more stringent than the commonality criteria under Rule 23(a)(2) and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). A common question is one where "the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class wide proof[,]" while an individual question is one where "members of a proposed class will need to present evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

The Ninth Circuit has held that "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Levya v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). See also *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017); *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010). But "to establish predominance, the named plaintiff must put forward a damages model establishing that 'damages are capable of measurement on a classwide basis'." *Siino v. Foresters Life Insurance and Annuity Co.*, 340 F.R.D. 157, 163 (N.D. Cal. Jan. 12, 2022) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-35 (2013). If there is no appropriate methodology for calculating damages on a class wide basis, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class," making Rule 23(b)(3) certification inappropriate. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-35 (2013) (finding predominance not met where questions of individual damage calculations would inevitably overwhelm questions common to the class). Thus, while "the Ninth Circuit has emphasized that the need for individualized findings as to the *amount* of damages does not defeat class certification, a plaintiff must still proffer a common methodology for *calculating* damages[.]" *Siino*, 340 F.R.D. at 164 (emphasis in original; internal quotation marks and citations omitted).

Here, Plaintiffs argue that common questions about how the County's Jail Diversion Program fee collection policy operates predominate over individual questions. Plaintiffs submit that individual questions concern only damages calculations and therefore cannot defeat certification under the predominance inquiry. Plaintiffs assert that because the members of the proposed damages subclass seek damages only in the form of returned pretrial fees, individual damage awards can readily "be calculated through a manageable formula" simply by reviewing the County's records to determine the amount of fees collected from each class member during the relevant period. (Doc. 61 at 32).

The Court finds this argument unpersuasive. Even if Plaintiffs are successful in establishing liability on any of the theories advance in the Second Amended Complaint, calculating damages for the indigent subclass would require an individualized assessment of ability to pay. Plaintiffs use indigency for purposes of qualifying for court appointed counsel as a proxy for establishing inability to pay pretrial fees, and a right to recover all pretrial fees previously paid. But the fact that an individual qualifies as indigent for purposes of obtaining court appointed counsel does not necessarily mean the individual would also be unable to pay the Jail Diversion Program fees associated with the particular conditions of his or her pretrial release. The County has submitted evidence that the fees associated with some conditions of pretrial supervision are minimal. (See Doc. 69-3 at ¶ 4).

Whether a pretrial arrestee who is indigent for purposes of obtaining court appointed counsel nevertheless has the ability to pay pretrial fees would require a fact intensive individualized inquiry. Therefore, even if the County is found liable for requiring payment of pretrial fees without considering ability to pay, the individualize damages inquiry for each class member would overwhelm questions common to class. The Court finds the predominance requirement of Rule 23(b)(3) is not met.

       b.   *Superiority*

Rule 23(b)(3) also requires the Court to consider whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Because the Court has concluded the predominance requirement is not satisfied, it is not necessary to address superiority. The Court nevertheless finds that, because individualized damages determinations that would be necessary if a damages class was certified, a class action is not superior.

Because Plaintiffs have not shown that the predominance and superiority requirements are satisfied, certification under Rule 23(b)(3) is not appropriate.

## V.   <u>Conclusion</u>

For the reasons discussed above,

IT IS RECOMMENDED that:

88

(1) The District Court Judges' Motion to Dismiss (Doc. 48) be GRANTED;

(2) The County Defendants' Motion to Dismiss (Doc. 46) be GRANTED as to Sheriff Holton and the Justices of the Peace and DENIED in all other respects;

(3) Plaintiffs' Renewed Motion for a Preliminary Injunction (Doc. 40) be DENIED; and

(4) Plaintiffs' Motion for Class Certification (Doc. 60) be GRANTED IN PART and DENIED IN PART as follows:

      (a)   Plaintiffs' motion to certify the proposed main damages and main injunctive classes should be denied as to all counts;

      (b)   Plaintiffs' motion to certify the proposed indigent damages subclass should be denied as to all counts; and

      (c)   Plaintiffs' motion to certify the proposed indigent injunctive subclass should be granted as to Counts 3 through 8, and denied without prejudice as to Counts 1, 2, and 9, subject to refiling if those claims survive summary judgment.

The Court should certify the following class as to Counts 3 through 8 of the Second Amended Complaint:

> All indigent persons who are or will be: accused of a crime in Ravalli County, Montana, arrested, incarcerated, placed on the Jail Diversion Program, and charged pretrial fees without having been convicted for the crime for which the Jail Diversion Program was ordered.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of

the Findings and Recommendation of the United States Magistrate Judge upon the

parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to

the findings and recommendations must be filed with the Clerk of Court and copies

served on opposing counsel within fourteen (14) days after entry hereof, or

objection is waived.

DATED this 13th day of January, 2023.

Kathleen L. DeSoto
United States Magistrate Judge