Phil Telfeyan
Lily Milwit
Equal Justice Under Law
400 7th St. NW, Suite 602
Washington, D.C. 20004
(202) 505-2058
ptelfeyan@equaljusticeunderlaw.org
lmilwit@equaljusticeunderlaw.org
*Attorneys for Plaintiffs*

Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

_____

TERI LEA EVENSON-CHILDS,　　　　)
DANIEL O'TOOLE, RICHARD　　　　)
CHURCHILL, and KEITH　　　　)
LEONARD, individually and on　　　　)
behalf of all others similarly situated,　)

　　　　Plaintiffs,　　　　)

　　　　v.　　　　)

RAVALLI COUNTY,　　　　)

　　　　Defendant.　　　　)
_____)

Case. No. 9:21-cv-89-DLC-KLD

PLAINTIFFS' BRIEF IN SUPPORT
OF PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
AS TO LIABILITY ON COUNTS
One, Two, Four, and Six

*Oral Argument Requested*

# **Table of Contents**

Table of Authorities ................................................................. ii

I.    Introduction ...................................................................1

II.   Argument ......................................................................1

     A.   Ravalli County Violates Procedural Due Process by Erroneously and Substantially Depriving Pretrial Supervisees of Their Property Without Prior Notice or an Opportunity to Be Heard (Count One)......2

     B.   Ravalli County Violates Due Process by Charging Fees that Function as Arbitrary Bail Without Bail Protections (Count Two)....13

     C.   Ravalli County Violates Due Process by Charging Mandatory Pretrial Fees Without Waivers for Indigence or Assessing Ability to Pay (Count Four)................................................................16

     D.   Ravalli County Violates Equal Protection by Promising Criminal Punishments for Those Who Cannot Afford Fees (Count Six) ..........19

III.  Conclusion ....................................................................27

## Table of Authorities

### Cases

*Bearden v. Georgia*, 461 U.S. 660 (1983) ................................................. 17, 20, 21

*Broussard v. Parish of Orleans*, 318. F3d. 644 (5th Cir. 2003) ...................... 11, 12

*Buffin v. California*, 2019 WL 424362 (N.D. Cal. Jan. 16, 2018) ........................18

*Caliste v. Cantell*, 329 F. Supp. 3d 296 (E.D. La. 2018) .........................................16

*Carter v. City of Montgomery*, 473 F. Supp. 3d 1273, (M.D. Ala. 2020) ..............18

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) .............................19

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ...................................6

*Coffin v. United States*, 156, U.S. 432 (1895) .........................................................14

*Douglas v. California*, 372 U.S. 353 (1963) .............................................................3

*Ferrill v. Parker Group, Inc.*, 168 F.3d 468 (11th Cir. 1999) ...............................25

*Frazier v. Jordan*, 457 F.2d 726 (5th Cir. 1972) ....................................................18

*Griffin v. Illinois*, 351 U.S. 12 (1956)........................................................ 3, 20, 26

*Griffin v. Illinois*, 351 U.S. 12, 19 (1956) ..............................................................18

*Hamlyn v. Rock Island Cnty. Metro. Mass Transit Dist.*, 960 F. Supp. 160 (N.D. Ill. 1997) ....................................................................................................................2

*Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017) ............................................16

*Hunter v. Underwood*, 471 U.S. 222 (1985).............................................................19

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) ...............................................9

*Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14 (D.D.C. 2001)....................2

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ...............................................................2

*Mayer v. Chicago*, 404 U.S. 189 (1971)........................................................ 3, 17, 26

*Morris v. Schoonfield*, 399 U.S. 508 (1970)..............................................................4

*Nelson v. Colorado*, 581 U.S. 128 (2017) ............................................. 2, 4, 13, 15

*ODonnell v. Harris Cnty.*, 892 F.3d 147 (5th Cir. 2018) .......................................13

*Rothgery v. Gillespie Cnty.*, 554 U.S. 191 (2008) ..................................................13

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) .............................26

*Schilb v. Kuebel*, 404 U.S. 357 (1971)............................................................. 10, 11

*Tate v. Short*, 401 U.S. 395 (1971) ................................................................ 3, 4, 17

*U.S. v. Salerno*, 481 U.S. 739, 755 (1987)..............................................................13

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977)...................................................................................................................25

*Washington v. Davis*, 426 U.S. 229 (1976) .............................................................25

*Welchen v. Bonta*, 630 F. Supp. 3d 1290 (E.D. Cal. 2022) ............................ 16, 18

*Williams v. Illinois*, 399 U.S. 235 (1970) ....................................................... 3, 4, 17

### Statutes

Montana Code Ann. § 46-18-232(2)....................................................................3, 22

## I.    Introduction

Through its Jail Diversion Program, Ravalli County charges unnoticed, uncontestable, process-less, exorbitant, uncapped, non-waivable, non-reimbursable, arbitrary, penalty-based fees to pretrial individuals assigned to supervision. Plaintiffs move for partial summary judgment as to liability on Counts One, Two, Four, and Six based on Defendant's unconstitutional fees.  Plaintiffs do not argue that the judges of Ravalli County cannot impose pretrial supervision, nor do Plaintiffs argue that the Jail Diversion Program cannot charge pretrial fees.  Rather, Plaintiffs argue that Defendant's current policies and practices of charging non-waivable fees without process and without considering ability to pay violate the Due Process and Equal Protection Clauses.

## II.    Argument

Plaintiffs move for summary judgment as to liability on Counts One, Two, Four, and Six because (A) Ravalli County violates procedural due process by depriving pretrial supervisees of substantial property without prior notice or hearing, (B) Ravalli County violates due process by charging fees that function as bail but without bail procedures, (C) Ravalli County violates due process by charging non-waivable pretrial fees without considering ability to pay, and (D) Ravalli County violates equal protection by requiring fees with a policy of punishing those who cannot afford them.

**A.**     **Ravalli County Violates Procedural Due Process by Erroneously and Substantially Depriving Pretrial Supervisees of Their Property Without Prior Notice or an Opportunity to Be Heard (Count One)**

Pretrial supervisees have a property interest in the money that Defendant mandates in fees, and Defendant's deprivation of that property without adequate process is unconstitutional.[1]  Due process is a "flexible" concept that "calls for such procedural protections as the particular situation demands," but Defendant offers no meaningful procedural protections in this case.  *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).  "Under the *Mathews* balancing test, a court evaluates (A) the private interest affected, (B) the risk of erroneous deprivation of that interest through the procedures used, and (C) the governmental interest at stake."  *Nelson v. Colorado*, 581 U.S. 128, 135 (2017).

*Mathews*' first prong weighs in Plaintiffs' favor because pretrial supervisees, especially indigent ones, have "an obvious interest" in their monetary property.  *Id.*; *see, e.g.*, *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 32 (D.D.C. 2001) (finding that financial injury resulting in "[t]he inability to pay utility bills or to feed one's children or the risk of being evicted from one's home, amounts to irreparable

---

[1] Judge DeSoto, in her ruling certifying the Plaintiffs' class and denying Defendants' Motion to Dismiss, opined that Count One of Plaintiffs' Complaint advanced the theory that "the mere imposition of pretrial fees is, in and of itself, unconstitutional." ECF 78 at p. 54.  Plaintiffs clarify here that Count One does not necessarily claim that all pretrial fees are in and of themselves unconstitutional, but that sufficient process is required before such a deprivation.

injury."); *Hamlyn v. Rock Island Cnty. Metro. Mass Transit Dist.*, 960 F. Supp. 160, 162 (N.D. Ill. 1997) (holding that monetary loss is an irreparable injury when "the plaintiff is so poor that he would be harmed . . . by the loss of" money).  The property interest is only heightened by the fact that the fees are ongoing and uncapped, resulting in total fees that routinely exceed thousands of dollars.  ECF 98 ¶¶48–56.

Regarding *Mathews*' second prong, the risk of erroneous deprivation is high because Defendant's fees are non-waivable for indigence, punitively enforced, non-reimbursable on acquittal, arbitrarily set, and lacking notice or hearing.  Depriving indigent criminal defendants of money they cannot afford is erroneous because "there can be no equal justice where the kind of trial a [person] gets depends on the amount of money [s]he has." *Griffin v. Illinois*, 351 U.S. 12, 19 (1956).  Under *Griffin*'s "equal justice" principle, deprivations in the criminal justice system that fail to account for indigence have repeatedly been deemed unconstitutional.  *See, e.g.*, *Douglas v. California*, 372 U.S. 353, 357–58 (1963) (indigent entitled to assistance of counsel on appeal); *Mayer v. Chicago*, 404 U.S. 189, 195 (1971) (indigent entitled to fee-waiver for appeal under a fine-only statute); *Williams v. Illinois*, 399 U.S. 235, 240–41 (1970) (indigent protected from imprisonment for non-willful non-payment of fine); *Tate v. Short*, 401 U.S. 395, 397–98 (1971) (indigent protected from jailing for non-willful non-payment of fine under a fine-only statute).  Although both the Supreme Court and Montana state law require fees

3

to be waivable for indigence, Defendant offers no such waivers or reductions. *See, e.g.*, Montana Code Ann. § 46-18-232(2) ("[T]he court may not sentence a defendant to pay costs unless the defendant is or will be able to pay them."); ECF 98 ¶¶73–76. Defendant's limited reduction for SSI/SSDI does not apply broadly to indigence and does not reduce Defendant's exorbitant device-fees, ECF 98 ¶¶79–82, 85–87, thus not curing the risk of erroneous deprivation.

Defendant's deprivation of money from indigent criminal defendants is even more erroneous when it occurs, as it does here, on threat of punishment. *See, e.g.*, *Williams*, 399 U.S. at 240–41 (finding punishment impermissible when based on non-willful non-payment of fine); *Morris v. Schoonfield*, 399 U.S. 508, 509 (1970) (same); *Tate*, 401 U.S. at 397 (finding imprisonment solely because of indigency impermissible). Despite the Supreme Court's clear instruction, Defendant imposes mandatory fees with the promise of punishment: non-payment can lead to removal from the Jail Diversion Program, ECF 98 ¶¶206–219, denials of court-ordered drug and alcohol testing, ECF 98 ¶¶220–233, and adverse sentencing orders, ECF 98 ¶¶244–251.

The risk of erroneous deprivation is also high because Defendant's fees are non-reimbursable. Defendant "may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions." *Nelson v. Colorado*, 581 U.S. 128, 136 (2017) (emphasis in original). Contrary to the Supreme Court's

guidance in *Nelson*, Defendant collects mandatory fees from class members who have been "adjudged guilty of no crime." ECF 98 ¶¶126–134, ¶¶197–199. But unlike in *Nelson*, which requires reimbursement of fees upon acquittal, 581 U.S. at 136, Defendant provides no reimbursement, even if supervisees are acquitted or have their charges dismissed. ECF 98 ¶94.

Defendant creates an even higher risk of erroneous deprivation by charging arbitrary rates. Courts play no involvement in setting fees, ECF 98 ¶¶138–143, Defendant's fees are not always tied to actual costs, ECF 98 ¶¶115, 117–118, and Defendant profits on every device, ECF ¶¶162–176. Lieutenant Colgan, who heads the Jail Diversion Program, admits that the $1,500 originally charged for device-deposits was "overcharging," "extreme," and "didn't make any sense." ECF 98 ¶¶98–105. He describes other prior policies, many of which "bled over" into his tenure, as inconsistent, "all over the map," and "unfair." ECF 98 ¶¶106, 113. Even the new device-deposit of $500 was set arbitrarily, purely "for simplicity reasons." ECF 98 ¶¶115. He does not "know how" the monthly fee of $105 was set — further evidence of arbitrariness. ECF 98 ¶¶117. Fee-policies change frequently and without formal notice, and the Jail Diversion Program does not have specific or written policies in place. ECF 98 ¶¶89, 121–125. Because Defendant's fees are set arbitrarily, they are not tethered to a rational basis, increasing the risk of erroneous deprivation.

The risk of erroneous deprivation is made higher still by the fact that Defendant collects its fees without any notice or opportunity to contest. Notice and hearing are fundamental in reducing the risk of erroneous deprivation by providing individuals a chance to contest prior to a deprivation. *See, e.g.*, *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) ("[T]he Constitution requires some kind of hearing *before* the State deprives a person of liberty or property.") (emphasis in original); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("[T]he root requirement of the Due Process Clause is that an individual be given an opportunity for a hearing *before* he is deprived of any significant protected interest.") (emphasis in original). Despite the need for advance notice, supervisees do not learn of Defendant's fees in advance, finding out only when signing enrollment paperwork. ECF 98 ¶¶188–196. Despite the need for an opportunity to be heard, supervisees cannot contest fees in court. ECF 98 ¶¶137–143. Taken together, the current features of Defendant's fees and the lack of associated procedures make the risk of erroneous deprivation unacceptably high.

Concerning *Mathews*' third prong, the potential government interests associated with Defendant's fees can be accomplished with specific notice and an opportunity to be heard regarding indigence. Sheriff Holton testified that one of the Program's purposes is reducing the jail population. ECF 98 ¶2. But there is no evidence to suggest that specific notice of fees, opportunities to contest the fees in

court, consideration of supervisees' abilities to pay the fees, or reimbursements for acquittals would in any way hamper Defendant's goal.  In fact, the jail population is *more* likely to be reduced with adequate notice because supervisees would be better able to plan for payments.  Currently, arrestees stay in jail longer if they cannot afford Defendant's fees, ECF 98 ¶¶63–71, so Defendant's stated goal would also be served by a hearing that accounts for ability to pay.  Sheriff Holton also testified that a goal of the Program is reducing recidivism, ECF 98 ¶3, but Plaintiffs are not challenging pretrial supervision itself, only the process-less fees that Defendant currently charges.  Moreover, Sheriff Holton conceded that the fees are "not determined based on what [they] think will be most likely to ensure that someone follows the law." ECF 98 ¶149.  The stated government interests, then, are not only unaffected by the implementation of procedural safeguards, but are actually enhanced by notice and an opportunity to be heard.

If Defendant's interest is also financial, the third *Mathews* prong still weighs in Plaintiffs' favor because Defendant's consistent profits would be minimally impacted by due process requirements.  Defendant already provides specific fee reductions for SSI/SSDI which, while certainly not sufficing as an indigence-waiver, show that the implementation of waivers is neither undue nor infeasible.  ECF 98 ¶80.  Moreover, the Program has made more revenue than it has paid in expenses every year since its inception, ECF 98 ¶¶177–182, profits off of every device, ECF

7

98 ¶¶162–176, and has more than $216,000 in an untouched capital account, ECF 98 ¶¶183–185, showing that there is more than sufficient room for indigence-reductions.  *See also* ECF 98 ¶186 (Sheriff Holton admitting that he "would reduce fees" if the Program brought in more revenue than needed).  Program Officer Fisher's rationalization for why supervisees have to shoulder the Program's operating costs — that "you cannot go get a free movie just because you want to at the store," ECF 98 ¶157 — is particularly unavailing because the County is not a for-profit entity selling a commercial product, it is universally accepted that taxpayers pay for other government-provided services under the public safety umbrella, and, most importantly, unlike pretrial liberty, access to movies is not a constitutionally-protected right.

Regardless of which government interests are being assessed, "there is no interest on the part of the State in [deprivation] without any procedural guarantees at all." *Morrisey v. Brewer*, 408 U.S. 471, 484 (1972).  Therefore, even if Defendant has a valid interest in reducing the jail population, reducing recidivism, and balancing its budget, it "has no interest" in exacting mandatory pretrial fees "without any procedural guarantees at all." *Id.*  Each *Mathews* factor weighs in Plaintiffs' favor, establishing that Defendant's fees deprive pretrial supervisees of their property without due process.

Plaintiffs do not advance the argument that Defendant cannot assess fees to pretrial supervisees — only that some procedures are required.  The type of process due increases with the extent to which the deprivation is "essentially penal in character," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 164 (1963), and Defendant's process-less fees meet all seven of the *Mendoza-Martinez* factors, warranting heightened procedures. *Id.* at 168–69.  First, especially for indigent class members, the fees pose an "affirmative disability or restraint," impeding housing, basic necessities, and pretrial freedom. *Id.*; ECF 98 ¶¶57–72.  Second, monetary exactions have "historically been regarded as punishment" as fines remain one of the main forms of punishment for criminal offenses. 374 U.S. at 168.  Third, because Defendant's fees are pretrial, they only "come[] into play on a finding of scienter" — when someone is arrested for a crime. *Id.*  Fourth, Defendant's fees attempt to "promote the traditional aims of punishment — retribution and deterrence," *id.*, as Sheriff Holton explicitly testified that reducing recidivism is one of the main goals of pretrial supervision.  ECF 98 ¶3.  Fifth, "the behavior to which [the fees] appl[y] is already a crime" — pretrial fees are assessed against individuals accused of crimes. 374 U.S. at 168.  Sixth, there is no "alternative purpose to which it may be rationally connected," and no alternative justification has been offered for Defendant's fees. *Id.* at 168–69.  Seventh, the fees "appear[] excessive," *id.* at 169, especially considering how arbitrarily they are set, ECF 98 ¶¶115–118, that there is

no reduction or waiver for indigence, ECF 98 ¶¶73–78, 80–82, 92, that they are not reimbursed on acquittal, ECF 98 ¶94, and that they are ongoing and uncapped, ECF 98 ¶¶48–56.  Even if the deprivation is something less than "essentially penal in character," Defendant must offer *some* pre-deprivation procedures, but Defendant offers none.

*Schilb v. Kuebel*, 404 U.S. 357 (1971), provides a potential roadmap for how Defendant can conform its fees to the Constitution.   In *Schilb*, the plaintiff challenged a refundable $75 deposit for pretrial release and a non-refundable $7.50. 404 U.S. at 358.  When his case resolved, the plaintiff had his $75 deposit returned, but the court retained $7.50 as a "bail bond cost."  *Id.*  The Supreme Court held that both fees were constitutionally sound because they were either returned after resolution of the case, tied to bail amounts, administrative in nature, or statutorily authorized.   *Id.* (explaining the reimbursement upon resolution); *id.* at 362–64 (describing the $7.50 as tied to bail amounts); *id.* at 367 (describing the bond cost as administrative); *id.* at 360–63 (describing the statutory authorization).  Importantly, the Supreme Court also noted that the plaintiff had not pleaded indigency, so the situation was "not one where we may assume that the [challenged fee and bail bond cost] work[ed] to deny relief to the poor man merely because of his poverty."  *Id.* at 370.

Defendant's fees have none of the constitutionally critical features in *Schilb*. While the one-time $7.50 in *Schilb* showed a low private interest at stake, Plaintiffs here are routinely charged hundreds of dollars *every month*, resulting in thousands of dollars total.  ECF 98 ¶¶34–56.  The fee in *Schilb* was tied to bail amounts, thus ensuring the same procedural protections attendant to bail, but Defendant's fees are "the same across the board" for all supervisees and thus not protected by bail procedures.  ECF 98 ¶¶34, 86.  The challenged fee in *Schilb* was also reimbursed upon resolution of the case, further mitigating the risk of erroneous deprivation, while Defendant's fees are not returned at any point, even if supervisees are ultimately acquitted.  ECF 98 ¶94.  And while the *Schilb* fee was statutorily authorized, the challenged fees here have no statutory basis.  ECF 98 ¶¶138–141. Finally, unlike in *Schilb*, this case involves an indigent class, so Defendant's fees "work to deny relief to the poor man merely because of his poverty."  404 US. at 370.  The absence of all the *Schilb* factors from Defendant's challenged fees reveals the lack of due process.

*Broussard v. Parish of Orleans*, 318. F3d. 644 (5th Cir. 2003), also illustrates the procedural deficiencies of Defendant's fees.  There, plaintiffs challenged statutes that imposed pretrial fees for arrestees who had posted bail.  *Id.* at 647.  The fees included a $15 "appearance bond" fee that could be waived upon acquittal, a $7 "notice of arraignment or of trial" fee, a $15 recognize bond fee, and a $5 "filing and

processing of appearance or witness bond" fee. *Id.* at 647–48. The Fifth Circuit held that the challenged fees were all procedurally adequate, in part because like the challenged fees in *Schilb* (but unlike Defendant's fees), "any deprivation attributable to these administrative fees is minimal" because the fees themselves are "nominal," making the private interest at stake relatively low. *Id.* at 655–56. Moreover, one of the fees was reimbursable on acquittal, and another allowed for judicial waiver — both weighing against the risk of erroneous deprivation. *Id.* at 655. The *Broussard* fees were also, like the *Schilb* fees but unlike Defendant's fees, statutorily authorized. *Id.*

Defendant's fees are dissimilar from the fees upheld in *Broussard* in every way. A far cry from the one-time "nominal" fees challenged in *Broussard*, which all together totaled $42, Defendant's fees regularly exceed thousands of dollars, making the private interest at stake significant. ECF 98 ¶¶54–56. Defendant's fees are non-reimbursable in the event of acquittal or dismissal — a key fact in *Broussard* that mitigates against the risk of erroneous deprivation. ECF 98 ¶94; *Broussard*, 318 F.3d at 655–56. And in contrast to *Broussard*, Defendant's fees are not statutorily authorized. ECF 98 ¶¶138–141.

Defendant's lack of any prior notice or opportunity to be heard establishes their due process violation. Here, Plaintiffs seek only a ruling on liability and will move for (and fully brief the issue of) relief at the appropriate time. To illustrate the

12

kinds of procedure that would cure Defendant's due process violations, appropriate protections may include: specific, advance, in-court notice of the amount of fees; caps on total fees so that supervisees have specific notice of how much they will ultimately have to pay; fees tied to bail amounts to enhance notice and procedural protections; pre-deprivation opportunity to contest fees in court; considerations of ability to pay; waivers or reductions based on indigence; reimbursements for acquittal or dismissal; and elimination of consequences for non-willful non-payment. Defendant can charge fees, but not without any such procedures.

### B.   Ravalli County Violates Due Process by Charging Fees that Function as Arbitrary Bail Without Bail Protections (Count Two)

Defendant's fees require the same level of due process protections required of bail because the fees function as a prerequisite to supervisees' pretrial freedom. When a deprivation is pretrial, due process does not require a full criminal trial, but it still calls for comprehensive pre-deprivation procedures because in "our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *U.S. v. Salerno*, 481 U.S. 739, 755 (1987); *see also Nelson v. Colorado*, 581 U.S. 128, 136 (2017) (finding the state "may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions") (emphasis in original). For bail fees, federal courts have held that arrestees are entitled to the right to counsel, consideration of ability to pay, an evidentiary hearing, and an impartial decisionmaker. *Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 207 (2008); *ODonnell v.*

13

*Harris Cnty.*, 892 F.3d 147, 159–61 (5th Cir. 2018), *overruled on other grounds by Daves v. Dallas Cnty.*, 22 F.4th 522 (5th Cir. 2022).  But class members in this case have no right to a hearing — with or without counsel, with or without evidence — to contest fees, ECF 98 ¶¶137–142, and fees are not scaled to ability to pay, ECF 98 ¶¶76–78, 81.

Defendant's lack of bail procedures is problematic because Defendant's fees function like bail.  Arrestees assigned to Jail Diversion are routinely required to pay their initial fees before they can be released from jail.  ECF 98 ¶¶64–68.  They are also not released from jail unless and until they pay any outstanding balances from previous Jail Diversion Program charges as well as any discretionarily-ordered device deposits.  ECF 98 ¶¶69–71.   Officer Fisher's description shows how Defendant's fees function like bail because "the alternative" to payment is "[s]tay in jail."  ECF 98 ¶63.  Plaintiff O'Toole, for instance, was required to pay $2,805 in fees, which included past due fees, initial set-up fees, and a device deposit, before he was released from jail.  ECF 98 ¶71.  The Jail Diversion Program fees that stood between Plaintiff O'Toole and his pretrial freedom were higher than his bail amount.  ECF 98 ¶72. Despite the fact that Plaintiff O'Toole could not achieve pretrial freedom until he paid Defendant's fees in full, he received none of the due process protections typically required of bail.

14

Defendant's justification for charging pretrial fees without process lacks any basis in law.  It is "axiomatic and elementary" "that there is a presumption of innocence in favor of the accused," *Coffin v. United States*, 156, U.S. 432, 453 (1895), but Defendant flips this presumption on its head by assuming that all supervisees are guilty enough to be charged process-less fees.  As the County Administrative Director, Trish Harrison, said of pretrial arrestees, "they wouldn't be in jail if there wasn't enough evidence for them to be in jail," and "if they're going to break the law, there should be certain things they're having to pay for."  ECF 98 ¶134.  The Program makes no differentiation between convicted misdemeanor probationers and pretrial class members, who are legally innocent.  ECF 98 ¶¶129–131.  Program officers routinely refer to pretrial supervisees as "offenders" and characterize them as having already broken the law, despite their pretrial status. ECF 98 ¶¶132–134.  As Defendant's own witnesses make evident, they justify their process-less fees with the unsupported assumption that pretrial arrestees are guilty enough to have to pay.  *But see Nelson v. Colorado*, 581 U.S. 128, 136 (2017) (finding the state "may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions") (emphasis in original).

The fact that Jail Diversion fees are ongoing, uncapped, and indefinite, unlike the one-time payment of bail, means that the fees should have even more procedural protections than bail.  ECF 98 ¶¶48–56.  Although Defendant's pretrial fees clearly

function like an ongoing version of bail, they lack any of the due process protections of bail and are therefore unconstitutional.

### C. Ravalli County Violates Due Process by Charging Mandatory Pretrial Fees Without Waivers for Indigence or Assessing Ability to Pay (Count Four)

Defendant does not consider ability to pay or offer waivers for indigence, ECF ¶¶73–78, thus violating due process.  Because bail is a potential infringement on arrestees' right to pretrial freedom, courts have repeatedly struck down bail schemes that detain individuals who cannot afford bail and have required judges assessing bail to inquire into arrestees' ability to pay.  *See, e.g.*, *Caliste v. Cantell*, 329 F. Supp. 3d 296, 312 (E.D. La. 2018); *Hernandez v. Sessions*, 872 F.3d 976, 990–91 (9th Cir. 2017); *Welchen v. Bonta*, 630 F. Supp. 3d 1290, 1300 (E.D. Cal. 2022).  This principle applies in full force to Defendant's mandatory pretrial fees.

Defendant's lack of consideration of ability to pay is particularly problematic given the exorbitant, ongoing, and uncapped amounts.  While the monthly fee amounts range, it is not uncommon for supervisees to be charged hundreds of dollars per month in fees, at least some of which are due before arrestees are released from jail.  ECF 98 ¶¶34–47, 63–69.  The Program's own employees concede that these costs are "significant," ECF 98 ¶¶57–59, and Lieutenant Colgan estimated that about half of pretrial supervisees are behind on Jail Diversion Program fees, stating that it is "not uncommon to see" pretrial supervisees between $300–$500 behind on

16

Program fees, ECF 98 ¶¶60–61.  The only reason more supervisees are not even further behind "is because [they] now remove people from services if they get that high."  ECF 98 ¶62.  The unaffordability of the fees is clear, as is class members' inability to pay them.

Despite the due process requirement to consider ability to pay, Defendant does not, instead insisting that supervisees have to figure out a way to pay unaffordable fees.  If supervisees say they cannot pay the fees, according to Lieutenant Colgan, "that's not our issue, that's not our problem, that's an issue [supervisees] have to figure out."  ECF 98 ¶78.  Program officers file ROVs based on non-payment of fees when they know that the supervisee cannot afford the fees.  ECF 98 ¶¶201, 230.  As a result, those who cannot afford to pay the fees are penalized.

Defendant's exaction of penalties for non-payment of fees by indigent supervisees further violates due process because the Supreme Court has consistently found that at any stage of the criminal justice process, different outcomes based on indigence violate due process and equal protection.  *See, e.g.*, *Bearden v. Georgia*, 461 U.S. 660, 667 (1983) (holding that probation cannot be revoked for inability to pay restitution); *Tate v. Short*, 401 U.S. 395, 398 (1971) (holding unconstitutional "converting [a fine] into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full"); *Mayer v. Chicago*, 404 U.S. 189, 195–96 (1971) (holding that government must provide transcript for appeal "where that is

necessary to assure the indigent as effective an appeal as would be available to the defendant with resources to pay his own way"); *Williams v. Illinois*, 399 U.S. 235, 244 (1970) (equal protection "requires that the statutory ceiling placed on imprisonment for any substantive offense be the same for all defendants irrespective of their income status"); *Griffin v. Illinois*, 351 U.S. 12, 19 (1956) (finding that state may not condition criminal defendant's right to appeal on ability to pay for trial transcript).  Lower courts have applied this line of precedent in cases challenging criminal outcomes based on non-payment of fees at various case stages, including pretrial.  *See, e.g.*, *Frazier v. Jordan*, 457 F.2d 726, 730 (5th Cir. 1972) (holding unconstitutional a municipal ordinance that provided two alternative sentences of a $17 fine or 13 days in jail); *Carter v. City of Montgomery*, 473 F. Supp. 3d 1273, 1305 (M.D. Ala. 2020) (applying the *Bearden* framework to jailing people convicted of traffic offenses for failing to pay traffic fines without first inquiring into ability to pay); *Buffin v. California*, 2019 WL 424362, at *9 (N.D. Cal. Jan. 16, 2018) (finding *Bearden* line of cases applies in pretrial context and applies "with special force in the bail context, where fundamental deprivations are at issue and arrestees are presumed innocent"); *Welchen v. Bonta*, 630 F. Supp. 3d 1290, 1300 (E.D. Cal. 2022) (finding unconstitutional a bail schedule that "deprived [plaintiff] of his fundamental right to pretrial liberty solely due to his indigence").  Here, supervisees' non-payment of fees leads to different outcomes and greater penalties in their

criminal cases.  ECF 98 ¶¶199–251.  Accordingly, Defendant's lack of consideration of ability to pay prior to enforcing Jail Diversion Program fees is unconstitutional.

Defendant can feasibly consider ability to pay within its existing structure, further illustrating the due process violation.  All supervisees are already required to fill out an initial enrollment form, which asks about employment, wages, and living arrangements.  ECF 98 ¶¶32–33.  Sheriff Holton confirmed that he will "consider proposals all day long" for fee waivers or reductions for indigent supervisees.  ECF 98 ¶93.  Supervisees could present evidence of their ability to pay to a neutral decisionmaker during existing bail hearings, creating no administrative burden for Defendant and bringing Defendant's fees closer into conformity with constitutional requirements.

### D.   Ravalli County Violates Equal Protection by Promising Criminal Punishments for Those Who Cannot Afford Fees (Count Six)

Defendant violates equal protection in treating similarly situated pretrial arrestees differently based on wealth status by promising punishment to those who cannot afford fees.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) ("[A]ll persons similarly situated should be treated alike.").  Under equal protection, claims can be divided into three categories: (1) a policy discriminates on its face; (2) the application of a facially neutral policy intentionally has a disparate impact; and (3) a facially neutral policy is being unequally administered.  *Hunter v.*

*Underwood*, 471 U.S. 222, 223 (1985).  Defendant's policy of promising to penalize

supervisees who cannot afford the fees is types (1) and (2).

Defendant's policy of penalizing non-willful non-payment is facially

discriminatory because it promises different criminal outcomes for those who cannot

afford the fees when compared to those who can.  The fees challenged here operate

similarly to those found unconstitutional in *Griffin v. Illinois*, 351 U.S. 12 (1956).

The *Griffin* Court held that requiring criminal defendants to pay transcript fees

before appealing violated the due process and equal protection rights of indigent

defendants who could not afford the fees.  *Id.* at 18.  The Court characterized the

challenged law as "invidious discrimination" because there was "no meaningful

distinction between a rule which would deny the poor the right to defend themselves

in a trial court and one which effectively denies the poor an adequate appellate

review accorded to all who have money enough to pay the costs in advance."  *Id.* at

18.  In other words, a price-tag *is* facial discrimination.  Defendant's fees carry the

promise of punishment for non-willful non-payment by indigent class members,

including removal from supervision, ECF 98 ¶¶203–219, denial of court-ordered

drug and alcohol testing, ECF 98 ¶¶220–233, and arrest, ECF 98 ¶¶234–243, and

adverse sentencing orders, ECF 98 ¶¶244–251.  Thus, Defendant's policy of

punishing non-waivable fees violates the Constitution because it "effectively denies

the poor [pretrial supervision]."

The *Griffin* holding laid the groundwork for *Bearden*, which recognized that "[d]ue process and equal protection principles converge" when considering cases involving "the treatment of indigents in our criminal justice system." *Bearden v. Georgia*, 461 U.S. 660, 664 (1983). *Bearden* identifies four factors when evaluating claims of wealth-based discrimination: (1) the nature of the individual interest affected, (2) the extent to which that interest is affected, (3) the rationality of the connection between legislative means and purpose, and (4) whether alternative means for effectuating the purpose exist. *Id.* at 666–67. All of these factors weigh against Defendant's policy of penalizing non-willful non-payment.

First, the individual interests in monetary property, pretrial freedom, and equal treatment are all significant. Defendant's fees cost thousands of dollars. ECF 98 ¶¶48–56. Non-willful non-payment can be considered grounds for bail revocation, impacting pretrial freedom. ECF 98 ¶¶199–243. And a wealth-based fee-structure denies equal justice under the *Griffin* framework, impacting class members' interest in equal treatment. All three interests are significant.

Second, these interests are meaningfully affected by Defendant's fee regime because supervisees who cannot afford the fees may be jailed. Supervisees who cannot afford the fees may be classified as "fail to enroll," ECF 98 ¶¶203–204, removed from Jail Diversion services, ECF 98 ¶¶206–216, and denied the ability to take court-mandated drug and alcohol tests, ECF 98 ¶¶220–233. Failure to enroll,

removal from supervision, and missed drug and alcohol tests violate supervisees' conditions of release, which means that their pretrial release may be revoked, ECF 98 ¶¶217–219, 227. Overdue fees are also often encompassed in supervisees' sentencing orders. ECF 98 ¶¶244–251. All of these consequences infringe on class members' significant interests, and none of them are experienced by supervisees who can afford to pay the fees.

Regarding *Bearden*'s third factor, the fee regime cannot be said to have a rational connection to any legislative purpose. Sheriff Holton concedes that "the price that [Jail Diversion is] setting is not determined based on what [they] think will be most likely to ensure that someone follows the law." ECF 98 ¶149. He also maintains that the Program's primary purpose is to reduce jailing, ECF 98 ¶2, even when the policy of not inquiring into ability to pay results in pretrial supervisees staying in jail longer or going back to jail when they would otherwise enjoy pretrial liberty. ECF 98 ¶¶63–71, 200–202, 205, 219, 227, 232–233, 234–243. Moreover, Plaintiffs only challenge fees, not the concept of supervision, and the fact that Plaintiffs do not challenge the Program itself means that their concerns about fees cannot undermine the core purposes of Jail Diversion. Non-waivable fees are also not rationally related to the legislative goals outlined in Montana state law, which require consideration of ability to pay for criminal justice-related fees, including pretrial fees. *See, e.g.*, Montana Code Ann. § 46-18-232(2). There is simply no

22

evidence in the record to suggest that the Program's lack of consideration of ability to pay fees is in any way related to a legislative purpose.

Concerning *Bearden*'s fourth factor, alternative means exist to effectuate Defendant's stated purpose of supervising pretrial arrestees, reducing recidivism, and promoting pretrial liberty. Collecting information about supervisees' financial status and receipt of public benefits creates no administrative burden for Program employees, ECF 98 ¶¶32–33, and Sheriff Holton expressed openness to considering waivers and reductions based on indigence, ECF 98 ¶93. Because not all supervisees are unable to afford the fees, such waivers and reductions need not threaten the existence of the Program, especially considering its untouched capital account of more than $216,000, ECF 98 ¶183, and the fact that the Program has generated more money than it spends every year, ECF 98 ¶¶177–182. Additionally, the Program currently utilizes one annual grant, and Sheriff Holton admits that other grants are likely available. ECF 98 ¶153. Sheriff Holton also claims that Ravalli County's jail population has reduced by "about a third since 2018," saving money due to the creation of the Jail Diversion Program. ECF 98 ¶155. But the approximate $91 per inmate per day that the Program is saving the County has not been shared with the Jail Diversion Program. ECF 98 ¶156. And Program leaders' insistence that taxpayer dollars not be used at all to support the Program is unconvincing given that taxpayers already support emergency services, costs associated with incarceration,

and even the supervision and monitoring costs for probationers convicted of felonies. ECF 98 ¶¶154, 158–159.  In any event, the Jail Diversion Program is the *only* program within the Sheriff's Office where the majority of the costs associated with operating the program are offloaded onto program's participants.  ECF 98 ¶¶151–152.  Those participants are forced to fund the Program despite the presumption of innocence and irrespective of their ability to do so.

Each *Bearden* factor weighs strongly against Defendant's policy of penalizing non-willful non-payment.  This aspect of Plaintiffs' challenge does not depend on actual punishments being merited out; Plaintiffs challenge Defendant's *policy* to punish those who non-willfully fail to pay.  Non-willful non-payment results in prolonged jail time, ECF 98 ¶¶63–71, reports of violation to the County Attorney's office, ECF 98 ¶¶200–202, the potential for bail revocation based on violations of conditions of pretrial release, ECF 98 ¶¶ 217–219, 227, and overdue Program fees incorporated into class members' sentencing orders, ECF 98 ¶¶244–251 — all outcomes never experienced by supervisees who can afford the fees.

The key fact for Plaintiff's equal protection claim is not the actual consequences Defendant merits out, but Defendant's stated policy of penalties. Defendant follows through on many of its punitive promises: for example, supervisees who cannot pay for testing are denied testing, reported for missing a test, and can have their bail revoked for missing the test, ECF 98 ¶¶220–233, meaning

that non-willful non-payment for testing leads to actual consequences. Officer Fisher testified that "the alternative" to paying the fees is to "stay in jail," ECF 98 ¶63, and Lieutenant Colgan testified that the Program has a longstanding "policy of removing people from the program if they can't pay." ECF 98 ¶207. Those who cannot afford the fees have their overdue amounts incorporated into their sentencing orders, while those who can afford the fees have court costs waived at sentencing. ECF 98 ¶¶244–251. But regardless of Defendant's follow-through, if the consequence is wrongful, then so too is the policy that promises the wrongful consequence.

As an alternative theory of liability under the equal protection clause, Defendant's promised penalties for non-willful non-payment have an intentionally disparate impact on indigent supervisees. Disparate impact theories of liability under the equal protection clause require proof of discriminatory intent or purpose. *Washington v. Davis*, 426 U.S. 229, 242 (1976). The discriminatory intent need not be Defendant's sole, dominant, or primary purpose. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Here, as in *Griffin*, there is discriminatory intent in Defendant's policy of penalizing non-willful non-payment because "[t]here is no meaningful distinction" between explicit discrimination against indigent arrestees and a price-tag on pretrial liberty that effectively denies pretrial freedom to those who cannot afford Defendant's

25

mandatory fees.  351 U.S. at 18; *see also Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472–73, 477 n.7 (11th Cir. 1999) ("animus and intent to discriminate are not synonymous" and "ill will, enmity, or hostility are not prerequisites of intentional discrimination").

Even though wealth is not a suspect classification, strict scrutiny applies to Plaintiffs' equal protection claims because Defendant's challenged fee regime impinges on a fundamental right.  *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).  Judge DeSoto already held that Plaintiffs' equal protection claim "alleges the deprivation of fundamental liberty interests, and is therefore subject to a heightened strict scrutiny standard of review."   ECF 78 at 44. Heightened scrutiny is appropriate here not only because the challenged fees infringe on fundamental liberty interests, but also because there is a fundamental right to equal treatment in the criminal justice system.  *See, e.g.*, *Griffin v. Illinois*, 351 U.S. 12, 17 (1956) (holding that the equal protection and due process clauses "emphasize the central aim of our entire justice system — all people charged with a crime must, so far as the law is concerned, stand on an equality before the bar of justice in every American court.").  The Supreme Court has applied this "central aim" of the justice system to *all* criminal penalties, including fines that do not necessarily lead to incarceration.  *See, e.g.*, *Mayer v. Chicago*, 404 U.S. 189, 197 (1971) ("The invidiousness of the discrimination that exists when criminal procedures are made

available only to those who can pay is not erased by any differences in the sentences that may be imposed."). Here, even for class members who are not actually incarcerated for non-payment, the fundamental right to equal justice is triggered by Defendant's promise to penalize non-willful non-payment, thus warranting heightened scrutiny.

Applying heightened scrutiny to Plaintiffs' equal protection claim, Defendant's fee regime fails for the same reasons outlined under the *Bearden* framework. Even conceding that Defendant's stated interests in supervising pretrial arrestees and reducing recidivism are compelling, there is absolutely no evidence that Defendant's assessment of pretrial fees without consideration of ability to pay is at all related, let alone narrowly tailored, to serve those interests. Moreover, and as laid out in the preceding *Bearden* analysis, there are alternative ways that Defendant can achieve its interests while also satisfying equal protection. Thus, Defendant's fee scheme violates equal protection on either theory of liability.

## III.   Conclusion

Plaintiffs respectfully request that summary judgment be granted as to Defendant's liability on Counts One, Two, Four, and Six.

*/s/ Phil Telfeyan*
Phil Telfeyan
Lily Milwit
Equal Justice Under Law
400 7th Street NW, Suite 602
Washington, D.C. 20004

(202) 505-2058
ptelfeyan@equaljusticeunderlaw.org
lmilwit@equaljusticeunderlaw.org

*/s/ Timothy Bechtold*
Timothy Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

*Counsel for Plaintiffs*

## Certificate of Service

I hereby certify that on January 12, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered counsel.

*/s/ Phil Telfeyan*
Phil Telfeyan
Counsel for Plaintiffs

## Certificate of Compliance

I hereby certify that that the foregoing document includes 6,485 words in compliance with Local Rule 7.1(d)(2)(A).

*/s/ Phil Telfeyan*
Phil Telfeyan
Counsel for Plaintiffs