IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| DANIEL O'TOOLE, RICHARD CHURCHILL, and KEITH LEONARD, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>RAVALLI COUNTY,<br><br>                    Defendant. | CV 21-89-M-DLC-KLD<br><br><br>FINDINGS AND RECOMMENDATION |

Plaintiffs Daniel O'Toole, Richard Churchill, and Keith Leonard (collectively "Plaintiffs") bring this class action under 42 U.S.C. § 1983 challenging the fees associated with Defendant Ravalli County's Jail Diversion Program on constitutional and state law grounds. Defendant Ravalli County ("the County") has filed a motion for summary judgment on all claims alleged in the Second Amended Class Action Complaint (Doc. 100), and Plaintiffs have filed a cross-motion for partial summary judgment (Doc. 97). The motions are fully briefed, and the Court heard oral argument on May 16, 2024.

## I.   <u>Background</u>

Montana's bail statutes establish a presumption of release for pretrial arrestees, except in cases that qualify for the death penalty. Mont. Code Ann. § 46-

9-106. The statutes provide that "[b]efore a verdict has been rendered, the court shall … authorize the release of the defendant upon reasonable conditions that ensure the appearance of the defendant and protect the safety of the community or of any person." Mont. Code Ann. § 46-9-106. Courts are authorized to "impose any condition that will reasonably ensure the appearance of the defendant as required or that will ensure the safety of any person or the community," and the statute provides a non-exhaustive list of conditions that may be imposed. Mont. Code Ann. § 46-9-108(1). When a defendant is released on conditions pending trial, pretrial services including supervision, monitoring for compliance, and testing, are typically performed by a "pretrial services agency," which is defined as "a government agency or a private entity under contract with a local government…that is designated by the district court, justice's court, municipal court, or city court to provide services pending a trial." Mont. Code Ann. § 46-9-505(5).

In 2018, the County established the Jail Diversion Program as a branch of the County's Sheriff's Office for the purpose of providing pretrial services to persons charged with criminal offenses in the County. (Doc. 104 at ¶ 1; Doc. 113 at ¶ 1). Ravalli County Sheriff Stephen Holton, a number of justice and district court judges, the office of the public defender, and the county attorney were all involved in creating the Jail Diversion Program. (Doc. 104 at ¶ 4). The Jail

Diversion Program is supervised by Lieutenant Chris Colgan, who reports to Sheriff Holton and Undersheriff Jesse Jessop, and is currently staffed by Officers Shane Fisher, Kitti Wallace, and Travis McElderry. (Doc. 104 at ¶¶ 9-11).

Through the Jail Diversion Program, the County provides jail diversion services to persons ordered by the court to participate in pretrial services as a condition of release from jail, including pretrial supervision, drug and alcohol testing, and GPS monitoring. (Doc. 113 at ¶ 1). The Jail Diversion Program is a self-funded program. (Doc. 104 at ¶ 150). The primary service it provides is pretrial supervision, which involves regular meetings or check-ins between the supervisee and a pretrial supervision officer to ensure that the supervisee is aware of and complying with the conditions of release. (Doc. 113 at ¶ 3). If the court orders pretrial supervision, it must be facilitated through the Jail Diversion Program, which charges a monthly fee of $105 for pretrial supervision. (Doc. 113 at ¶¶ 4, 7). This monthly fee is reduced to as low as $25 for supervisees who receive Social Security Insurance and Social Security Disability Insurance. (Doc. 113 at ¶ 7). The monthly supervision fee may also be reduced to $55 for supervisees using monitoring equipment, like the SCRAM CAM or SCRAM Remote Breath.[1] (Doc. 104 at ¶¶ 83-84).

---

[1] SCRAM Systems provides alcohol and location monitoring devices for courts and agencies, including the SCRAM CAM continuous alcohol monitoring device,

The Jail Diversion Program also provides drug and alcohol testing services as well as GPS monitoring. (Doc. 113 at ¶ 8). Supervisees are responsible for paying the cost of court-ordered testing and monitoring, such as urinalysis testing, breath tests, and GPS tracking devices. (Doc. 113 at ¶ 8). Unless the judge in the criminal case specifies a method, a supervisee may, with approval from Jail Diversion Program officers, choose between different types of testing, which impose varying costs and requirements. (Doc. 113 at ¶ 17). For example, the Jail Diversion Program charges supervisees participating in urinalysis drug monitoring between $20 and $60 per test, depending on the type of test, twice a week. (Doc. 104 at ¶¶ 37, 38). For those supervisees using drug patch testing, the Jail Diversion Program charges $68 every ten days, for a total of $204 per month, plus a one-time $75 administrative fee. (Doc. 104 at ¶¶ 40, 42). Supervisees using the 24/7 Sobriety Program are charged $2 per test for twice daily breathalyzers, and those participating in alcohol monitoring through the SCRAM program must pay daily fees amounting to roughly $300 per month and a one-time administrative fee. (Doc. 104 at ¶¶ 36, 43, 45-47). The Jail Diversion Program similarly charges a one-time setup fee and a $390 monthly fee for GPS monitoring services. (Doc. 104 at ¶ 44). Testing and GPS monitoring services are also offered in other

---

SCRAM Remote Breath device, and SCRAM GPS device. https://www.scramsystems.com (last visited April 30, 2024).

communities around the state of Montana, and pretrial supervisees may obtain these services from other vendors with the approval of Jail Diversion Program officers. (Doc. 113 at ¶ 4; Doc. 104 at ¶ 30).

The three named Plaintiffs, all of whom financially qualified for court-appointed counsel in their state criminal proceedings, are former participants in the Jail Diversion Program. O'Toole was enrolled in the Jail Diversion Program as a pretrial supervisee for 20 months between January 2020 and August 2021, during which time he accumulated a total $4,630 in fees. (Doc. 104 at ¶ 55). Jail Diversion Program case notes reflect that O'Toole absconded in February 2021 with SCRAM CAM drug monitoring equipment. (Doc. 98-2 at 55). A complaint request was filed with the county attorney for felony theft of the Jail Diversion Program monitoring equipment, and O'Toole was rearrested on April 14, 2021. (Doc. 98-2 at 55; Doc. 104 at ¶ 71). The court ordered that O'Toole be released on bail and "remain on Jail Diversion." (Doc. 104 ¶ 72). Of the $4,630 in Jail Diversion Program fees he accumulated while on pretrial release, O'Toole ultimately paid a total of $3,550. (Doc. 98-9 at 11-13).

Churchill was enrolled in the Jail Diversion Program as a pretrial supervisee for 11 months between December 2020 and November 2021. (Doc. 104 at ¶ 54). During that period, Churchill accumulated at total of $1,045 in supervision fees, of which he paid $825. (Doc. 104 at ¶ 54; Doc. 113 at ¶ 46). Churchill also

participated the Jail Diversion Program's drug testing services for approximately five or six weeks in late December 2020 and early January 2021, and was permitted to pay what he could at that time. (Doc. 113 at ¶¶ 48-49). In February 2021, a warrant was issued for Churchill's arrest after a urinalysis resulted in a positive drug test. (Doc. 113 at ¶ 50). After bonding out, Churchill paid some unspecified amount of past-due Jail Diversion Program fees. (Doc. 113 at ¶ 50-51). In July 2021, Churchill tested positive for methamphetamine and missed two drug tests that he claims he was not allowed to take because he did not have the money to pay for them. (Doc. 113 at ¶¶ 53-54). The facility responsible for administering Churchill's drug tests, Compliance Monitoring, reported this information to the Jail Diversion Program. (Doc 113 at ¶ 54). Based on the report it subsequently received, the Ravalli County Attorney's Office moved to revoke Churchill's release, and the court issued a warrant for his arrest. (Doc. 113 at ¶ 55).

During his time on pretrial supervision with the Jail Diversion Program, Leonard was ordered by the court to participate in pretrial supervision and alcohol monitoring. (Doc. 113 at ¶ 56). With the permission of his supervising officer, Leonard used the 24/7 Sobriety Program to fulfill his alcohol monitoring condition. (Doc. 113 at ¶ 56). At one point, Leonard asked the court to modify his conditions of release because he could not afford the 24/7 Sobriety Program alcohol breath test fees and the court advised him it would consider removing the conditions if he

6

could stay clean for 60 days—which he did not do. (Doc. 110 at ¶ 59, citing Doc. 110-4 at 4). Leonard stopped paying his Jail Diversion Program supervision fees after making three or four payments. (Doc. 113 at ¶ 61). Leonard was never violated or arrested for failure to pay pretrial service fees. (Doc. 113 at ¶ 62).

In August 2021, Plaintiffs filed this action against Ravalli County, Ravalli County Sheriff Holton, two Ravalli County district court judges, and two Ravalli County justices of the peace seeking to enjoin operation of Jail Diversion Program. (Doc. 1). The Court has dismissed all claims against the district court judges, the justices of the peace, and Sheriff Holton, leaving the County as the sole remaining Defendant. (Docs. 78 and 79).

Plaintiffs asserts nine claims for relief against the County. (Doc. 34). Count 1 of their Second Amended Complaint alleges "Violation of Procedural Due Process Regarding Deprivation of Property Interest in Fee Amount." (Doc. 34 at 54). Plaintiffs claim the County deprives arrestees assigned to the Jail Diversion Program of their property without due process as guaranteed under the Fourteenth Amendment to the United States Constitution by charging pretrial fees without any finding of guilt. (Doc. 34 at ¶ 193).

Count 2 alleges "Violation of Procedural Due Process for Arbitrary Bail." (Doc. 34 at 55). Plaintiffs claim the County charges fees associated with the conditions of pretrial release for however long the case remains in pretrial status,

and in doing so imposes the fees as quasi-bail, without the attendant due process protections. (Doc 34 at ¶ 195).

Count 3 alleges "Status-Based Discrimination on the Basis of Homelessness." (Doc. 34 at 55). Plaintiffs assert that the County discriminates against unhoused arrestees on ankle monitoring by requiring them to pay a multi-thousand-dollar cash deposit before being released from jail, thereby criminalizing homelessness in violation of the prohibition against cruel and unusual punishment embodied in the Eighth Amendment to the United States Constitution. (Doc. 34 at ¶¶ 197-98).

Count 4 alleges "Violation of Procedural Due Process Regarding Ability to Pay." (Doc. 34 at 56). Plaintiffs claim that the County's practice of assessing pretrial fees without considering ability to pay violates the procedural due process clause of the Fourteenth Amendment to the United States Constitution. (Doc. 34 at ¶¶ 200-201).

Count 5 alleges "Violation of Procedural Due Process for Incarceration for Non-Payment of Fees." (Doc. 34 at 56). Plaintiffs assert that by permitting the revocation of bail based on failure to pay pretrial fees without considering ability to pay, the County is effectively criminalizing poverty in violation of the Fourteenth Amendment's procedural due process clause. (Doc. 34 at ¶¶ 203-05).

Count 6 alleges "Violation of Federal Equal Protection for Wealth-Based Discrimination." (Doc. 34 at 57). Because indigent pretrial arrestees may be incarcerated if they cannot afford pretrial fees, Plaintiffs allege the County treats similarly situated pretrial arrestees differently based indigency, and in doing so engages in wealth-based discrimination in violation of the Fourteenth Amendment's equal protection clause. (Doc. 34 at ¶¶ 209-10).

Count 7 asserts "Violation of State Equal Protection for Social Condition Discrimination." (Doc. 34 at 57). Plaintiffs allege that the County discriminates against pretrial arrestees on the basis of social condition, specifically indigency, in violation of the equal protection clause of Article II, § 4 of the Montana Constitution because indigent pretrial arrestees face punishment for non-willful failure to pay Jail Diversion Program fees, while similarly situated wealthy pretrial arrestees only face punishment for willful nonpayment. (Doc. 34 at ¶¶ 212-14).

Count 8 alleges a claim for "False Imprisonment." (Doc. 34 at 58). Plaintiffs claim that the County unlawfully detains pretrial arrestees beyond their release date by conditioning release on payment of arbitrary pretrial fees, and that "[s]uch unlawful and involuntary restraint" constitutes false imprisonment. (Doc. 34 at ¶¶ 216-17).

Count 9 alleges "Violation of Due Process via Contract Increasing Criminal Exposure." (Doc. 34 at 58). Plaintiffs allege that the County unlawfully requires

pretrial arrestees to sign contracts "agreeing" to further criminal charges if they do not comply with certain pretrial conditions. (Doc. 34 at ¶¶ 219-22).

The Court previously determined that Plaintiffs' claims were sufficient to survive the County's motion to dismiss for failure to state a claim for relief, and has certified the following injunctive class as to Counts 3 through 8 of the Second Amended Complaint:

> All indigent persons who are or will be: accused of a crime in Ravalli County, Montana, arrested, incarcerated, place on the Jail Diversion Program, and charged pretrial fees without having been convicted of a crime for which the Jail Diversion Program was ordered.

(Docs. 78 and 79).

Plaintiffs request declaratory, injunctive, and monetary relief. Specifically, they seek a declaratory judgment that the Jail Diversion Program and the County's conduct in implementing and enforcing the program is unlawful. Plaintiffs also seek a permanent injunction enjoining the County from continuing the allegedly unlawful policies and practices of the Jail Diversion Program, and a judgment ordering the County to train all sheriff's office employees on the permanent injunction. Finally, Plaintiffs request compensatory damages, including specifically all pretrial fees paid to the County, and an award of reasonable attorney fees and costs. (Doc. 34 at ¶ 224).

The County has filed a motion for summary judgment on all nine claims asserted by Plaintiffs individually, and on Counts 3 through 8 with regard to

injunctive relief as it pertains to the certified class. (Doc. 100). Plaintiffs have filed a cross-motion for partial summary judgment as to liability on the procedural due process and equal protection claims set forth in Counts 1, 2, 4, and 6. (Doc. 97).

## II.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).

Once the moving party has satisfied its initial burden with a properly supported motion, summary judgment is appropriate unless the non-moving party designates by affidavits, depositions, answers to interrogatories or admissions on file "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials" of the pleadings. *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249-50. The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007). When presented with cross-motions for summary judgment on the same matters, the court must "evaluate each motion separately, giving the non-moving party the benefit of all reasonable inferences." *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

## III.  Discussion

The County argues it is entitled to summary judgment on all claims alleged in the Second Amended Complaint because Plaintiffs cannot establish the necessary elements for municipal liability under § 1983. Section 1983 provides a cause of action for the violation of federal constitutional rights by persons acting under color of state law.  42 U.S.C. § 1983. A municipality like Ravalli County is considered a "person" under § 1983 and may be sued for causing a constitutional deprivation. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). "A municipality cannot, however, 'be held liable under § 1983 on a respondeat superior theory.'" *Ulrich v. City and County of San Francisco*, 308

F.3d 968, 984 (9th Cir. 2002) (quoting *Monell*, 436 U.S. at 691). Rather, liability attaches "only where the municipality itself causes the constitutional violation through 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Ulrich*, 308 F.3d at 984 (quoting *Monell*, 436 U.S. at 694).

To prevail on a claim § 1983 against the County, Plaintiffs must demonstrate that: (1) they were deprived of a constitutional right; (2) the County had a policy, custom, or practice; (3) the policy, custom or practice amounted to deliberate indifference to Plaintiffs' constitutional rights; and (4) the policy, custom or practice was the moving force behind the constitutional violation. *See Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011); *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992).

The County contends Plaintiffs cannot establish an underlying constitutional violation, and even if they could, Plaintiffs have not provided evidence of a municipal custom, policy or practice that was the moving force behind any alleged constitutional violation. The County also raises quasi-judicial immunity, arguing that to the extent it is enforcing court-ordered bond conditions, including pretrial services and associated fees, it is entitled to absolute immunity for its alleged conduct. Finally, in what amounts to a collateral attack on the class certification order, the County maintains Plaintiffs cannot demonstrate that the certified class is

entitled to injunctive relief because there is no readily discernible, clear, and precise statement of the parameters defining the class.

Plaintiffs counter that the County's motion for summary judgment should be denied because: municipal liability attaches to at least ten of the County's official policies and practices; the County relies on disputed facts as to all nine counts; the County does not have quasi-judicial immunity; and the County's arguments against class-wide injunctive relief are premature. Plaintiffs cross-move for partial summary judgment as to liability on three of their procedural due process claims, and their sole federal equal protection claim.

The Second Amended Complaint contains broad allegations of an implied County policy, but does not expressly identify what alleged custom, practice or policy provides the basis for Plaintiffs' claims. (Doc. 34). The Second Amended Complaint is replete with allegations that the County incarcerates supervisees for failure to pay fees. Thus, at the motion to dismiss stage, the Court construed Plaintiffs' pleading as alleging that the County has an unconstitutional policy of requiring pretrial supervisees to pay Jail Diversion Program fees without considering ability to pay and incarcerating pretrial supervisees for nonpayment.[2] (Doc. 78 at 55).

---

[2] Although the Court also referred the County's alleged policy of threatening incarceration (Doc. 78 at 44), warnings about the potential consequences of failing to pay pretrial fees, including possible incarceration, do not implicate the

For the first time in response to the County's summary judgment motion, Plaintiffs identify ten specific County policies and practices that they contend provide a basis for imposing municipal liability. (Doc. 107 at 5-11). In particular, Plaintiffs assert the County has a policy and/or practice of not providing prior notice of fees; not allowing fees to be contested; charging exorbitant fees; charging uncapped fees; not waiving fees; not reimbursing fees; charging arbitrary fees; promising punishment for non-payment of fees; imposing penalties for non-payment of fees; and using homelessness as a proxy for flight risk in charging device deposits. (Doc. 107 at 5-11).

Notably missing from this list is any assertion that the County has a policy of incarcerating pretrial supervisees for failure to pay fees. Plaintiffs nevertheless stand by their theory that the County incarcerates pretrial supervisees for failure to pay fees, as evidenced by the fact that they oppose the County's motion for summary judgment on Count 5. At oral argument, Plaintiffs explained that although they have not moved for summary judgment on Count 5, they oppose summary judgment on the ground that there are genuine issues of material fact as to whether the County incarcerates pretrial supervisees for failure to pay fees.

---

Constitution. *See Edwards v. Leaders in Community Alternatives, Inc.*, 850 Fed. Appx. 503 (9th Cir. 2021) (concluding in a tort context that statements about the potential consequences of failing to pay pretrial supervision fees were not wrongful and "were within legal bounds").

The ten policies identified by Plaintiffs in their summary judgment response brief are subsumed within the overarching policy as previously framed by the Court and correspond roughly to the nine causes of action set forth in the Second Amended Complaint. As part of the discussion that follows, the Court will consider whether Plaintiffs have met their summary judgment burden of providing evidence to support the inference that such policies and/or practices exist. *See e.g. Dixon v. County of Sonoma*, 2020 WL 4932061, at *6 (N.D. Cal. July 1, 2020) (explaining that "to survive summary judgment on a claim of liability based on an impermissible municipal policy, practice or custom, plaintiff must point to an express policy, practice, or custom, or provide evidence showing an inference that such policy, practice or custom exists").

## A.    Procedural Due Process (Counts 1, 2, 4, 5, and 9)

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty or property, without due process of law," and provides a basis for both substantive and procedural due process claims. U.S. Const. Amend. XIV, § 1. To prevail on their procedural due process claims, Plaintiffs must demonstrate "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Kildare v. Saenz*, 325 F.3d 1078, 1085 (9th Cir. 2003).

### 1.    Deprivation of a Liberty or Property Interest

16

The County does not dispute that Plaintiffs have constitutionally protectible interests in their monetary property and liberty. (Doc. 101 at 11). The County does, however, take the position that Plaintiffs do not have a recognizable property interest in receiving pretrial services from the County. The County begins with the generally accepted premise that property interests do not arise from the United States Constitution, but "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). Because Montana's bail statutes do not require the County to provide pretrial services or authorize the courts to order that it do so, the County contends Plaintiffs do not have a property interest in the provision of pretrial services. If a supervisee fails to pay required fees, the County may remove the supervisee from the Jail Diversion Program. (Doc. 113 at ¶ 15). Absent a protected property interest, however, the County argues Plaintiffs cannot assert a due process claim based solely on the County's refusal to provide pretrial services for failure to pay associated fees.

In response, Plaintiffs make clear they are not claiming a property interest in the provision of pretrial services or asserting a protected liberty interest as a basis for their procedural due process claims. (Doc. 107 at 17-18). Plaintiffs explain that the only interest they assert as a basis for their procedural due process claims "is

their undisputed interest in their monetary property, which [the County] deprives [them of] by mandating fees." (Doc. 107 at 18).

The County does not dispute that money constitutes a property interest protected by the Fourteenth Amendment. *See e.g. Nelson v. Colorado*, 581 U.S. 128, 135 (2017) (holding that criminal defendants whose criminal convictions were reversed or vacated had "an obvious interest" for due process purposes in restitution, fees, and costs they had paid to the state while incarcerated). While Plaintiffs presumably have a cognizable property interest in money paid for Jail Diversion Program services, to satisfy the first element of a procedural due process claim Plaintiffs must also demonstrate that the County deprived them of that property interest.

In their Second Amended Complaint, all named Plaintiffs claim to have paid substantial Jail Diversion Program fees. O'Toole, for example, alleges that in addition to posting bail as set by the court in each of his criminal cases, he paid thousands of dollars in Jail Diversion Program fees while on pretrial release. (Doc. 34 at ¶¶ 79, 83, 86). Churchill alleges he was required to pay approximately $335 per month in supervision and drug testing fees while in the Jail Diversion Program, and Leonard claims he went into debt as a result of having pay at least $120 every month for twice-daily alcohol tests. (Doc. 34 at ¶¶ 93, 101). For purposes of the

County's motion to dismiss, the Court accepted these factual allegations as true. (Doc. 78 at 3).

At the summary judgment stage, however, these allegations are not fully borne out by the evidence. Although it is undisputed that O'Toole accumulated $4,630 in Jail Diversion Program fees over a 20-month period, he did not pay the entire amount. (Doc. 98-9 at 11-13). Jail Diversion Program records reflect that O'Toole paid a total of $3,550 between January 2020 and August 2021, leaving him with an unpaid balance of $1,080. (Doc. 98-9 at 11-13). The record reflects that Churchill paid a total $825 in pretrial supervision fees over an 11-month period, and some unspecified amounts for drug testing services. (Docs. 104 at ¶ 54; 113 at ¶¶ 46, 50; 98-9 at 7-8). Leonard apparently made three or four supervision fee payments and presumably paid at least some 24/7 Sobriety Program alcohol breath test fees, but it is not clear how long he was enrolled in the Jail Diversion Program or what amounts he actually paid. (Doc. 113 at ¶¶ 56, 61).

Because it is undisputed that all named Plaintiffs paid at least some Jail Diversion Program fees, and the County does not argue otherwise, the Court will assume that Plaintiffs have demonstrated they were deprived of a constitutionally protected property interest as required to satisfy the first element of their procedural due process claims.

2.    <u>Adequacy of Procedural Protections</u>

The second element of a procedural due process claim is "a denial of adequate procedural protections." *Kildare*, 325 F.3d at 1085. Due process is a "flexible" concept, and "calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (citing *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972)). Fundamentally, procedural due process requires some kind of notice and "some kind of a hearing" before the state can deprive a person of life, liberty, or property. *Zinermon v. Burch*, 494 U.S. 113, 127-28 (1990) (citations omitted).

To evaluate the constitutional adequacy of existing procedural protections, courts apply the three-part test set forth in *Mathews*, which balances (1) the private interest affected; (2) the risk of an erroneous deprivation of the private interest through the procedures used; and (3) the governmental interest at stake, including fiscal and administrative burdens. *Mathews*, 424 U.S. at 335; *Nelson v. Colorado*, 137 S. Ct. 1249, 1255 (2017). The County does not frame its due process arguments in terms of the *Mathews* balancing test, and makes no argument as to the first and third factors. The Court nevertheless finds that application of the first and third *Mathews* factors is relatively straightforward.

First, as addressed above, the private interest affected is Plaintiffs' property interest in money paid for Jail Diversion Program services. To evaluate the nature of this interest, the Court looks for guidance to analogous cases upholding the

imposition of pretrial administrative fees for posting bond against due process challenges. In *Broussard v. Parish of Orleans*, 318 F.3d 644, 649 (5th Cir. 2003), for example, the plaintiffs challenged the constitutionality of nominal statutorily imposed bail fees on procedural due process grounds. *Broussard* concluded that the private interests at stake were "not great," and the bail fees did not "trigger any heightened level of private interest." *Broussard,* 318 F.3d at 655. *See also Schlib v. Kuebel*, 404 U.S. 357, 365 (1971) (rejecting an equal protection challenge to a statutorily imposed bail fee, describing the bail fee as one that "smacks of administrative detail and of procedure and is hardly to be classified as a 'fundamental' right or as based upon any suspect criterion"). Similarly, in *Payton v. County of Carroll*, 473 F.3d 845, 850-51 (7th Cir. 2007), a class of former arrestees challenged a state statute authorizing a nominal administrative fee for posting bond on procedural due process grounds. The Seventh Circuit agreed with *Broussard* that the private interests at stake in such a challenge were not great and did not trigger a heightened level of private interest. *Payton*, 473 F.3d at 851.

The Montana Supreme Court's decision in *State v. Spady*, 354 P.3d 590 (Mont. 2015) is also helpful for purposes of evaluating the private interest at stake here. *Spady* rejected a due process challenge to the twice daily $2 alcohol breath test fees imposed pursuant to the Montana 24/7 Sobriety and Drug Program Monitoring Act, Mont. Code Ann. §§ 44-4-1201 *et seq*. The criminal defendant in

*Spady* claimed that pretrial fees imposed for the 24/7 Sobriety Program were punitive and amounted to pretrial punishment in violation of his due process rights. *Spady*, 354 P.3d at 598-99. The Court disagreed and concluded that the fees did not have a punitive effect on pretrial criminal defendants. *Spady*, 354 P.3d at 599. The Court reasoned that although the defendant "must pay $2 for each test, he is free from physical restraint and able to carry on his daily activities. The fee is similar to other fees imposed at the pretrial phase, whereby the defendant forfeits some money for the privilege of release." *Spady*, 354 P.3d at 599.

    With the possible exception of Count 5, Plaintiffs have not pled a liberty interest as a basis for their procedural due process claims. Although Count 5 is titled "Violation of Procedural Due Process for Incarceration for Non-Payment of Fees," Plaintiff made clear in their summary judgment briefing and again at oral argument that their procedural due process claims are based solely on their asserted interest in monetary property. (Doc. 107 at 17-18). Like the fees at issue in *Spady*, Jail Diversion Program fees are imposed at the pretrial phase and require the defendant to forfeit some money for the privilege of release, and in exchange for the pretrial services provided by the Jail Diversion Program. As addressed above, Plaintiffs do not have a protected interest in the provision of pretrial services. While Plaintiffs do have a recognized interest in their monetary property, the private interest at stake is relatively modest.

Plaintiffs nevertheless assert their property interest is heightened in this case because Jail Diversion Program fees far exceed the nominal administrative fees at issue in *Payton*, *Broussard,* and *Spady.* While some Jail Diversion Program fees are nominal—like the individual $2 alcohol breath test fees imposed pursuant to the 24/7 Sobriety Program—others are far more substantial.

As addressed above, O'Toole paid a total of $3,550 in Jail Diversion Program fees over a 20-month period, for an average monthly payment of $178. Leonard evidently made three or four supervision fee payments and paid some 24/7 Sobriety Program alcohol breath test fees, but the total amount of his payments is not clear. Churchill, in turn, paid a total of $825 in supervision fees over an 11-month period, for an average monthly payment of $75, along with some unspecified amounts for drug testing services. On these facts, the Court concludes the private interest at stake here is more than de minimis, but is still relatively modest. *Spady* lends further support for this conclusion. While the individual $2 alcohol breath test fees at issue in *Spady* were nominal, twice daily testing at that rate would result in an average monthly payment of approximately $120. The average monthly payments actually made by Plaintiffs were thus comparable to the fees upheld as constitutional in *Spady.*

23

Turning next to the third *Mathews* factor, the governmental interests at stake are significant. The County has a significant, statutorily recognized interest in requiring pretrial services and in recouping the costs of those services. *See e.g.*, Mont. Code Ann. § 46-9-108(2)(b) (providing that "[t]he court may require as a condition of release that the defendant pay for the costs of the electronic monitoring or alcohol monitoring"). The County also has a significant interest in providing pretrial services to ensure that supervisees appear at future court proceedings and to ensure the safety of the community, and a corresponding interest in charging the fees necessary to provide pretrial services.

Again, *Spady* provides some additional guidance. Although Plaintiffs do not claim that the Jail Diversion Program fees violate due process because they amount to punishment, as did the *Spady* plaintiffs, their procedural due process claims encompass the statutorily mandated 24/7 Sobriety Program alcohol breath test fees. The Montana Supreme Court recognized in *Spady* that the intent of the 24/7 Sobriety Program "is clearly to protect the public from repeat drunk drivers and provide additional pretrial and posttrial prevention options to judges," and the purpose of the program is "squarely within the State's power to protect the health and safety of its citizens." *Spady*, 354 P.3d at 599 (citing Mont. Code Ann. § 44-4-1202(2)(a),(b)). The County also has an interest protecting the health and safety of

24

its citizens, and a similar interest in recouping the costs associated with providing the pretrial services necessary to ensure the health and safety of the community.

The real focus of the due process arguments advanced by both parties is on the second *Mathews* factor—the risk of an erroneous deprivation of the private interest through the procedures used. This factor requires the Court to consider the "fairness and reliability of the existing…procedures, and the probable value, if any, of additional procedural safeguards." *Mathews*, 424 U.S. at 343.

The County addresses Plaintiffs' due process claims collectively, and contends it is entitled to summary judgment on Counts 1, 2, 4, 5, and 9 of the Second Amended Complaint because there are sufficient procedural protections in place to satisfy due process. Plaintiffs counter that many of the facts the County relies on are disputed, and cross-move for partial summary judgment on liability as to Counts 1, 2, and 4.

a.    *Count 1*

In Count 1, Plaintiffs allege the County deprives them of their property without due process by charging them pretrial fees without any finding of guilt. (Doc. 34 at ¶ 193). To the extent Count 1 can be read as advancing the theory that the imposition of pretrial fees without a criminal conviction is, in and of itself, unconstitutional, Plaintiffs clarify that they are not claiming the County cannot

assess pretrial fees, but rather that it cannot do so without providing adequate procedural protections, including notice and a hearing.

The County asserts there are adequate procedural protections in place to provide pretrial supervisees with notice and an opportunity to be heard regarding the imposition of pretrial fees and ability to pay, thereby minimizing the risk of an erroneous deprivation.

The County points first to the framework provided by Montana's bail statutes, which require courts to consider a variety of factors regarding risk and ability to pay when determining whether a defendant should be released or detained prior to trial. Mont. Code Ann. § 46-9-109. The bail statutes allow a pretrial supervisee to move for modification of the conditions of release at any time, or to alter the conditions of bail. Specifically, at any time after the initial impositions of conditions, "the court may, upon reasonable basis, amend the order to impose additional or different conditions of release upon its own motion or upon the motion of either party." Mont. Code Ann. § 46-9-108(3). Likewise, "[u]pon application by the state or the defendant, the court before which the proceeding is pending may increase or reduce the amount of bail, substitute one bail for another, alter the conditions of bail, or revoke bail." Mont. Code Ann. § 46-9-311(1). The bail statutes further provide if a defendant fails "to comply with any condition of a bail or recognizance," the court may issue an arrest warrant and "[u]pon the arrest,

the defendant must be brought before the court without unnecessary delay and the court shall conduct a hearing and determine bail…" Mont. Code. Ann. § 46-9-505(1), (4).

Consistent with this statutory scheme, the County has come forward with evidence that the Ravalli County District Court determines pretrial conditions at the defendant's initial appearance or arraignment.[3] (Doc. 110 at ¶¶ 26, 28). In addition to following the procedures required by Montana's bail statutes when setting bail and pretrial conditions, the District Court has implemented an

---

[3] The County's Statement of Undisputed Facts relies in part on declarations provided by Ravalli County District Court Judges Howard Recht and Jennifer Lint in support of the County's earlier motion to dismiss, and affidavits provided by Justices of the Peace Jennifer Ray and Jim Bailey in opposition to Plaintiffs' motion for class certification. (Doc. 110 at ¶¶ 24-34, citing Docs. 49-1; 49-2; 69-1; 69-2). Plaintiffs argue the County should not be allowed to rely on this evidence for summary judgment purposes because they have not had the opportunity to depose any of the judges, all of whom have been dismissed from the case. Plaintiffs explain that they did not realize the County would be relying on the judges' sworn statements for summary judgment purposes until after discovery had closed. Plaintiffs further explain that when they contacted counsel for the District Court Judges to inquire about whether the judges would oppose being subpoenaed for testimony about their declarations, counsel confirmed that they would object to such a subpoena. (Doc. 106-12 ¶ 15). Notwithstanding any apparent opposition, Plaintiffs could have proceeded to subpoena the non-party judges for depositions pursuant to Federal Rule of Civil Procedure 45, and could have moved to reopen discovery for the limited purpose of deposing the judges. Because Plaintiffs did neither of these things, their argument that the County should not be allowed to rely on the judges' declarations and affidavits for summary judgment purposes is unavailing.

additional safeguard in the form of a bond review hearing 90 days after the defendant's initial appearance to review whether bail and pretrial conditions are appropriate going forward, even if the defendant has not requested review. (Doc 110 at ¶ 24, citing Docs. 49-1 at ¶ 3; 49-2 at ¶ 3). The District Court Judges state they are aware of the costs associated with pretrial conditions, and takes those costs into account when setting conditions and bail, including by reducing the amount of bail in light of pretrial services fees and the defendant's financial resources. (Docs. 110 at ¶ 27; 49-1 at ¶ 5; 49-2 at ¶ 5). The District Court Judges evaluate the facts of each individual case and apply state law in assessing risk, ability-to-pay, and setting conditions of release and bail that are appropriate under the circumstances. (Doc. 110 at ¶ 28, citing Docs. 49-1 at ¶ 7; 49-2 at ¶ 7). According to the District Court Judges, they assess the appropriateness of bail and conditions of release at several stages of the proceedings, including at the defendant's initial appearance, during the 90-day bond review hearing, upon revocation of an order of release, and whenever an issue with bail or conditions is brought to the court's attention by the parties. (Docs. 49-1 at ¶ 8; 49-2 at ¶ 8). The District Court Judges explain that they will not revoke an order of release solely for the failure to pay pretrial fees, and while the failure to pay fees may be included in a revocation order, revocation is always based on another violation of pretrial conditions, such as failure to appear, alcohol or drug use, or other criminal act.

(Doc. 110 at ¶ 29, citing Docs. 49-1 at ¶¶ 10-11; 49-2 at ¶¶ 10-11). The District Court Judges state that at all stages of a criminal proceeding, they consider the defendant's ability to pay, including any obligation to pay incurred fees for pretrial services, in setting conditions of release and bail. (Docs. 49-1 at ¶ 12; 49-1 at ¶ 12).

The County has also come forward with evidence that, like the District Court, the Ravalli County Justice Court considers a defendant's ability to obtain bail and pay for pretrial services when setting conditions of release. (Doc. 110 at ¶ 30, citing Docs. 69-1 at ¶¶ 8-9; 69-2 at ¶¶ 8-9). The Justice Court regularly holds hearings for the purpose of setting conditions of release, and the Justices of the Peace state that bail and pretrial monitoring services are among the issues discussed and decided at these hearings. (Doc. 69-1 at ¶ 2; Doc. 69-2 at ¶ 2). If a defendant advises the court that he or she is unable to afford pretrial monitoring, the Justices of the Peace will consider that factor at the time of the hearing. (Doc. 110 at ¶ 33, citing Doc. 69-1 at ¶ 8; 69-2 ¶ 9). When the court is advised of a defendant's potential inability to afford pretrial services, the Justices of the Peace explain that they will consider lowering the defendant's bond if doing so will facilitate payment for the monitoring deemed necessary under the circumstances. (Doc. 110 at ¶ 32, citing Doc. 69-1 at ¶ 8; 69-2 at ¶ 8). Justice of the Peace Jennifer Ray makes "clear to detainees that they should notify the Court if they have

difficulty meeting the conditions of release rather than violating the conditions."
(Doc. 69-1 at ¶ 9).

The Justices of the Peace explain that if a defendant is ordered to obtain
pretrial services, the defendant meets with a probation officer to discuss available
services and sign a contract for those services. (Docs. 69-1 at ¶ 4; 69-2 at ¶4). The
Justices of the Peace represent that the court regularly works with individuals on
pretrial monitoring, as it does with people paying fines or restitution, who have
difficulty making payments by adjusting payments during times of financial
hardship. (Doc. 110 at ¶ 33, citing Docs. 69-1 at ¶ 9; 69-2 at ¶ 9). Neither Justice of
the Peace on the bench at the time Plaintiffs were receiving pretrial services recalls
ever revoking bond solely because of a defendant's failure to pay for pretrial
monitoring or for being late with a payment. (Doc. 110 at ¶ 34, citing Docs. 69-1 at
¶ 10; 69-2 at ¶ 10).

With respect to operation of the Jail Diversion Program itself, the County
has presented evidence that the fees for each service provided are based on the cost
of equipment and personnel required to provide those services, and are set as low
as possible to cover the cost of providing services. (Doc. 110 at ¶ 5, citing Doc. 50-
1 at ¶ 4). According to Sheriff Holton, neither the Sheriff's Office nor the County
realize a profit from the provision of pretrial services. (Doc. 110 at ¶ 5, citing Doc.
50-1 at ¶ 4). Sheriff Holton states that if the County is "prohibited from collecting

fees for pretrial services the Ravalli County Sheriff's Office would quit providing those services and would refer criminal defendants to private service providers." (Doc. 110 at ¶ 67, citing Doc. 50-1 at ¶ 8).

Evidence submitted by the County reflects that Defendants who participate in the Jail Diversion Program must pay any applicable equipment fees at the time of enrollment, but have 30 days from the date of enrollment to start paying monthly pretrial supervision fees. (Doc. 110 at ¶ 9; Doc. 110-2 at 2-4). If a defendant cannot afford equipment fees, the defendant is enrolled in the Jail Diversion Program for purposes of supervision but not for purposes of any equipment-related testing or monitoring. (Doc. 110 at ¶ 9, citing Doc. 110-2 at 3-4). The Jail Diversion Program then notifies the Ravalli County Attorney's Office of the defendant's failure to successfully enroll in the monitoring program, but the defendant is not detained pending payment. (Doc. 110 at ¶ 9, citing Doc. 110-2 at 3-4). Defendants who cannot afford to pay for the first month of court-ordered GPS tracking/monitoring equipment at the time of enrollment are not held in jail unless the court orders they be held until they can obtain the equipment. (Doc. 110 at ¶¶ 9, 22). Jail Diversion Officers have the discretion to place defendants who are enrolled in the program on a payment plan if they are having difficulty paying Jail Diversion Program fees. (Doc.110-2 at 7).

Officer Fisher, whose duties include supervising and monitoring individuals for compliance with court-ordered conditions of pretrial release, explains that when she first meets with an individual who has been ordered to obtain pretrial services, they discuss the cost and other requirements of drug and alcohol testing. (Doc. 69-3 at ¶ 5). Unless the court orders otherwise, Officer Fisher ordinarily defers to the individual as to the type of testing that best suits the individual's financial situation. (Doc. 69-3 at ¶ 5). Officer Fisher further states that "[i]f an individual does not submit to testing because they claim to be unable to pay, the supervising officer advises them that it will be considered a 'failure to provide' and will be reported as such to the Ravalli County Attorney and the Court." (Doc. 69-3 at ¶ 7).

If a supervisee fails to pay for Jail Diversion Program services, that failure is documented for the Ravalli County Attorney's Office, and it is the county attorney who decides whether to seek an arrest warrant. (Doc. 110 at ¶¶ 19-20; Doc. 50-1 at ¶ 7). If a supervisee if not in compliance with the conditions of release for whatever reason, the pretrial services officer notifies the Ravalli County Attorney's Office and, in the case of a misdemeanant supervisee, the court. (Doc. 110 at ¶¶ 19-21). Officer Fisher has testified that while pretrial services officers may make warrantless arrests under certain circumstances, they do not arrest supervisees for failure to pay Jail Diversion Program fees. (Doc. 110 at ¶ 18, citing Doc. 110-3 at 2-4; Doc. 69-3 at ¶ 7). Sheriff Holton has similarly stated that the Ravalli County

Sheriff's Office does not arrest pretrial services supervisees for failure to pay pretrial fees without a warrant from the court. (Doc. 110 at ¶ 18, citing 50-1 at ¶ 7).

According to the County, the procedures outlined above provide pretrial supervisees with constitutionally adequate notice and opportunity to be heard regarding their ability to pay Jail Diversion Program fees. As to notice, the record reflects that supervisees are advised of their pretrial service options and associated fees no later than their initial meeting with their pretrial services officer. (Docs. 69-1 at ¶ 4; 69-2 at ¶4; Doc. 69-3 at ¶ 5). With respect to the opportunity to be heard, supervisees may raise the issue of pretrial service fees and ability to pay at the initial bond hearing and, in the District Court, the 90-day bond review hearing. (Doc. 110 at ¶¶ 24, 27, 28, 30, 32, 33). The bail statutes also allow pretrial supervisees to move for modification of the conditions of release at any time, or to alter the conditions of bail. *See* Mont. Code Ann. § 46-9-108(3); § 49-9-311(1). If a supervisee fails to comply with the conditions of release, including by not paying Jail Diversion Program fees or participating in required testing or monitoring due to alleged inability to pay, the County notifies the Ravalli County Attorney's Office and, in the case of a misdemeanant supervisee, the court. (Doc. 110 at ¶¶ 19-21). Whether to take further action, such as issuing an arrest warrant and initiating pretrial revocation proceedings, is within the discretion of the county attorney and the court. If revocation proceedings are initiated, the supervisee has

33

another opportunity to raise the issue of pretrial fees at the revocation hearing. *See* Mont. Code. Ann. § 46-9-505(1), (4). In addition to the procedures provided by the courts, the undisputed evidence demonstrates that Jail Diversion Program officers have the discretion to place defendants who are enrolled in the program on a payment plan if they are having difficulty paying Jail Diversion Program fees. (Doc.110-2 at 7). And unless the court orders otherwise, supervising officers defer to the individual as to the type of testing that best suits the individual's financial situation. (Doc. 69-3 at ¶ 5).

Plaintiffs counter that many of the facts the County relies on are disputed. Plaintiffs first challenge the County's assertion that bond hearings address ability to pay pretrial fees. Plaintiffs mainly rely on a declaration from former Ravalli County public defender Ryan Archibald, who states that in his experience, the judges never brought up Jail Diversion Program fees during bond hearings and would only address the issue if raised by defense counsel. (Doc. 106-11 at ¶¶ 14). Archibald explains that the judges also did not address Jail Diversion Program fees during the 90-day bond review hearing unless defense counsel raised the issue. (Doc. 106-11 at ¶ 18). Archibald states that when he or other defense counsel did bring up Jail Diversion Program fees, the judges would say that they could not lower or waive the fees because the fees were set and controlled by Jail Diversion

Program. (Doc. 106-11 at ¶ 19). Archibald states that he never saw a judge reduce bond based on Jail Diversion Program fees. (Doc. 106-11 at ¶ 22).

In all material respects, Archibald's declaration is consistent with the other evidence of record, which reflects that defendants have the opportunity to raise the issue of Jail Diversion Program fees at the initial bond hearing, and again at the District Court's 90-day bond review hearing, if they choose to do so. While the County agrees that the courts cannot adjust or waive those fees, the courts do have the authority to account for a defendant's ability to pay when setting bail and conditions of release. The courts also have the authority to modify conditions of release to relieve the defendant of any or all pretrial service requirements and corresponding fees.

With respect to the named Plaintiffs, there is no evidence that Churchill raised the issue of Jail Diversion Program fees or his inability to pay during any of his court proceedings. (Doc. 110 at ¶¶ 44-55). Leonard testified at his deposition that he asked the court to modify his conditions of release because he could not afford the 24/7 Sobriety Program alcohol breath test fees and the court advised him it would consider removing the conditions if he could stay clean for 60 days— which he did not do. (Doc. 110 at ¶ 59, citing Doc. 110-4 at 4). O'Toole testified at his deposition that his attorney advised the court at one point that he could not afford the Jail Diversion Program fees associated with the conditions of his release,

but nothing changed. (Doc. 106-10 at 3-4). What matters for purposes of procedural due process is not the outcome, however, but the fact that Plaintiffs undisputedly had the opportunity to be heard on their ability to pay Jail Diversion Program fees.

Plaintiffs next challenge the County's assertion that it determines the amount of Jail Diversion Program fees based on its own costs to provide services. According to Sheriff Holton, fees for each service provided by the Jail Diversion Program are based on the cost of equipment and personnel required to provide those services and are set as low as possible to cover the cost of providing services. (Doc. 50-1 at ¶ 4). Sheriff Holton states that neither the Sheriff's Office nor the County realizes a profit from the provision of pretrial services. (Doc. 50-1 at ¶ 4). Plaintiffs dispute the accuracy of Sheriff Holton's statements, and cite Lieutenant Colgan's deposition testimony that he does not know how the "margin between what it costs to acquire the equipment and the test and how much is charged to the individual" was determined. (Doc. 107 at 15, citing Doc. 113 at ¶ 6). Plaintiffs also point to evidence they contend shows the County makes a profit on all device fees and has netted tens of thousands of dollars every year since Jail Diversion Program began. (Doc. 107 at 16, citing Doc. 98, at ¶¶ 162-183).

The Court agrees with the County that any factual dispute over the calculation of Jail Diversion Program fees and whether the County realizes a profit

is not material to Plaintiffs' due process claims. Plaintiffs claim they are not given adequate notice and opportunity to be heard regarding the imposition of pretrial fees and ability to pay. The relevant due process inquiry is not whether the Jail Diversion Program fees are based on the County's costs, or whether the County realizes a profit, but whether there are adequate procedural protections in place to provide pretrial supervisees with notice and an opportunity to be heard regarding the imposition of those fees and their ability to pay.

Finally, Plaintiffs challenge the County's assertion that the only consequence of non-payment of fees is that "the County declines to provide services." (Doc. 107 at 16, citing Doc. 101 at 11). Plaintiffs cite deposition testimony by Sheriff Holton, Lieutenant Colgan, and three supervising officers reflecting that if supervisees are removed from any court-ordered pretrial services for failure to pay, they are in violation of their conditions of bail, which triggers violation reports that are sent to the County Attorney's office and the courts. (Doc. 107 at 16, citing Doc. 98 at ¶¶ 200-202, 217-219, 230-232). This evidence is consistent with that provided by the County, and supports the County's argument that any additional consequences, such as the issuance of an arrest warrant or revocation of pretrial release, are imposed by the county attorney's office or the courts, not the County.

Plaintiffs also rely on Lieutenant Colgan's testimony that he has instructed Jail Diversion Program officers to initiate pretrial services arrests for supervisees with past due or outstanding GPS payments (Doc. 107 at 16, citing Doc. 98 at ¶¶ 238-239, 242-243). But Plaintiffs have not provided evidence that they or any other pretrial supervisees were in fact arrested solely because of past due or outstanding GPS payments. Next, Plaintiffs cite evidence they claim establishes that supervisees are subject to prolonged pretrial detention if they cannot pay initial set up fees. (Doc. 107 at 16, citing Doc. 98 at ¶¶ 64-69). The deposition excerpts Plaintiffs cite do not support this assertion, and are instead consistent with evidence that if a supervisee cannot afford initial equipment fees, the County notifies the County Attorney's Office of the supervisee's failure to successfully enroll in the monitoring program but does not detain the supervisee pending payment unless the court requires enrollment prior to release. (Docs. 104-1 at 5-6; 110-2 at 3-4).

Of the named Plaintiffs, O'Toole is the only one who asserts he was ever detained solely for failure to pay pretrial fees. Plaintiffs point to a Jail Diversion Program case note reflecting that at the time of his arrest on April 15, 2021, O'Toole owed a total of $2,805 for damaged equipment, past due equipment fees, and new equipment fees and needed to pay that amount before being released. (Doc. 98 at ¶ 71, citing Doc. 98-2 at 55). But Plaintiffs have not provided any

evidence the O'Toole was actually required to pay those fees before being released from custody. O'Toole has instead stated in a prior affidavit that he was charged "about $105 to be released, which is the cost of one month of supervision fees." (Doc. 13-4 at ¶ 21). Consistent with O'Toole's statement, Jail Diversion Program records reflect that he paid $105 in pretrial fees on May 7, 2021. (Doc. 98-9 at 13). At around the same time, O'Toole also paid $600 in pretrial fees, at least some of which represented the cost of damaged equipment. Even assuming the County required O'Toole to pay some of his accumulated fees before releasing him, one such instance is generally not sufficient to establish a policy for purposes of imposing municipal liability on the County. *See Benavidez v. County of San Diego*, 993 F.3d 1134, 1154 (9th Cir. 2021).

The undisputed evidence instead demonstrates that existing procedures provide adequate protection for the property interest at stake—the loss of money— minimizing the risk of an erroneous deprivation and obviating the need for additional procedural protections. As outlined above, the Ravalli County Courts are aware of the fees charged for pretrial services and take those fees into account when setting bond and the conditions of release. Pretrial supervisees are given reasonable notice of pretrial fees no later than at the time they enroll in the Jail Diversion Program. Supervisees who have difficulty paying for pretrial services can work with their supervising officer to arrange a payment plan, and also have

the option of moving to the modify the conditions of release at any time, thereby bringing the issue before the court. Supervisees may be heard on their ability to pay pretrial fees at other court hearings as well, including the 90-day bond hearing in District Court and any subsequent revocation hearing. The fact that many of these procedures are provided by the courts rather than the County makes no difference. What matters is that the County has come forward with undisputed evidence demonstrating that pretrial supervisees have an opportunity to be heard at a meaningful time and in a meaningful manner on matters related to Jail Diversion Program fees, including ability to pay. *Mathews*, 424 U.S. at 333.

Balancing all three *Mathews* factors, the Court concludes that Plaintiffs' modest private interest in their monetary property is outweighed by the sufficiency of existing procedures and the County's significant interest in recouping the costs of providing pretrial services necessary to ensure the safety of the community. Because the *Mathews* factors weigh in favor of finding no due process violation, the County's motion for summary judgment on Count 1 of the Second Amended Complaint should be granted and Plaintiffs' cross-motion for summary judgment should be denied.

        b.    *Count 2*

As set forth in Count 2, Plaintiffs' second due process claim alleges that the pretrial fees charged by the County are imposed as "quasi-bail without the

attendant due process protections." (Doc. 34 at ¶ 195). Plaintiffs argue that the County's pretrial fees require the same level of due process protections required of bail because the fees function as a prerequisite to supervisees' pretrial freedom. (Doc. 99 at 16).

To support their assertion that the County's pretrial fees are the functional equivalent of bail, Plaintiffs again rely on deposition testimony by Sheriff Holton, Lieutenant Colgan, and two Jail Diversion Program officers that supervisees may be required to pay initial enrollment fees and GPS equipment fees prior to release. (Doc. 99 at 17, citing Doc. 98 at ¶¶ 64-68). As explained above, however, this testimony is consistent with evidence that if a supervisee cannot afford initial equipment or enrollment fees, the County notifies the County Attorney's Office of the supervisee's failure to successfully enroll in the monitoring program but does not detain the supervisee pending payment unless the court requires enrollment prior to release. (Docs. 104-1 at 5-6; 110-2 at 3-4). Thus, any detention pending payment of the fees necessary for enrollment is not the result of a County policy, but rather the court's order requiring enrollment prior to release.

Plaintiffs further argue that the County's pretrial fees operate as bail because supervisees are not released from jail "unless and until they pay any outstanding balances from previous Jail Diversion Program charges." (Doc. 99 at 17). To support this assertion, Plaintiffs again rely on the Jail Diversion Program case note

41

reflecting that at time of O'Toole arrest in April 2021, he owed the Jail Diversion Program a total of $2,805 and would need to pay that amount before being released. (Doc. 99 at 17, citing Doc. 98 at ¶ 71). But again, even assuming O'Toole was required to pay some of these fees prior to his release, one such instance is not sufficient to establish a County policy.

Although Plaintiffs have said they are not claiming that the imposition of pretrial fees without a criminal conviction is unconstitutional, they invoke the "axiomatic and elementary" principle that "there is a presumption of innocence in favor of the accused" to argue that Jail Diversion Program fees should have even more procedural protections than bail. (Doc. 99 at 18, quoting *Coffin v. United States*, 156 U.S. 432, 453 (1895)). Plaintiffs argue that the Jail Diversion Program does not differentiate between convicted probationers and pretrial supervisees who are legally innocent, and assert that the County justifies its "process-less fees with unsupported assumption that pretrial arrestees are guilty enough to have to pay." (Doc. 99 at 18).

This argument is unpersuasive for two reasons. First, the pretrial fees charged by the County are not "process-less." As addressed at length above, the undisputed evidence demonstrates that pretrial supervisees have an opportunity to be heard at a meaningful time and in a meaningful manner on matters related to Jail Diversion Program fees, including ability to pay. Second, several courts have

upheld the imposition of fees imposed at the pretrial stage against due process challenges. *See e.g., Schlib*, 404 U.S. at 370-71 (finding that statutorily imposed administrative bail fee did not violate due process even though it was imposed on those who were convicted and those who were acquitted); *Payton*, 473 F.3d at 850-51 (relying on *Schlib* to reject a similar due process challenge to a statute authorizing a nominal administrative fee for posting bond); *Spady*, 354 P.3d at 599 (rejecting a due process challenge to pretrial alcohol breath test fees because the fees did not have a punitive effect on pretrial criminal defendants and "were similar to other fees imposed at the pretrial phase, whereby the defendant forfeits some money for the privilege of release").

At oral argument, Plaintiffs pointed out that in *Schlib* and other administrative bail fee cases there was some at least partial refund procedure in place. *See e.g. Schlib*, 404 U.S. at 360-61; *Broussard*, 318 F.3d at 655-56. Plaintiffs rely on these cases to argue that the County's pretrial fee policy violates due process because there is no similar procedure for pretrial supervisees to obtain a refund of Jail Diversion Program fees in the event they are not convicted. But as Plaintiffs conceded at oral argument, none of the named Plaintiffs are in the position of seeking a refund after having been acquitted or otherwise exonerated of their criminal charges. In addition, *Schlib* and *Broussard* are distinguishable in that, unlike administrative bail fees, Jail Diversion Program fees are contractual

and are paid in exchange for specific services, such as pretrial supervision and monitoring. *See Spady,* 354 P.3d at 599.

Plaintiffs also cite *Nelson v. Colorado*, 581 U.S. 1, 28, 136 (2017) for the proposition that the state "may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions" and must provide refund procedures. (Doc. 99 at 18). In *Nelson*, defendants whose convictions were reversed or vacated sought refunds of restitution, fees, and costs exacted from them by the state as a consequence of their convictions. *Nelson*, 581 U.S. at 131. After their convictions were invalidated, the defendants moved for refunds of the amounts they had paid. *Nelson*, 581 U.S. at 132. The Supreme Court determined that once the defendants' "convictions were erased, the presumption of their innocence was restored," and the state had no interest in retaining funds taken from them solely because of their invalidated convictions. *Nelson*, 581 U.S. at 135-36. *Nelson* held that a state statute conditioning a refund on the defendant's proof of innocence by clear and convincing evidence violated due process, and made clear that a state "may not impose anything more than minimal procedures on the refund of exactions dependent upon a conviction subsequently invalidated." *Nelson*, 581 U.S. at 137, 139.

Like the administrative bail fee cases Plaintiffs rely on, *Nelson* is inapposite on this point because none of the named Plaintiffs are in the position of seeking

refunds after having had a conviction reversed or vacated. *Nelson* is also distinguishable because, unlike conviction-related fees and costs, Jail Diversion Program fees are similar to other fees imposed at the pretrial phase, whereby the defendant forfeits some money in exchange for a service and the privilege of release. *See Spady,* 354 P.3d at 599.

Because Plaintiffs have not presented evidence that Jail Diversion Program fees are the functional equivalent of bail, and the undisputed evidence demonstrates that pretrial supervisees have an opportunity to be heard at a meaningful time and in a meaningful manner on matters related to Jail Diversion Program fees, including ability to pay, Count 2 fails as a matter of law.

   c. *Count 4*

Count 4 alleges that the Fourteenth Amendment's Due Process Clause prohibits outcomes in the criminal legal system from hinging on a person's ability to make a monetary payment, and that the County's practice of assessing pretrial fees without considering ability to pay violates procedural due process. (Doc. 34 at ¶¶ 200-201).

As Plaintiffs described it at oral argument, this claim is based on *Griffin v. Illinois*, 351 U.S. 12 (1956) and the theory that due process requires states to waive certain fees for indigent defendants in criminal cases. In *Griffin,* the Supreme Court held that a state law requiring every criminal defendant to pay a fee for a

trial transcript as a prerequisite to filing an appeal constituted "invidious discrimination" and violated the equal protection and due process rights of indigent criminal defendants who were unable to pay the fee. *Griffin,* 351 U.S. at 18. The Supreme Court recognized that there is no constitutional right to appellate review, but made clear that if a state chooses to provide for appellate review, it cannot "do so way in a way that discriminates against some convicted defendants on account of their poverty." *Griffin*, 351 U.S. at 18. The holding in *Griffin* was grounded on the notion that "to deny adequate [appellate] review to the poor means that many of them may lose their life, liberty or property because of unjust convictions which appellate courts would set aside." *Griffin,* 351 U.S. at 19. *Griffin* reasoned that "[s]uch a denial is a misfit in a country dedicated to affording equal justice to all and special privileges to none in the administration of its criminal law." *Griffin*, 351 U.S. at 19.

Analogizing to *Griffin*, Plaintiffs argue that because the County has chosen to provide pretrial services, it cannot do so in a way that discriminates against supervisees based on their poverty and should be required to waive pretrial fees for supervisees who cannot afford them. But because Plaintiffs do not assert a fundamental liberty interest as the basis for their procedural due process claims, *Griffin* does not apply. The Supreme Court has generally limited application of *Griffin*'s equality principles to cases where fundamental rights or interests are at

stake. *See e.g.*, *Bearden v. Georgia,* 461 U.S. 660 (1983) (incarceration and liberty interests); *Williams v. Illinois*, 399 U.S. 235 (1970) (incarceration and liberty interests); *Tate v. Short*, 401 U.S. 395 (1971); *Boddie v. Connecticut*, 401 U.S. 371 (1971) (access to courts); *M.L.B. v. S.L.J.*, 519 U.S. 102, 114, 116 (1996) (access to courts).

Here, as discussed at length above, the summary judgment record demonstrates that the County does not have a policy of incarcerating indigent supervisees for failure to Jail Diversion Program fees. Because there are no fundamental rights or interests at issue, *Griffin* does not apply. To the extent Plaintiffs claim that due process requires the County to waive Jail Diversion Program fees for indigent defendants, Count 4 fails as a matter of law. To the extent Count 4 simply asserts that the County has a practice of assessing pretrial fees without considering ability to pay in violation of procedural due process, Count 4 is duplicative of Count 1 and fails for all of the same reasons.

        d.    *Count 5*

Count 5 is similar to Count 4 in that it alleges the County provides constitutionally deficient due process by assessing pretrial fees without considering ability to pay, but additionally alleges that in doing so, the County effectively criminalizes poverty by incarcerating pretrial arrestees because of their inability to afford pretrial fees. (Doc. 34 at ¶¶ 204-05).

Although Count 5 is titled "Violation of Procedural Due Process for Incarceration for Non-Payment of Fees," Plaintiffs made clear in their summary judgment briefing and again at oral argument that their procedural due process claims are based solely on their asserted interest in monetary property. (Doc. 107 at 17-18). In opposing summary judgment on Count 5, Plaintiffs argue there are issues of fact regarding whether the County incarcerates supervisees for failure to pay Jail Diversion Program fees. Plaintiffs challenge the County's assertion that the consequences of failing to pay for services, if any, are determined by court, not the County, and contend the County "punishes" supervisees for failure to pay. (Doc. 107 at 28). Plaintiffs again cite deposition testimony that pretrial services officers report the failure to pay pretrial fees to the courts (Doc. 98 at ¶¶ 200-202), have the authority to arrest supervisees for failure to comply with conditions of release without prior approval from the county attorney (Doc. 98 at ¶¶ 238-243), and may remove supervisees from pretrial services for failure to pay fees (Doc. 98 at ¶¶ 206-217).

This deposition testimony is consistent with evidence provided by the County, which demonstrates that if a supervisee fails to pay for Jail Diversion Program services while enrolled in the program, or does not submit to testing because they claim inability to pay, that failure is documented for the County Attorney's Office, and it is the county attorney who decides whether to seek an

arrest warrant. (Doc. 50-1 at ¶¶ 4, 7; Doc. 69-3 at ¶ 7). The courts, in turn, are responsible for determining whether to issue an arrest warrant and whether to revoke pretrial release. Pretrial services officers do not arrest supervisees for failure to pay Jail Diversion Program fees, and do not ordinarily arrest supervisees without a warrant or other court order. (Doc. 110 at ¶ 18, citing Doc. 110-3 at 2-4; Doc. 69-3 at ¶ 7). Notably, Plaintiffs have not cited to any instance in which the County has arrested a pretrial supervisee for failure to pay Jail Diversion Program fees the supervisee could not afford, or for failure to participate in court-ordered drug or alcohol testing due to inability to pay.

As addressed above, the County has demonstrated that pretrial supervisees have an adequate opportunity to be heard on matters related to Jail Diversion Program fees, including ability to pay. The County has also provided undisputed evidence that it does not have a policy of incarcerating supervisees for failure to pay fees. If a supervisee cannot afford equipment fees at the time of enrollment in the Jail Diversion program, the supervisee is enrolled in the program for purposes of supervision but not for purposes of any equipment-related testing or monitoring. (Doc. 110 at ¶ 9, citing Doc. 110-2 at 3-4). The Ravalli County Attorney's Office is notified of the failure to enroll for equipment monitoring, but the County does not detain or arrest the supervisee pending payment. (Doc. 110 at ¶ 9, citing Doc. 110-2 at 3-4). Supervisees who cannot afford to pay for the first month of court-

49

ordered GPS monitoring equipment at the time of enrollment are not held in jail

unless the court orders they be held until they can obtain the equipment. (Doc. 110

at ¶¶ 9, 22). For all of the above reasons, the County is entitled to summary

judgment on Count 5.

e.    *Count 9*

Count 9 alleges the County requires pretrial arrestees to sign "coercive

contracts" agreeing to further criminal charges if they do not comply with certain

pretrial conditions in violation of due process. (Doc. 34 at ¶¶ 219-23). Specifically,

Plaintiffs allege the County requires supervisees "to sign a contract stating that

they can be criminally charged with felony theft and criminal mischief if they do

not maintain contact with the Jail Diversion officer or if they damage the devices

they are required to use or wear, such as a GPS ankle monitor or an alcohol

monitoring alcohol device." (Doc. 34 at ¶ 159).

The County argues this claim fails as a matter of law because Plaintiffs do

not have a constitutionally protected right to avoid prosecution for criminal

conduct. *See Beal v. Missouri Pacific R. R. Corp.*, 312 U.S. 45, 49 (1941) ("No

citizen or member of the community is immune from prosecution, in good faith,

for his alleged criminal acts."). Plaintiffs could potentially face prosecution under

Montana's criminal mischief and theft statutes regardless of whether they signed

the County's contract. *See* Mont. Code Ann. §§ 45-6-101, 45-6-301. Because any

potential criminal liability arises not from the County's contract but by operation of law, Plaintiffs cannot show that the County's policy of requiring supervisees to sign the contracts results in a constitutional violation and Count 9 is subject to summary dismissal. *See Edwards v. Leaders in Community Alternatives, Inc.*, 850 Fed. Appx. 503 (9th Cir. 2021), 50 Fed. Appx. 503 (2021) (finding that statements about the potential consequences of failing to pay pretrial supervision fees were not wrongful and were within legal bounds).

**B.    Equal Protection (Counts 6 and 7)**

The Equal Protection Clause of the Fourteenth Amendment prohibits the government from denying individuals equal protection of the laws, "which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Plaintiffs' federal equal protection claim is set forth in Count 6 of the Second Amended Complaint, which alleges wealth-based discrimination in violation of the Fourteenth Amendment.[4] (Doc. 34 at 57 ¶¶ 207-10). Plaintiffs claim that the County treats similarly situated pretrial arrestees "differently based on whether

---

[4] Count 7 asserts a state equal protection claim for social condition discrimination under the equal protection clause of Article II, § 4 of the Montana Constitution. (Doc. 34 at ¶¶ 212-214). Because this claim is the state law equivalent of Plaintiffs' federal equal protection claim, it rises and falls with Count 6.

they are indigent" and "[i]ndigent pre-trial arrestees risk incarceration simply because they cannot afford pre-trial fees." (Doc. 34 at ¶ 209).

Equal protection claims can be divided into three general categories: (1) claims that an official policy discriminates on its face; (2) claims that application of a facially neutral policy intentionally has a disparate impact on a particular class; and (3) claims that a facially neutral policy is being unequally administered. *See E&T Realty v. Strickland*, 830 F.2d 1107, 1113 n.5 (11th Cir. 1987); *Waln v. Dyart School District,* 522 F.Supp.3d 560, 607 (D. Ariz. 2021), re'vd on other grounds, 54 F.4th 1152 (9th Cir. 2022).

Plaintiffs are asserting equal protection violations under the first two theories. Plaintiffs do not claim that the County charges different amounts for Jail Diversion Program services based on wealth, or that it treats the failure to comply with conditions of the program any differently based on wealth. Rather, they claim the County's Jail Diversion Program fee policy has an intentionally disparate impact on indigent supervisees, and is facially discriminatory because it promises different criminal outcomes for those who cannot afford the fees compared to those who can. (Doc. 99 at 23).

1.    Disparate Impact

"Proof of discriminatory intent is required to show that state action having a disparate impact violates the Equal Protection Clause." *McLean v. Crabtree*, 173

F.3d 1176, 1185 (9th Cir. 1999). At the motion to dismiss stage, the Court found that discriminatory intent could be inferred from Plaintiffs' allegations that the County had a policy of requiring pretrial supervisees to pay Jail Diversion Program fees without considering ability to pay and incarcerating supervisees for nonpayment. (Doc. 78 at 39-40).

Plaintiffs' allegation that the County has a policy of incarcerating supervisees for non-willful failure to pay pretrial fees was critical to the Court's conclusion that Plaintiffs had alleged sufficient facts from which a reasonable inference of discriminatory intent could be made. As discussed above, however, the evidence submitted on the parties' cross-motions for summary judgment shows that the County does not have a policy of incarcerating supervisees who fail to pay Jail Diversion Program fees because they cannot afford do so. Plaintiffs have not provided evidence that they were arrested or detained solely for failure to pay Jail Diversion Program fees, or provided evidence of any other instance in which the County has arrested and detained a pretrial supervisee solely for failure to pay pretrial fees the supervisee could not afford, or for failure to participate in court-ordered drug or alcohol testing due to inability to pay. Rather, as outlined above, the undisputed evidence demonstrates that the County's policy is that supervisees who fail to pay pretrial fees, either because they choose not to or because they

cannot afford to do so, may be removed from pretrial services and a violation report may be sent to the court.

Even if Plaintiffs could demonstrate discriminatory intent, the County argues their equal protection claim fails under rational basis review. Plaintiffs counter that although wealth is not a suspect classification, strict scrutiny applies because the County's "fee regime" impinges on a fundamental right. (Doc. 99 at 29). *See San Antonio Indep. School District v. Rodriguez*, 411 U.S. 1, 17 (1973) (strict scrutiny applies if the classification impinges on a fundamental right or the classification is itself suspect).

Plaintiffs are correct that at the motion to dismiss stage, this Court held their equal protection claim was subject to a heightened strict scrutiny standard of review because it alleged the deprivation of fundamental liberty interests. (Doc. 78 at 41-44). The Court relied in large part on *Buffin v. California*, 2018 WL 424362, at *7-10 (N.D. Cal. Jan 16, 2018), which applied strict scrutiny to claims by a class of pretrial detainees that the defendant's use of a countywide bail schedule violated their equal protection rights because it failed to take into account their ability to pay preset mandatory bail amounts. Because the plaintiffs alleged "the deprivation of the fundamental right to personal liberty," the *Buffin* court concluded their equal protection claims were subject to strict scrutiny review. *Buffin*, 2018 WL 424362,

at *8-10 (relying on *Bearden v. Georgia*, 461 U.S. 660 (1983), *Tate v. Short*, 401 U.S. 395 (1971), and *Williams v. Illinois*, 399 U.S. 235 (1970)).

Analogizing to *Buffin*, this Court concluded that because Plaintiffs were claiming the County has an unconstitutional policy of requiring pretrial arrestees to pay Jail Diversion Program fees without considering their ability to pay and incarcerating them for nonpayment, Plaintiffs alleged a wealth-based liberty deprivation triggering strict scrutiny review. (Doc. 78 at 44). Plaintiffs' allegation that the County had a policy of incarcerating pretrial supervisees for failure to pay fees they could not afford was central to the Court's conclusion. As discussed at length above, however, the summary judgment record demonstrates that the County does not incarcerate supervisees for non-willful failure to Jail Diversion Program fees, but rather may remove them from pretrial services and notify the County Attorney's Office and the court. Because the uncontroverted evidence also shows that the courts do not revoke pretrial release solely for failure to pay Jail Diversion Program fees, Plaintiffs have not and cannot establish that the County has a policy which results in the deprivation of a wealth-based liberty interest. The Court therefore applies rational basis review to Plaintiff's equal protection claim.

"Rational basis review asks whether 'there is a rational relationship between disparity of treatment and some legitimate purpose.'" *Erotic Service Provider Legal Education and Research Project v. Gascon*, 880 F.3d 450, 457 (9th Cir.

2018), *amended* 881 F.3d 792 (9th Cir. 2018) (citation omitted). This standard of review "is highly deferential to the government, allowing any conceivable rational basis to suffice." *Erotic Service Provider,* 880 F.3d at 457 (citation omitted). Rational basis review involves a two-step analysis: (1) whether the challenged government policy serves a legitimate purpose; and (2) whether the challenged policy promotes that purpose. *Erotic Service Provider*, 880 F.3d at 457.

The County's Jail Diversion Program fee policy survives rational basis review. First, the County has a legitimate interest in supervising individuals on pretrial release to ensure that they appear at future court proceedings and to ensure the safety of the community. Relatedly, the County also has a legitimate interest in in recouping the costs associated with providing the pretrial services necessary to protect to the community and ensure that supervisees appear in court. In fact, the County's interest in recouping the costs of pretrial monitoring is statutorily recognized in Montana. *See* Mont. Code ann. § 46-9-108(2)(b) (providing that "[t]he court may require as a condition of release that the defendant pay for the costs of the electronic monitoring or alcohol monitoring").

Second, the County's policy of requiring supervisees to pay Jail Diversion Program fees for pretrial services is rationally related to the County's legitimate interest in offsetting the cost of providing the pretrial services necessary to protect the community and ensure that supervisees appear in court. The County's policy of

removing supervisees who fail to pay those fees from pretrial services and

notifying the court is also rationally related that interest. *See Ortwein v. Schwab*,

401 U.S. 656, 660-61 (1973) (concluding that an appellate court filing fee in a civil

action did not violate equal protection because wealth is not a suspect class and the

fee was rationally related to the state's interest in offsetting court operating costs).

Accordingly, the County's Jail Diversion Program fee policy survives rational

basis review, and Plaintiffs' equal protection claim fails as a matter of law to the

extent it is based on a disparate impact theory.

### 2.    Facial Discrimination

To succeed on a facial challenge, Plaintiffs must show "that no set of

circumstances exists under which" the County's policy "would be valid." *United

States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiffs' argument is not that the

facially neutral Jail Diversion Program fees are themselves discriminatory, but that

the County's "policy of penalizing non-willful non-payment is facially

discriminatory because it promises different criminal outcomes for those who

cannot afford fees compared to those who can." (Doc. 99 at 23).

As they did at the motion to dismiss stage, Plaintiffs analogize to *Griffin v.

Illinois*, 351 U.S. 12, 18 (1956), in which the Supreme Court held that a state law

requiring every criminal defendant to pay a fee for a trial transcript as a

prerequisite to filing an appeal violated the equal protection and due process rights

of indigent criminal defendants who were unable to pay the fee. Relying on equal

protection and due process concepts, the Court found the law constituted

"invidious discrimination" in violation of the Fourteenth Amendment because

there was "no meaningful distinction between a rule which would deny the poor

the right to defend themselves in a trial court and one which effectively denies the

poor an adequate appellate review accorded to all who have money enough to pay

the costs in advance." *Griffin,* 351 U.S. at 18.

   *Griffin* provided the foundation for *Bearden v. Georgia*, 461 U.S. 660, 664-

65 (1983), which recognized that "[d]ue process and equal protection principles

converge" when considering cases involving "the treatment of indigents in our

criminal justice system." *Bearden* identified four factors for courts to use when

evaluating claims of unconstitutional wealth-based discrimination: (1) "the nature

of the individual interest affected"; (2) the extent to which that interest is affected;

(3) "the rationality of the connection between legislative means and purpose," and

(4) whether "alternative means for effectuating the purpose" exist. *Bearden*, 461

U.S. at 666-67.

   Applying these factors to the evidence presented on the parties' cross-

motions for summary judgment, Plaintiffs' wealth-based equal protection claim

fails as a matter of law. First, as explained in the procedural due process analysis

above, the individual interest affected by the County's fee policy is not a

fundamental liberty interest, but rather a relatively modest property interest in money paid for Jail Diversion Program fees. Second, the extent to which that interest is affected is not great, given that Plaintiffs only paid a small portion of their accumulated fees and there is no evidence that their pretrial release was revoked solely for failure to pay. Moreover, as further explained in the procedural due process analysis above, supervisees have an adequate opportunity to be heard regarding their ability to pay pretrial fees. Third, as addressed in the preceding disparate impact analysis, the County's policy of charging pretrial fees, and removing supervisees from services if they fail to pay and reporting that failure to the county attorney and the courts, is rationally related to the County's legitimate interests. Finally, because existing procedures provide supervisees with adequate notice and opportunity to be heard regarding ability to pay, the Court need not consider whether there are alternative means for effectuating the same purpose. Because Plaintiffs' facial challenge claim fails under the *Bearden* analysis, and their disparate impact claim also fails as a matter of law, the County is entitled to summary judgment on Counts 6 and 7 of the Second Amended Complaint.

### C.    Discrimination Based on Homeless Status (Count 3)

Count 3 alleges that the County discriminates against unhoused pretrial arrestees on alcohol monitoring by demanding that they pay a multi-thousand-dollar cash deposit before being released from jail, thereby criminalizing

homelessness in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. (Doc. 34 at ¶ 197). To support the legal viability of this claim, Plaintiffs rely on and analogize to Ninth Circuit caselaw holding that criminalizing homelessness is cruel and unusual punishment in violation of the Constitution. (Doc. 34 at ¶¶ 130, 135). *See e.g. Johnson v. City of Grants Pass*, 72 F.4th 868, 896 (9th Cir. 2023) (holding that the defendant city could not, "consistent with the Eighth Amendment, enforce its anti-camping ordinances against homeless persons for the mere act of sleeping outside…when there is no other place in the City for them to go"); *Martin v. City of Boise*, 920 F.3d 584, 617 (9th Cir. 2019) ("just as the state may not criminalize the state of being 'homeless in public places', the state may not criminalize conduct that is an unavoidable consequence of being homeless—namely siting, lying, or sleeping on the streets'").

Assuming the Eighth Amendment theory advanced in Count 3 is a viable one, the County argues it is entitled to summary judgment because Plaintiffs' factual allegations are inconsistent with the undisputed evidence. The County requires a $500 deposit for SCRAM CAM equipment from supervisees who live out of state, have a history of absconding, have a history of damaging or losing Jail Diversion Program equipment, or pose a substantial risk of flight. (Doc. 110 at ¶10). The monitoring equipment does require a telephone connection, which may not be available to a homeless person. (Doc. 110 at ¶ 11). But as the County rightly

contends, the fact that it is not capable of providing remote alcohol monitoring due to technological factors does not amount to a policy of refusing pretrial services based on homelessness. The record instead reflects that the County has a policy of requiring a $500 equipment fee deposit from supervisees who have been identified by pretrial supervision officers as posing a risk of flight—a determination that is made based on several factors. (Doc. 110 at ¶¶ 10-14). While the inability to maintain a stable address may factor into that determination, the record does not support Plaintiffs' assertion that the County's policy of requiring an equipment deposit from supervisees who pose a flight risk criminalizes homelessness. Moreover, as addressed above, the County does not hold supervisees who cannot afford equipment fees in jail unless the court orders they be held until they can obtain the equipment. (Doc. 110 at ¶¶ 9, 22). Accordingly, Plaintiffs' claim that the County's policy of charging equipment deposits criminalizes homelessness in violation of the Eighth Amendment is subject to summary dismissal.

To the extent Plaintiffs allege the County's application of the Jail Diversion Fee policy violates the Equal Protection Clause, homelessness is not a suspect class and the rational relationship test thus applies to any claims of discriminatory treatment based on homelessness. See *Nails. v Haid*, 2013 WL 5230689, at *3 (C.D. Cal. Sept. 17, 2013); *Joel v. City of Orlando*, 232 F.3d 1353, 1357 (11th Cir.

2000) ("Homeless persons are not a suspect class.")). The Jail Diversion Program fee policy survives rational basis review for the same reasons discussed above.

### D.    False Imprisonment (Count 8)

Count 8 alleges the County "unlawfully detains pre-trial arrestees beyond their release date by conditioning their release on the unconstitutional payment of whatever arbitrary dollar amount in pre-trial fees that [the County] demands," on the theory that doing so constitutes false imprisonment of pretrial arrestees who are unable to afford to pay those fees. (Doc. 34 at ¶¶ 216-17).

Under Montana law, "[t]he two elements of false imprisonment are the restraint of an individual against his well and the unlawfulness of such restraint." *Hughes v. Pullman*, 36 P.3d 339, 343 (Mont. 2001). The County argues, and the Court agrees, that this claim fails because, as explained above, the undisputed evidence demonstrates that the County does not detain supervisees for failure to pay Jail Diversion Program fees.

### E.    *Monell* Liability

Returning to the municipal liability factors under *Monell*, the Court concludes Plaintiffs' § 1983 claims against the County fail as a matter of law for several reasons. First, as discussed at length above, Plaintiffs have not shown an underlying violation of their Fourteenth Amendment procedural due process and equal protection rights, their Eighth Amendment right to be free from cruel and

unusual punishment, or any other constitutional rights. Second, Plaintiffs have not provided evidence to support the inference that the County has a municipal custom, policy, or practice of requiring pretrial supervisees to pay Jail Diversion Program fees without considering ability to pay and incarcerating pretrial supervisees for nonpayment. To the extent Plaintiffs argue for the first time on summary judgment that the County has ten specific policies of not providing prior notice of fees; not allowing fees to be contested; charging exorbitant fees; charging uncapped fees; not waiving fees; not reimbursing fees; charging arbitrary fees; promising punishment for non-payment of fees; imposing penalties for non-payment of fees; and using homelessness as a proxy for flight risk in charging device deposits, Plaintiffs either fail to present evidence to support the inference the policies exist or, if the policy does exist, that the policy was the moving force behind any alleged constitutional violation.

Because the County is entitled to summary judgment on all claims for the reasons outline above, the Court does not address quasi-judicial immunity or the County's arguments regarding class certification.

## IV.    Conclusion

For the reasons discussed above,

IT IS RECOMMENDED that the County's motion for summary judgment (Doc. 100) on all claims in the Second Amended Complaint be GRANTED,

Plaintiffs' cross-motion for partial summary judgment as to liability on Counts 1, 2, 4, and 6 (Doc. 97) be DENIED, and this case be dismissed.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendation of the United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.

DATED this 27th day of June, 2024.

Kathleen L. DeSoto
United States Magistrate Judge